1 | GERGOSIAN & GRALEWSKI LLP
Edward M. Gergosian (105679)

2 | 655 West Broadway, Suite 1410
San Diego, CA 92101

3 | Telephone: (619) 237-9500
Facsimile: (619) 237-9555

4 |

5 | SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Nichole Browning (251937)

6 | 2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598

7 | Telephone: (925) 945-0770
Facsimile: (925) 945-8792

8 | -and-
Eric L. Zagar (250519)

9 | Tara P. Kao
280 King of Prussia Road

10 | Radnor, PA 19087
Telephone: (610) 667-7706

11 | Facsimile: (610) 667-7056

12 | *Counsel for Plaintiff*

**FILED**

**08 FEB -7 PM 3: 50**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

13 | UNITED STATES DISTRICT COURT

14 | SOUTHERN DISTRICT OF CALIFORNIA

15 |

16 | CHARLES GRAHAM, Derivatively on Behalf of Nominal Defendant LEAP WIRELESS INTERNATIONAL, INC.,

Case No. **08 CV 0246 L NLS**

17 | Plaintiff,

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

18 |

19 | vs.

**JURY TRIAL DEMANDED**

20 | S. DOUGLAS HUTCHESON, AMIN KHALIFA, GRANT BURTON, DEAN M. LUVISA, MICHAEL B. TARGOFF, JOHN D.

21 | HARKEY, JR., ROBERT V. LAPENTA, MARK H. RACHESKY, M.D., and JAMES D.

22 | DONDERO,

23 | Defendants,

24 | and

25 | LEAP WIRELESS INTERNATIONAL, INC.,

26 | Nominal Defendant.

27 |

28 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      This is a shareholder's derivative action brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure for the benefit of nominal defendant LEAP Wireless International, Inc. ("LEAP" or the "Company") against the members of its Board of Directors (the "Board") and certain executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, insider trading and other violations of law.

2.      The Individual Defendants (defined herein) breached their fiduciary duties by knowingly making false and misleading statements and failing to disclose material facts about LEAP and its business in violation of the federal securities laws, including §10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Specifically, the Individual Defendants, especially the Audit Committee, knew that they were not properly accounting for the Company's service revenues, equipment revenues, and operating expenses under Generally Accepted Accounting Principles ("GAAP"). On November 9, 2007, their improper practice finally fell apart when the Company announced that it expects to restate its financial results from 2004 through 2007 to correct these accounting errors. Notably, two months before this surprising announcement, on September 7, 2007, the Company announced that its Chief Financial Officer, Amin Khalifa, was resigning from his position with the Company.

3.      As a result of the Individual Defendants' misconduct, the Company was required to make adjustments, which admittedly affected its historical financial results. In fact, on December 14, 2007, the Company restated its financial statements for the years ended December 31, 2006 and 2005 (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 and for the period from January 1, 2004 to July 31, 2004. In addition, the Company has announced it is restating the condensed consolidated financial statements as of and for the quarterly periods ended June 30, 2007 and March 31, 2007. Over these periods, the restatement had a net cumulative impact of *approximately $8 million on service revenues and approximately $23 million on operating income*.

4.    Based on their knowledge of material non-public information regarding their misconduct, the Individual Defendants collectively sold over 500,000 shares of LEAP common stock at artificially inflated prices, garnering proceedings totaling over *$47 million*.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

6.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

7.    Plaintiff Charles Graham is, and was at all relevant times, a shareholder of nominal defendant LEAP.

8.    Nominal Defendant LEAP is incorporated in the State of Delaware and is headquartered at 10307 Pacific Center Court, San Diego, California.  LEAP is a wireless communications carrier that offers digital wireless service in the United States under the Cricket ® ("Cricket") and Jump TM Mobile ("Jump") brands.  Cricket service offers customers unlimited wireless service for a flat monthly rate without requiring a fixed-term contract or credit check.  Jump offers customers a per-minute prepaid wireless service.  LEAP conducts operations through its subsidiaries and has no independent operations or sources of operating revenue other than through dividends, if any, from its subsidiaries.

9.    Defendant Stewart Douglas Hutcheson ("Hutcheson") has been Chief Executive Officer ("CEO") and President of the Company and Cricket since February 2005.  Hutcheson also serves as a Director of the Company.  As of September 6, 2007, Hutcheson became the Company's and Cricket's interim Chief Financial Officer ("CFO") in addition to serving as CEO and President of

2

1    the Company and Cricket. Hutcheson previously served as President and CFO of the Company and

2    Cricket from January 2005 through February 2005, as Executive Vice President and CFO from

3    January 2004 through January 2005, and as Senior Vice President and CFO from August 2002 to

4    January 2004. Hutcheson also served as Senior Vice President, Chief Strategy Officer of the

5    Company from March 2002 to August 2002, as Senior Vice President, Product Development and

6    Strategic Planning from July 2000 to March 2002, as Senior Vice President, Business Development

7    from March 1999 to July 2000 and as Vice President, Business Development from September 1998 to

8    March 1999.

9        10.    In 2007, Defendant Hutcheson sold approximately 23,923 of his personally held shares

10   of LEAP common stock for proceeds of approximately $1.9 million, while in possession of material

11   non-public information concerning the Company's accounting improprieties.

12       11.    Defendant Amin Khalifa ("Khalifa") was the Executive Vice President and CFO of the

13   Company, Cricket and their domestic subsidiaries, from July 25, 2006 until his resignation on or

14   about September 6, 2007.

15       12.    Defendant Grant Burton ("Burton") was, at all relevant times, Vice President, Chief

16   Accounting Officer and Controller of the Company.

17       13.    Defendant Dean M. Luvisa ("Luvisa") was the Company's acting CFO and Vice

18   President, Finance from March 2006 to July 25, 2006, having previously served as its acting CFO,

19   Vice President, Finance and Treasurer from February 2005 to March 2006, Vice President, Finance,

20   and Treasurer from May 2002 to February 2005 and as its Vice President, Finance from September

21   1998 to May 2002.

22       14.    In 2007, Defendant Luvisa sold approximately 4,233 of his personally held shares of

23   LEAP common stock for proceeds of approximately $243,000, while in possession of material non-

24   public information concerning the Company's accounting improprieties.

25       15.    Collectively, defendants Hutcheson, Khalifa, Burton, and Luvisa are referred to herein

26   as the "Officer Defendants."

27       16.    Defendant Michael B. Targoff ("Targoff") has served as a director of the Company and

28   a member of the Board's Audit Committee and Compensation Committee since September 1998.

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17. In 2007, Defendant Targoff sold 35,000 of his personally held shares of LEAP common stock for proceeds of approximately $2.9 million, while in possession of material non-public information concerning the Company's accounting improprieties.

18. Defendant John D. Harkey, Jr. ("Harkey") has served as a director of the Company and as a member of the Board's Audit Committee since March 2005.

19. Defendant Robert V. LaPenta ("LaPenta") has served as a director of the Company and as a member of the Board's Audit Committee since March 2005.

20. Collectively, defendants Targoff, Harkey, and LaPenta are referred to herein as the "Audit Committee Defendants."

21. Defendant Mark H. Rachesky, M.D. ("Rachesky") was, at all relevant times, Chairman of the Board and a member of the Board's Compensation Committee. Rachesky is the founder and President of MHR Fund Management LLC. According to the Company's most recent Proxy Statement, Rachesky is an indirect beneficial owner of approximately 17.3 percent of the Company's common stock through his affiliation with MHR Fund Management LLC and related entities.

22. Defendant James D. Dondero ("Dondero") joined the Board in 2004 and served as Chairman of the Board's Compensation Committee until he resigned on or about September 10, 2007. Dondero was, at all relevant times, President of Highland Capital Management, L.P. According to the Company's most recent Proxy Statement, Dondero is an indirect beneficial owner of approximately 6.9 percent of the Company's common stock through his affiliation with Highland Capital Management, L.P.

23. In 2007, Dondero sold 505,000 LEAP shares for proceeds of approximately $42 million that he indirectly beneficially owned through his affiliation with Highland Capital Management, L.P. and related entities.

24. Collectively, defendants Hutcheson, Targoff, Harkey, LaPenta, Rachesky, and Dondero are referred to herein as the "Director Defendants."

25. Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

26.   By reason of their positions as officers, directors, and/or fiduciaries of LEAP and because of their ability to control the business and corporate affairs of LEAP, the Individual Defendants owed LEAP and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage LEAP in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LEAP and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to LEAP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of LEAP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with LEAP, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

28.   To discharge their duties, the officers and directors of LEAP were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of LEAP were required to, among other things:

a.   exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.   exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

c.     exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP;

d.     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

e.     refrain from acting upon material inside corporate information to benefit themselves.

29.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and for ensuring that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

a.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(i)     transactions are executed in accordance with management's general of specific authorization;

(ii)     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

30.     Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

31.     According to SAS 55.13:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

32.     LEAP's Audit Committee Charter provides that the Audit Committee shall, among other things:

a.      "[O]versee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;"

b.      "[M]eet with management, the independent auditor and the senior internal audit executive in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit;"

c.      "[R]eview and discuss with management and the independent auditor: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, complex or unusual transactions, highly judgmental areas and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (C) the effect of recent regulatory and professional accounting pronouncements, as well as off-balance sheet structures, on the Company's financial statements;"

d.      "[R]eview and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations' and consider whether they are complete and consistent with information known to committee members;"

e.      "[R]eview and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;" and

f.      "[B]e directly responsible for the appointment, compensation and oversight of the Company's senior internal audit executive, and the senior internal audit executive shall report directly to the Committee. In furtherance of this responsibility, the Committee shall have the sole authority to appoint or replace the senior internal audit executive. The Committee shall consult with management but shall not delegate

7
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

these responsibilities. The Committee shall periodically review the effectiveness of the internal audit function."

33.     As alleged in detail herein, the Individual Defendants (particularly the Officer Defendants Hutcheson, Khalifa, Burton, and Luvisa and the Audit Committee Defendants Targoff, Harkey and LaPenta), failed to implement and maintain adequate internal control systems for the Company, and thereby violated: (i) their fiduciary duties of good faith and loyalty; (ii) GAAP; and (iii) as to the Audit Committee Defendants, the Audit Committee Charter.

### FACTUAL ALLEGATION
#### *The Individual Defendants Abdicate Their Fiduciary Duties*

34.     Between August 2004 and November 2007, the Individual Defendants knew that the Company's internal financial controls were ineffective. The Individual Defendants' failure to ensure effective internal controls at LEAP resulted in the Company materially overstating its financial results by improperly recognizing revenue.

35.     Since 2004, the Individual Defendants received numerous reports regarding problems with LEAP's accounting and financial reporting practices and internal controls. Through their receipt of weekly, monthly, and quarterly reports, attendance at Board and Audit Committee meetings, review of the Company's financial statements, conversations with the Company's management, internal auditors, and external auditors, the Individual Defendants knew that LEAP's accounting and financial reporting practices were improper, and its internal controls were materially deficient.

36.     In breach of their fiduciary duty of good faith and loyalty, the Individual Defendants willfully ignored the obvious and pervasive problems with LEAP's accounting and internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. The material non-public information discussed above was well known among LEAP insiders, including the Officer Defendants and Audit Committee Defendants, who comprise the entire executive corps of the Company and its entire Board, and was discussed formally and informally during LEAP Board and committee meetings, management meetings, and other meetings attended by the Individual Defendants. Indeed, the Individual Defendants were keenly aware that the Company

1    was engaging in improper accounting practices, which resulted in the $31 million restatement of the

2    Company's historical financial results.

3        37.    The Individual Defendants, particularly the Audit Committee Defendants, prepared

4    and/or reviewed the 2004-2007 financial statements, which were disseminated to shareholders and

5    filed with the U.S Securities and Exchange Commission ("SEC").    Moreover, the Individual

6    Defendants, because of their knowledge and participation in the improper accounting practices, knew

7    that 2004-2007 financial statements were materially false and misleading.

8        38.    As such, during the relevant period, the Individual Defendants, especially Audit

9    Committee Defendants, knowingly caused the Company to make a series of false and misleading

10    statements concerning the Company's financial condition, materially misrepresenting that the

11    Company's financial condition was better than it actually was.    Furthermore, the Individual

12    Defendants made a series of false and misleading statements concerning the condition of the

13    Company's internal controls, materially misrepresenting that the Company maintained sound internal

14    controls and was able to regulate its business in accordance with applicable laws and regulations.  As

15    a result of these materially false and misleading statements that they knew were untrue, the Individual

16    Defendants caused the Company's stock price to be artificially inflated.  Furthermore, the Individual

17    Defendants engaged in an improper practice knowing that it would and did cause harm to the

18    Company and subject the Company to costs, fines, and other damages associated with their unlawful

19    and improper business practices.

20        39.    Specifically, since 2004, the Company, with the knowledge, approval, and/or

21    acquiescence of the Individual Defendants, regularly and systematically violated GAAP by, among

22    other things:

23        a.    improperly recognizing for revenue from customers who had voluntarily discontinued

24        service;

25        b.    improperly accounting for the timing and recognition of certain service revenues and

26        operating expenses; and

27        c.    improperly failing to maintain adequate internal accounting and financial reporting

28        controls.

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

40.     Despite the Company's improper and materially misleading financial statements, and the fact that the Individual Defendants are and have been aware of improprieties, the Company's stock price soared in 2007.  The Company's common stock peaked in 2007 at $98.33 per share on July 23, 2007 when it was trading in the mid-$20s in August 2004.

41.     This dramatic stock-increase is a direct result of the Individual Defendants' improper accounting of the Company's service revenues, equipment revenues, and operating expenses and the deliberate overstatement of the Company's financial performance in the Company's Form 10-K and 10-Qs.

### *The Individual Defendants' Insider Selling*

42.     With knowledge of their improper accounting practices and its effect on the Company's financial statements, the Individual Defendants sold their personal shares of LEAP stock at artificially inflated prices.

43.     The Individual Defendants knew that once the truth regarding their misconduct came to light, LEAP's stock price would fall significantly.  Indeed, on November 9, 2007 when the Individual Defendants were forced to disclose the problems at LEAP, the stock price of LEAP common stock plummeted $21.38, or 36.8%, from $58.10 to a low of $ 36.72, and has continued its downward slide.

44.     Specifically, in contravention of their fiduciary duties of good faith and loyalty, defendants Dondero, Hutcheson, Luvisa and Targoff, with the knowledge that the Company's financial statements were false and materially misstated, sold more than *$47 million* worth of Company stock in order to line their own pockets, and the pockets of their affiliates, while unwitting investors rushed to get a piece of the LEAP action, and while the Individual Defendants continued to further impair the Company's financial and operating condition.

45.     The below table depicts the stock sales by defendants Dondero, Hutcheson, Luvisa and Targoff in 2007 based upon unlawful inside information:

//

//

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Defendant Name | Transaction Date | Number of Shares Sold | Price | Total Proceeds |
|---|---|---|---|---|
| Dondero | 05/23/07 | 90,000 | $85.68 | $7,711,200.00 |
| | 05/30/07 | 200,000 | $84.89 | $16,978,000.00 |
| | 06/07/07 | 75,000 | $83.29 | $6,246,750.00 |
| | 06/08/07 | 140,000 | $83.93 | $11,750,200.00 |
| | | **505,000** | | **$42,686,150.00** |
| Hutcheson | 02/27/07 | 6,277 | $67.32 | $422,567.64 |
| | 02/27/07 | 625 | $67.32 | $42,075.00 |
| | 05/23/07 | 17,021 | $85.61 | $1,457,167.81 |
| | | **23,923** | | **$1,921,810.45** |
| Luvisa | 12/12/06 | 4,233 | $57.46 | $243,228.18 |
| | | **4,233** | | **$243,228.18** |
| Targoff | 06/06/07 | 35,000 | $83.52 | $2,923,200.00 |
| | | **35,000** | | **$2,923,200.00** |
| | **TOTAL =** | **568,156** | | **$47,774,388.63** |

46.    The stock sales described above were not part of any normal or regular pattern or practice of such sales by defendants Dondero, Hutcheson, Luvisa and Targoff, but rather were unusual in that:

a.    All of these defendants' stock sales occurred during the same time period;

b.    All of these defendants' stock sales occurred soon after the Company's positive earnings releases, which contained false and misleading statements.

47.    At the time that the stock sales referenced in the above paragraph were made, each of these defendants knew that the Company's financial statements were false and materially overstated, and that the Company's stock price was materially inflated as a result thereof.

### *The Individual Defendants' Unjust Enrichment*

48.    Based on the Company's materially misleading and inaccurate financial results for fiscal years 2004 through 2007, the Officer Defendants have received salaries, cash bonuses, restricted stock awards and stock option grants to purchase LEAP common stock.

49.    Specifically, defendants Hutcheson, Khalifa and Luvisa, based on the Company's inflated financial statements resulting from their own misconduct, received the following compensation, including stock and option awards:

11

| Defendant | Year | Salary | Cash Bonus | Stock Award | Number of Options Granted |
|---|---|---|---|---|---|
| Hutcheson | 2006 | $541,346.00 | $100,000.00 | $926,452.00 | 116,000 |
| | 2005 | $349,154.00 | $133,682.00 | $3,651,520.00 | 161,007 |
| | 2004 | $334,816.00 | $602,785.00 | | |
| Khalifa | 2006 | $115,385.00 | $50,000.00 | $108,081.00 | 175,000 |
| Luvisa | 2006 | $282,654.00 | $50,000.00 | $242,806.00 | 17,500 |
| | 2005 | $266,255.00 | $166,864.00 | $823,437.00 | 17,140 |
| | 2004 | $200,667.00 | $235,878.00 | | |

50      As a direct and proximate result of their breaches of fiduciary duties, as alleged herein, the Officer Defendants were unjustly enriched by their receipt of the salaries, cash bonuses, and stock-based awards set forth above, the amounts of which would have been substantially lower had the Company's financial results been accurately recorded.

### *Dissemination of False and Misleading Financial Statements*

50.     As known by defendants Hutcheson, Khalifa, Burton, Luvisa, Targoff, Harkey, LaPenta, Rachesky, and Dondero, their improper accounting practices caused LEAP's financial statements to materially overstate the Company's net income because these defendants failed to properly account for the Company's service revenues, equipment revenues and operating expenses.

51.     The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

a.      Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on May 16, 2005 and signed by defendants Hutcheson, Luvisa, Dondero, Harkey, LaPenta, Rachesky, and Targoff;

b.      Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 27, 2006 and signed by defendants Hutcheson, Luvisa, Burton, Dondero, Harkey, LaPenta, Rachesky, and Targoff; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   c. Form 10-K for the fiscal year ended December 31, 2006, filed with the SEC on March

2     1, 2007 and signed by defendants Hutcheson, Khalifa, Burton, Dondero, Harkey,

3     LaPenta, Rachesky, and Targoff.

4  52. The foregoing financial statements were false and misleading because the Individual

5 Defendants accounted for service revenues, equipment revenues, and operating expenses incorrectly

6 from 2004 to the present, thus overstating net income.  Specifically, the Individual Defendants caused

7 the Company to report the following inaccurate financial information:

| | Year Ended Dec. 31, 2006 | Year Ended Dec. 31, 2005 | Five Months Ended Dec. 31, 2004 | Seven Months Ended July 31, 2004 |
|---|---|---|---|---|
| **REVENUES** | | | | |
| **Service Revenues** | $972,781 | $763,680 | $285,647 | $398,451 |
| **Equipment Revenues** | $163,919 | $150,983 | $58,713 | $83,196 |
| **Total Revenues** | $1,136,700 | $914,663 | $344,360 | $481,647 |
| **OPERATING EXPENSES (loss)** | | | | |
| **Cost of Service** | ($261,614) | ($200,430) | ($79,148) | ($113,988) |
| **Cost of Equipment** | ($262,330) | ($192,205) | ($82,402) | ($97,160) |
| **General and Administrative** | ($197,070) | ($159,249) | ($57,110) | ($81,514) |
| **Total Operating Expenses** | ($1,114,930) | ($859,431) | ($333,922) | ($522,779) |
| **Operating Income (loss)** | $43,824 | $69,819 | $10,438 | ($40,600) |

18  53. In each of LEAP's Forms 10-K for fiscal years 2004 to 2006, the Individual

19 Defendants falsely stated that the Company's consolidated financial statements are prepared in

20 conformity with GAAP.

21  54. Moreover, during the relevant period, defendants Hutcheson, Luvisa and Khalifa

22 signed Chief Executive Officer and Chief Financial Officer Certifications Pursuant to 18 U.S.C.

23 Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

24 ("Certifications"), which attested to the purported accuracy of the financial statements contained in

25 the 2004-2006 annual reports, the effectiveness of the internal controls, and compliance with Section

26 13(a) of the Exchange Act, when they knew that these Certifications were false and misleading.

27 Because of their involvement with the improprieties, defendants Hutcheson, Luvisa and Khalifa knew

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  that the 2004-2006 financial results overstated net income.  In the following Certifications, defendants

2  Hutcheson, Luvisa and Khalifa falsely certified that: "(i) the accompanying Annual Report on Form

3  10-K of the Company . . . (the "Report") fully complies with the requirements of Section 13(a) or

4  Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and (ii)  the

5  information contained in the Report fairly presents, in all material respects, the financial condition and

6  results of operations of the Company:"

7        a.     Defendants Hutcheson and Luvisa signed the Certification for the Form 10-K for the

8                fiscal year ended December 31, 2004, filed with the SEC on May 16, 2005;

9        b.     Defendants Hutcheson and Luvisa signed the Certification for the Form 10-K for the

10                fiscal year ended December 31, 2005, filed with the SEC on March 27, 2006; and

11        c.     Defendants Hutcheson and Khalifa signed the Certification for the Form 10-K for the

12                fiscal year ended December 31, 2006, filed with the SEC on March 1, 2007.

13      55.    Furthermore, LEAP's executives, including the Officer Defendants, were overpaid

14  improper cash bonuses, stock and options based on the foregoing false and misleading financial

15  statements.

16  ### *Disclosure of the Individual Defendants' Wrongdoing*

17      56.    On November 9, 2007, LEAP issued a press release announcing that it would

18  undertake a massive restatement of the Company's financial results for fiscal years 2004, 2005 and

19  2006 and for the first and second quarters of 2007 to "correct for errors in previously reported service

20  revenues, equipment revenues, and operating expenses."  Specifically, the November 9, 2007 press

21  release states that "the restatements are expected to result in a net cumulative reduction of

22  approximately $20 million in service revenues and approximately $20 million in operating income."

23  In addition, LEAP warned the investing public that "the Company's previously issued financial

24  statements for periods from fiscal year 2004 through the second quarter of 2007 *should not be relied*

25  *upon*." (emphasis added.)

26      57.    In addition, the November 9, 2007 press release reported that:

27          The most significant adjustment relates to the Company's prior accounting

28          for a group of customers who voluntarily disconnected service. These

customers comprised a small percentage of the Company's disconnected customers. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected. The Company also identified other errors relating to the timing and recognition of certain service revenues and operating expenses. The effect of the timing errors varied across periods. The error with the largest variation across periods related to the reconciliation of billing system data for pay in arrears customers. This error resulted in an understatement of revenue in 2004 and 2005 and an overstatement of revenue in subsequent periods as the number of pay in arrears customers in the Company's customer base declined.

In connection with management's review, errors were also identified relating to the classification of certain components of equipment revenues and cost of equipment. Prior to June 2007, approximately $120 million of revenue from the sale of equipment was offset against related cost of equipment and reported on a net basis. The reclassification of these revenues and costs on a gross basis will not impact operating income.

Estimated Adjustments to Prior Period Results

The Company's preliminary estimates of the required adjustments to service revenues and operating income are set forth below. The effect of these errors on the results of the individual quarters contained in these periods varies:

| Unaudited and in thousands | Six Months Ended June 30, 2007 | Year Ended December 31, 2006 | Years Ended December 31, 2005 and 2004 |
|---|---|---|---|
| Service Revenues: | | | |
| Previously Reported | $677,021 | $972,781 | $1,447,778 |
| Adjustment (estimated) | $(14,000) | $(25,000) | $    19,000 |
| As Restated (estimated) | $663,021 | $947,781 | $1,466,778 |
| Operating Income: | | | |
| Previously Reported | $ 41,260 | $ 43,824 | $    39,657 |
| Adjustment (estimated) | $(12,000) | $(20,000) | $    12,000 |
| As Restated (estimated) | $ 29,260 | $ 23,824 | $    51,657 |

58.    In addition, LEAP cautioned investors that its pending restatement could result in the Company's default under certain credit agreements, as follows:

The restatements described above may result in a default under the senior secured credit agreement among Cricket Communications, Inc., Leap Wireless International, Inc., Bank of America, N.A. and certain lenders, under which approximately $890 million in borrowings is currently outstanding. This potential default arises from the Company's potential breach of representations regarding the presentation of its prior financial statements and not as a result of any non-compliance with its financial covenants.

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

59. On November 16, 2007, LEAP issued a press release announcing receipt of a NASDAQ Staff Determination Letter Due to failure to file Form 10-Q:

> Leap Wireless International, Inc. (NASDAQ:LEAP) today announced that, as expected, it received a letter from The NASDAQ Stock Market on November 14, 2007, indicating that the Company was not in compliance with NASDAQ Marketplace Rule 4310(c)(14) since it has not yet filed its 2007 third quarter Form 10-Q with the Securities and Exchange Commission (SEC).
>
> The Company has not yet filed its Form 10-Q for the third quarter of 2007 due to certain errors which will require the Company to restate its financial statements for fiscal years 2004, 2005 and 2006 and for the first and second quarters of 2007. The Company is finalizing its third quarter 2007 financial and operational results and working with its independent registered public accounting firm to review and audit the results and restated financial information. The Company currently expects to finalize its third quarter financial statements and file its Form 10-Q on or before December 14, 2007. Upon the Company's filing of its Form 10-Q for the third quarter of 2007, the Company will again become compliant with NASDAQ Marketplace Rule 4310(c)(14).
>
> As a result of its current non-compliance in filing its Form 10-Q, Leap has been notified that its common stock is subject to delisting in accordance with standard NASDAQ procedures. The Company intends to request a hearing before a NASDAQ Listing Qualifications Panel to review the determination, which will automatically stay any suspension of trading on The NASDAQ Stock Market in the Company's stock pending a decision by the panel, and the Company's stock will remain listed during this time period. Hearings before a Listing Qualifications Panel are typically held 30 to 45 days from a company's request, and the panel generally issues a written decision approximately 30 days after the hearing, although the Company could receive a written decision sooner.
>
> Leap also confirmed that a shareholder derivative complaint was recently filed in the Superior Court of the State of California, County of San Diego against the Company's directors alleging breach of fiduciary duties and related claims arising from the Company's pending restatements, the unsolicited merger proposal from MetroPCS Communications, Inc., and sales of Leap common stock by certain of the defendants. Additional lawsuits arising out of these events may be filed against the Company and/or its Board of Directors.

60. On December 13, 2007, LEAP issued a press release reporting the Results for Third Quarter 2007 and also announcing the approximately *$31 million restatement*:

> Leap Wireless International, Inc. (NASDAQ:LEAP), a leading provider of innovative and value-driven wireless communications services, today announced financial and operational results for the third quarter of 2007. The Company reported service revenues for the third quarter of $354.5 million, an increase of 47 percent from the prior year quarter, driven by a 42 percent increase in weighted-average customers and an increase of $1.64 in average monthly service revenue per user (ARPU). Operating income for the third quarter of 2007 was $9.4 million compared to operating income of $7.1

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

million for the third quarter of 2006. Adjusted operating income before depreciation and amortization (OIBDA) for the third quarter of 2007 was $95.7 million, up 87 percent from $51.2 million for the third quarter of 2006. The Company ended the period with 2.71 million customers, an increase of 37.8 percent from the prior year quarter, and reported net customer additions for the quarter of 36,500 . . . .

Net loss for the third quarter was $43.3 million, or $0.64 per diluted share, compared to a net loss of $0.8 million, or $0.01 per diluted share, for the corresponding quarter of the prior year. The increase in net loss over the prior year period is primarily attributable to a $12.9 million increase in net interest expense resulting from an increase in the Company's long-term debt and a change in the Company's tax accounting method for amortizing certain wireless licenses that resulted in accelerated deductions and other tax benefits and a $24.1 million increase in income tax expense for accounting purposes. The change in taxes includes $19.3 million in one time expenses and is expected to improve the potential utilization of these tax benefits in future periods. Together, the increases in net interest and tax expense as a result of the change in tax accounting method during the third quarter of 2007 contributed $0.55 to the net loss of $0.64 per diluted share reported for the quarter.

"In September, the Company initiated a comprehensive review of our service revenue activity and forecasting process, which ultimately resulted in our announcement that we would restate financial statements for fiscal years 2004, 2005, 2006 and the first two quarters of 2007," continued Hutcheson. *"Over these periods, the restatement had a net cumulative impact of approximately $8 million on service revenues and approximately $23 million on operating income over these periods.* We have been working with our independent auditors to finalize our financial statements and expect to file the third quarter Form 10-Q by December 14, 2007 and complete the necessary amendments and restatements of the required prior annual and quarterly reports on or before December 31, 2007."

\* \* \*

The Company has announced it is restating its consolidated financial statements as of and for the years ended December 31, 2006 and 2005 (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 and for the period from January 1, 2004 to July 31, 2004. In addition, the Company has announced it is restating the condensed consolidated financial statements as of and for the quarterly periods ended June 30, 2007 and March 31, 2007 . . . .

61.    On December 14, 2007, the Company filed with the SEC its quarterly report on Form 10-Q containing the restated financial results:

The Company has announced it will restate its historical consolidated financial statements as of and for the years ended December 31, 2006 and 2005 (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 (Successor Company) and for the period from January 1, 2004 to July 31, 2004 (Predecessor Company). In addition, the Company will restate its condensed consolidated financial statements as of and for the quarterly periods ended June 30, 2007 and March 31, 2007.

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The determination to restate these consolidated financial statements and quarterly condensed consolidated financial statements was made by the Company's Audit Committee upon management's recommendation following the identification of errors related to the Company's accounting for revenues and operating expenses. The general nature and scope of the related errors and adjustments are summarized as follows:

- *Errors in the Timing of Recognition of Service Revenues ("Revenue — Timing Adjustments")* — The Company identified several timing errors in the recognition of service revenues that generally resulted from errors in the processes that the Company used to ensure that revenues were not recognized until service had been provided to customers and cash had been received from them. The nature of these timing errors generally was that revenue that was recognized in a particular month should have been recognized in either the preceding or the following month. These errors resulted in an understatement of service revenues of $6.2 million, $2.3 million and $0.9 million in the seven months ended July 31, 2004, the five months ended December 31, 2004 and the year ended December 31, 2005, respectively, and an overstatement of service revenues of $16.1 million, $2.8 million and $2.2 million in the year ended December 31, 2006 and the quarters ended March 31, 2007 and June 30, 2007, respectively.

- *Other Errors in the Recognition of Service Revenues ("Other — Revenue Adjustments")* — The Company incorrectly recognized revenue for a group of customers who voluntarily disconnected their service. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected, due to the fact that one of the key reports used to validate that revenue is not recognized for customers who have not yet paid erroneously excluded this subset of disconnected customer balances. These customers comprised a small percentage of the Company's disconnected customers, and the error arose in connection with the Company's re-implementation of the pay-in-advance billing method for new and reactivating customers in May 2006. This error resulted in an overstatement of service revenues of $2.8 million, $2.0 million and $2.6 million in the year ended December 31, 2006 and the quarters ended March 31, 2007 and June 30, 2007, respectively. In addition, certain other errors were made in the recognition of revenue and revenue-related accounts, resulting in an understatement of service revenues of $0.8 million in the year ended December 31, 2005, an overstatement of service revenues of $2.3 million and $1.8 million in the year ended December 31, 2006 and the quarter ended March 31, 2007, respectively, and an understatement of service revenues of $0.3 million in the quarter ended June 30, 2007.

- *Errors in the Classification of Certain Components of Service Revenues, Equipment Revenues and Operating Expenses ("Reclassification Adjustments")* — The Company identified errors relating to the classification of certain components of service revenues, equipment revenues and operating expenses. The Company incorrectly classified certain customer service fees as equipment revenue rather than service revenue. The Company incorrectly classified certain costs related to handset insurance purchased by some pay-in-arrears customers as a reduction of service revenues rather than as a cost of service. The

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company incorrectly classified certain revenues received by the Company in connection with handsets sold to Company customers under insurance or other handset replacement programs as a reduction in handset costs rather than as equipment revenues. These classification errors resulted from deficiencies in certain account analyses that resulted in the Company incorrectly analyzing certain types of transactions for their classification impacts. The errors resulted in a net understatement of total revenues and understatement of operating expenses of $4.9 million, $4.2 million, $41.4 million, $51.7 million, $10.5 million and $9.9 million in the seven months ended July 31, 2004, the five months ended December 31, 2004, the years ended December 31, 2005 and 2006 and the quarters ended March 31, 2007 and June 30, 2007, respectively. These errors had no impact on operating income or net income.

- *Other Non-Material Items ("Other Adjustments")* — The Company identified other errors that were not material, individually or in the aggregate, to its financial statements taken as a whole. However, because the Company is restating its financial statements for the effects of the items noted above, the Company revised its previously reported financial statements to correct all identified errors, including those that were not material. These items resulted in a net understatement of operating expenses of $0.5 million in the year ended December 31, 2005, a net overstatement of operating expenses of $1.1 million in the year ended December 31, 2006, a net overstatement of operating expenses of $0.5 million in the three months ended March 31, 2007 and a net understatement of operating expenses of $1.0 million in the three months ended June 30, 2007.

- *Income Tax Adjustments* — The State of Texas made certain technical corrections to the Texas Margins Tax (TMT) credit in June 2007 which confirmed that the Company was eligible for a $2.5 million TMT credit against future tax liabilities. The Company believes that it is more likely than not that the TMT credit will be realized and therefore a valuation allowance should not have been established for this item during the second quarter of 2007. Accordingly, the Company has recorded an adjustment to release that valuation allowance in the second quarter of 2007, which resulted in the realization of a $2.5 million income tax benefit and a $2.5 million increase in net income for such period.

The Company is also restating its income tax provisions for the historical periods described above to reflect the tax impact of the adjustments to pre-tax income. In particular, the Company's tax provision for the quarter ended March 31, 2007 was originally computed using an annual effective tax rate. As a result of the adjustments made to the Company's historical financial statements, the Company's revised income forecast at March 31, 2007 was lowered to a level close to break even. Under the revised forecast, a small change in the pre-tax book income projection would produce a significant variance in the effective tax rate and, therefore, it would be difficult to make a reliable estimate of the annual effective tax rate. As a result and in accordance with Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 18, "Accounting for Income Taxes in Interim Periods — An Interpretation of APB Opinion No. 28" ("FIN 18"), the Company's restated income tax provision for the quarter ended March 31, 2007 has been calculated by applying the actual effective tax rate to the year-to-date income.

19
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      62.    On December 26, 2007, LEAP filed amended Form 10-K for fiscal year ended

2    December 31, 2006.

3            This Amendment No. 1 on Form 10-K/A to the Leap Wireless International,
             Inc. (the "Company") Annual Report on Form 10-K for the year ended
4            December 31, 2006 includes restated audited consolidated financial
             statements for the years ended December 31, 2006 and 2005 (including
5            unaudited restated financial information as of and for the interim periods
             therein), for the period from August 1, 2004 to December 31, 2004
6            (Successor Company) and for the period from January 1, 2004 to July 31,
             2004 (Predecessor Company) previously included in our Annual Report on
7            Form 10-K for the year ended December 31, 2006 (the "Original Form 10-
             K").
8
             These previously issued audited consolidated financial statements and
9            unaudited condensed consolidated financial statements of the Company have
             been restated to correct errors relating to (i) the timing of recognition of
10           certain service revenues prior to or subsequent to the period in which they
             were earned, (ii) the recognition of service revenues for certain customers
11           that voluntarily disconnected service and (iii) the classification of certain
             components of service revenues, equipment revenues and operating expenses.
12           See Note 2 to the Company's audited consolidated financial statements
             included in "Part II — Item 8. Financial Statements and Supplementary
13           Data" of this report and the information set forth in "Part II — Item 7.
             Management's Discussion and Analysis of Financial Condition and Results
14           of Operations — Results of Operations — Adjustments to Quarterly
             Condensed Consolidated Financial Statements (Unaudited)" for additional
15           information. The Company also has restated its unaudited condensed
             consolidated financial statements as of and for the quarterly periods ended
16           March 31 and June 30, 2007.

17           The Company has amended and restated in its entirety each item of the
             Original Form 10-K filed with the Securities and Exchange Commission (the
18           "SEC") on March 1, 2007 (the "Original Filing Date") that required a change
             to reflect this restatement and to include certain additional information. These
19           items include Item 1A of Part I and Items 6, 7, 8 and 9A of Part II. The
             Company has supplemented Item 15 of Part IV to include current
20           certifications of the Company's Chief Executive Officer and Acting Chief
             Financial Officer pursuant to Sections 302 and 906 of the Sarbanes-Oxley
21           Act of 2002, included as Exhibits 31 and 32 to this Amendment. No other
             information included in the Original Form 10-K is amended hereby.
22
             Pursuant to Rule 12b-15 under the Securities Exchange Act of 1934, as
23           amended, this Amendment amends and restates only the items and exhibits to
             the Original Form 10-K that are being amended and restated, and those
24           unaffected items or exhibits are not included herein. Except as stated above,
             this Amendment speaks only as of the Original Filing Date, and this filing
25           has not been updated to reflect any events occurring after the Original Filing
             Date or to modify or update disclosures affected by other subsequent events.
26           In particular, forward-looking statements included in this Amendment
             represent management's views as of the Original Filing Date. Such forward-
27           looking statements should not be assumed to be accurate as of any future
             date. This Amendment should be read in conjunction with the Company's
28

                                          20
                        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    other filings made with the SEC subsequent to the Original Filing Date,
     together with any amendments to those filings.

2

3    As previously disclosed in the Company's Current Report on Form 8-K filed
     on November 8, 2007, the Company's consolidated financial statements
4    previously included in the Original Form 10-K (and other SEC filings in
     which such financial statements were included) and in the Company's
5    Annual Report on Form 10-K for the year ended December 31, 2005 filed
     with the SEC on March 27, 2006, and the Company's unaudited interim
6    condensed consolidated financial statements previously included in the
     Company's Quarterly Reports on Form 10-Q for the quarterly periods ended
7    September 30, June 30, and March 31, 2006 and 2005, should not be relied
     upon.

8        63.    On the same date, LEAP filed amended Forms 10-Q for the fiscal quarters ended

9    March 31, 2007 and June 30, 2007.

10                **The Individual Defendants' Breaches of Fiduciary Duties**

11       64.    The Company's pervasive accounting and financial reporting problems were the direct

12   result of the Individual Defendants' breaches of fiduciary duties.

13       65.    In breach of their fiduciary duties, the Individual Defendants, especially the Audit

14   Committee Defendants, knowingly accounted for the Company's revenues and expenses improperly,

15   as described above, and failed to implement proper financial reporting and oversight procedures.

16       66.    In particular, the Officer Defendants and Audit Committee Defendants failed in good

17   faith to:

18       a.    evaluate and ensure the adequacy of the Company's internal controls and

19             accounting and financial reporting systems and practices;

20       b.    evaluate and ensure the adequacy of the Company's compliance with laws and

21             regulations relating to financial reporting; and

22       c.    ensure that the financial statements were prepared in accordance with GAAP.

23       67.    The Audit Committee Defendants, from 2004 to 2007, prepared and reviewed all

24   financial statements of the Company, held committee meetings and met with management regularly

25   regarding the Company's accounting practices and compliance with applicable regulations. As such,

26   the Audit Committee Defendants knew of the accounting problems but did nothing to rectify or

27   prevent it.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

68.    According to the Company's proxy statement filed with the SEC on August 10, 2005, "[t]he Audit Committee held nine meetings during the 2004 fiscal year."  Moreover, the Audit Committee's responsibilities include "meeting with [the Company's] management, [] independent auditors and [] senior internal audit executive to discuss: (i) each annual audit, major issues regarding accounting principles and financial statement presentations, complex or unusual transactions, and other special financial issues; (ii) analyses prepared by management or the independent auditors of significant financial reporting issues and judgments made in connection with the preparation of the financial statements; and (iii) the effect of recent regulatory and professional accounting pronouncements and off-balance sheet structures on the financial statements." As stated in the Report of the Audit Committee for fiscal year 2004, "the Audit Committee has reviewed and discussed the audited financial statements of Leap as of December 31, 2004 and for the periods from January 1, 2004 to July 31, 2004 and from August 1, 2004 to December 31, 2004 with both management and PricewaterhouseCoopers LLP."

69.    According to the Company's proxy statement filed with the SEC on April 12, 2006, "[t]he Audit Committee held ten meetings during the 2005 fiscal year."  In the Report of the Audit Committee, the Audit Committee stated that "the Audit Committee has reviewed and discussed the audited financial statements of Leap as of and for the year ended December 31, 2005 with both management and PricewaterhouseCoopers LLP."

70.    According to the Company's proxy statement filed with the SEC on April 6, 2007, "[t]he Audit Committee held seven meetings during the 2006 fiscal year." As stated in the Report of the Audit Committee for fiscal year 2006, "the Audit Committee has reviewed and discussed the audited financial statements of Leap as of and for the year ended December 31, 2006 with both management and PricewaterhouseCoopers LLP."

71.    As such, the Audit Committee Defendants breached their fiduciary duties by knowingly employing the improper accounting practices at the Company in violation of GAAP and disseminating false and misleading financial statements resulting therefrom.

72.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, LEAP has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Company's restatements of historical financial statements.

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

73.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

74.    Plaintiff is an owner of LEAP common stock and was an owner of LEAP common stock at all times relevant hereto.

75.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

76.    As a result of the facts set forth herein, Plaintiff has not made any demand on the LEAP Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to initiate and vigorously prosecute this action.

77.    The Board currently consists of five (5) directors: defendants Hutcheson, Harkey, LaPenta, Targoff, and Rachesky.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.    Defendants Hutcheson and Targoff, because they face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith for engaging in illegal insider trading of LEAP securities, as alleged herein, and therefore they are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

b.    Defendant Hutcheson, at all times relevant to this action, served as the Company's President, CEO, CFO, and interim CFO, which provided him unlimited access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings.  As such, Defendant Hutcheson was intimately familiar with the Company's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    business, accounting functions, and internal controls, and knew of or recklessly

2    disregarded the Company's accounting improprieties and GAAP violations, but failed

3    to take the necessary measures to ensure that the Company's publicly reported

4    financial results complied with GAAP and accurately and truthfully reflected the

5    financial condition of the Company. By such actions, Defendant Hutcheson breached

6    his duties by causing or allowing the improper financials described above, to be

7    published or disseminated. In light of his knowledge of the Company's ongoing

8    improper practices, defendant Hutcheson faces a substantial likelihood of being held

9    liable for breaching his fiduciary duties, and therefore is incapable of disinterestedly

10    and independently considering a demand to commence and vigorously prosecute this

11    action;

12    c.    The principal professional occupation of Defendant Hutcheson is his employment with

13    LEAP, pursuant to which he received and continues to receive substantial monetary

14    compensation and other benefits. Accordingly, Defendant Hutcheson lacks

15    independence from Defendants Rachesky and Targoff, who are not disinterested

16    and/or independent and who exert influence over Defendant Hutcheson's

17    compensation by virtue of their position as members of the Board's Compensation

18    Committee. This lack of independence renders defendant Hutcheson incapable of

19    impartially considering a demand to commence and vigorously prosecute this action;

20    d.    According to LEAP's Proxy Statements filed with the SEC for fiscal years 2004

21    through 2007, Defendants Harkey, LaPenta, and Targoff were, at all times relevant to

22    this action, members of the Audit Committee. Furthermore, the Audit Committee is

23    responsible for or oversees a number of matters as set forth in the Audit Committee

24    Charter, such as, to review and discuss the: (1) financial statements; (2) earnings

25    releases; (3) financial information and guidance provided to analysts; and (4) results of

26    the auditors' annual review, including GAAP alternatives preferred by the auditors (if

27    any), and other issues that arise during the audit. Nonetheless, the Audit Committee

28    Defendants caused or allowed the Company's reported financial results that were

24

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  based upon defective presumptions and/or manipulated facts and Company filings

2  presented in violation of GAAP. By such actions, Defendants Harkey, LaPenta, and

3  Targoff breached their duties by preparing, approving and signing the false and

4  misleading financial statements, described above. Accordingly, defendants Harkey,

5  LaPenta, and Targoff are incapable of disinterestedly and independently considering a

6  demand to commence and vigorously prosecute this action;

7  e.  The entire LEAP Board participated in the wrongs complained of herein by reviewing,

8  approving and signing the Company's false and misleading Forms 10-K filed with the

9  SEC for fiscal years 2004 through 2006, as alleged herein. Pursuant to their specific

10  duties as Board members, each was charged with the management of the Company

11  and to conduct its business affairs. Each of the directors breached the fiduciary duties

12  that they owed to LEAP and its shareholders in that they failed to prevent and correct

13  the improper financials. Thus, the LEAP Board cannot exercise independent objective

14  judgment in deciding whether to bring this action or whether to vigorously prosecute

15  this action because its members are interested personally in the outcome. Their

16  actions that have subjected the Company to material losses incurred in restating more

17  than three and a half years of financial results and potentially subjecting the Company

18  to civil liability for possible violations of applicable securities laws. Accordingly, the

19  Director Defendants are incapable of disinterestedly and independently considering a

20  demand to commence and vigorously prosecute this action;

21  f.  The Director Defendants of LEAP, as more fully detailed herein, participated in,

22  approved and/or permitted the wrongs alleged herein to have occurred and participated

23  in efforts to conceal or disguise those wrongs from LEAP's stockholders, disregarded

24  the wrongs complained of herein, and are therefore not disinterested parties.

25  //

26  //

27  //

28  //

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

78.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

79.    As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

80.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by: (i) willfully ignoring the obvious and pervasive problems with LEAP's accounting and internal control practices and procedures and failing to make a good faith effort to correct the problems or prevent their recurrence; and (ii) knowingly disseminating to LEAP shareholders false financial statements.

81.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Company's restatements of historical financial statements.

## COUNT II

### AGAINST DEFENDANTS HUTCHESON, TARGOFF, DONDERO,
### AND LUVISA FOR UNJUST ENRICHMENT

82.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

83.    Defendants Hutcheson, Targoff, Dondero, and Luvisa were unjustly enriched by their sales of their personally held and/or beneficially held shares of LEAP common stock while in possession of material non-public information concerning the Company's pervasive violations of GAAP and accounting improprieties that ultimately necessitated the restatement of more than three years of the Company's financial results, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

84.    To remedy Defendants Hutcheson, Targoff, Dondero, and Luvisa's unjust enrichment, the Court should order them to disgorge to the Company all of the profits they received from their insider stock sales.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF §10(b) AND RULE 10b-5 OF THE SECURITIES AND EXCHANGE ACT

85.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86.    Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

87.    The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein.

88.    The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

89.    The Company relied upon the Individual Defendants' fraud in, *inter alia*, granting them shares of LEAP restricted stock and options to purchase LEAP common stock.

90.    As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained damages as alleged herein.

WHEREFORE, Plaintiff demands judgment as follows:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of law;

b.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and violations of law;

c.      Imposing a constructive trust in favor of the Company for the amount of proceeds defendants Hutcheson, Targoff, Dondero, and Luvisa received from their sales of LEAP common stock alleged herein;

d.      Ordering defendants Hutcheson, Targoff, Dondero, and Luvisa to disgorge to the Company all proceeds derived from their sales of LEAP common stock alleged herein;

e.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 7, 2008

Respectfully submitted,

GERGOSIAN & GRALEWSKI LLP
EDWARD M. GERGOSIAN (105679)

_____
EDWARD M. GERGOSIAN

655 West Broadway, Suite 1410
San Diego, CA 92101

SCHIFFRIN BARROWAY
  TOPAZ & KESSLER, LLP
Nichole Browning (251937)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
-and-
Eric L. Zagar (250519)
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087

*Attorneys for Plaintiff*

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Charles Graham, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.   I declare under penalty of perjury that the foregoing is true and correct.

DATE: __2/ 4/07__

_CHARLES GRAHAM_

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 147371    — BH
* * C O P Y * *
February 07, 2008
15:51:14

**Civ Fil Non-Pris**
USAO #.: 08CV0246 CIVIL FILING
Judge..: M. JAMES LORENZ
Amount.:                $350.00 CK
Check#.: BC# 5780

**Total-> $350.00**

FROM: GRAHAM V. HUTCHESON ET AL
      CIVIL FILING

(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM)

**I (a) PLAINTIFFS**
CHARLES GRAHAM, Derivatively on Behalf of Nominal Defendant LEAP WIRELESS INTERNATIONAL, INC.

**DEFENDANTS**
S. DOUGLAS HUTCHESON, AMIN KHALIFA, GRANT BURTON, DEAN M. LUVISA, MICHAEL B. TARGOFF, JOHN D. HARKEY, JR., ROBERT V. LAPENTA, MARK H. RACHESKY, M.D., and JAMES D. DONDERO

08 FEB -7 PM 4:01

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**    San Diego, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**   BY:   CP   San Diego, CA   DEPUTY
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Edward M. Gergosian
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
(619) 237-9500

**ATTORNEYS (IF KNOWN)**

'08 CV 0246 L NLS

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

- 1 U.S. Government Plaintiff
- 2 U.S. Government Defendant
- **X** 3 Federal Question (U.S. Government Not a Party)
- 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 5 | 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)**
15 U.S.C. § 78 j(b) and FRCP 23.1 - Shareholder Derivative Action challenging Defendants' violations of federal securities laws.

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| • 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | • 610 Agriculture | • 422 Appeal 28 USC 158 | • 110 400 State Reappointment |
| • 120 Marine | • 310 Airplane | • 362 Personal Injury-Medical Malpractice | • 620 Other Food & Drug | • 423 Withdrawal 28 USC 157 | • 410 Antitrust |
| • 130 Miller Act | • 315 Airplane Product Liability | • 365 Personal Injury-Product Liability | • 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | • 430 Banks and Banking |
| • 140 Negotiable Instrument | • 320 Assault, Libel & Slander | • 368 Asbestos Personal Injury Product Liability | • 630 Liquor Laws | • 820 Copyrights | • 450 Commerce/ICC Rates/etc. |
| • 150 Recovery of Overpayment &Enforcement of Judgment | • 330 Federal Employers' Liability | | • 640 RR & Truck | • 830 Patent | • 460 Deportation |
| • 151 Medicare Act | • 340 Marine | **PERSONAL PROPERTY** | • 650 Airline Regs | • 840 Trademark | • 470 Racketeer Influenced and Corrupt Organizations |
| • 152 Recovery of Defaulted Student Loans (Excl. Veterans) | • 345 Marine Product Liability | • 370 Other Fraud | • 660 Occupational Safety/Health | **SOCIAL SECURITY** | • 810 Selective Service |
| | • 350 Motor Vehicle | • 371 Truth in Lending | • 690 Other | • 861 HIA (1395ff) | • 850 Securities/Commodities Exchange |
| • 153Recovery of Overpayment of Veterans Benefits | • 355 Motor Vehicle Product Liability | • 380 Other Personal Property Damage | **LABOR** | • 862 Black Lung (923) | • 875 Customer Challenge 12 USC |
| **X** 160 Stockholders Suits | • 360 Other Personal Injury | • 385 Property Damage Product Liability | • 710 Fair Labor Standards Act | • 863 DIWC/DIWW (405(g)) | • 891 Agricultural Acts |
| • 190 Other Contract | | | • 720 Labor/Mgmt. Relations | • 864 SSID Title XVI | • 892 Economic Stabilization Act |
| • 195 Contract Product Liability | | | • 730 Labor/Mgmt. Reporting & Disclosure Act | • 865 RSI (405(G)) | • 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | • 740 Railway Labor Act | **FEDERAL TAX SUITS** | • 894 Energy Allocation Act |
| • 210 Land Condemnation | • 441 Voting | • 510 Motions to Vacate Sentence Habeas Corpus | • 790 Other Labor Litigation | • 870 Taxes (U.S. Plaintiff of Defendant) | • 895 Freedom of Information Act |
| • 220 Foreclosure | • 442 Employment | • 530 General | • 791 Empl Ret. Inc. Security Act | • 871 IRS – Third Party 26 USC 7609 | • 900 Appeal of Fee Determination Under Equal Access to Justice |
| • 230 Rent Lease & Ejectment | • 443 Housing/Accommodations | • 535 Death Penalty | | | • 950 Constitutionality of State |
| • 240 Tort to Land | • Welfare | • 540 Mandamus & Other | | | • 890 Other Statutory Actions |
| • 245 Tort to Product Liability | • Other Civil Rights | • 550 Civil Rights | | | |
| • 290 All Other Real Property | | • 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

**X** 1 Original Proceeding   • 2 Removal from State Court   • 3 Remanded from Appellate Court   • 4 Reinstated or Reopened   • 5 Transferred from another district (specify)   • 6 Multidistrict Litigation   • 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   • CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23    **DEMAND $**    Check YES only if demanded in complaint:   **JURY DEMAND: X** YES • NO

**VIII. RELATED CASE(S) IF ANY (See Instructions): JUDGE**    Docket Number

**DATE February 7, 2008**    **SIGNATURE OF ATTORNEY OF RECORD**   *Edward Gergosian*

PAID $350 RCPT# 147371 2/7/08 BM

CR

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)