1   KEITH E. EGGLETON, State Bar No.159842
    Email: keggleton@wsgr.com
2   DIANE M. WALTERS, State Bar No. 148136
    Email: dwalters@wsgr.com
3   L. DAVID NEFOUSE, State Bar No. 243417
    Email: dnefouse@wsgr.com
4   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
5   650 Page Mill Road
    Palo Alto, California 94304-1050
6   Telephone: (650) 493-9300
    Facsimile: (650) 565-5100
7

8   Attorneys for Defendants
    S. Douglas Hutcheson, Amin Khalifa,
9   Grant Burton, Dean M. Luvisa, Michael
    B. Targoff, John D. Harkey, Jr., Robert V.
10  Lapenta, Mark H. Rachesky, M.D. and
    James D. Dondero
11

12                  UNITED STATES DISTRICT COURT

13                SOUTHERN DISTRICT OF CALIFORNIA

14

15  CHARLES GRAHAM, Derivatively      )   CASE NO.: 08-CV-0246-L-NLS
    on Behalf of Nominal Defendant LEAP )
16  WIRELESS, INTERNATIONAL, INC.,    )
                                       )   **DECLARATION OF DIANE M.**
17              Plaintiff,             )   **WALTERS IN SUPPORT OF**
                                       )   **INDIVIDUAL DEFENDANTS'**
18      v.                             )   **MOTION TO DISMISS**
                                       )   **PLAINTIFF'S VERIFIED**
19  S. DOUGLAS HUTCHESON, AMIN        )   **SHAREHOLDER DERIVATIVE**
    KHALIFA, GRANT BURTON, DEAN M.    )   **COMPLAINT**
20  LUVISA, MICHAEL B. TARGOFF, JOHN D. )
    HARKEY, JR., ROBERT V. LAPENTA, MARK )
21  H. RACHESKY, M.D., and JAMES D.   )
    DONDERO,                           )   Date:   August 4, 2008
22                                     )   Time:   10:30 a.m.
                Defendants,            )   Dept:   14
23      and                            )   Before: The Hon. M. James Lorenz
                                       )
24  LEAP WIRELESS INTERNATIONAL, INC., )
                                       )
25              Nominal Defendant.     )
                                       )
26  _____ )

27

28

1   I, Diane M. Walters, declare as follows:

2   1.   I am an attorney with the law firm of Wilson Sonsini Goodrich & Rosati,

3   Professional Corporation, and am counsel of record for Defendants S. Douglas Hutcheson, Amin

4   Khalifa, Grant Burton, Dean M. Luvisa, Michael B. Targoff, John D. Harkey, Jr., Robert V.

5   Lapenta, Mark H. Rachesky, M.D., and James D. Dondero (collectively, the "Individual

6   Defendants"). I make this declaration in support of the Individual Defendants' Motion to

7   Dismiss Plaintiff's Verified Shareholder Derivative Complaint. I have personal knowledge of

8   the facts set forth herein and, if called as a witness, I could and would testify competently hereto.

9   2.   Attached hereto as Exhibit A is a true and correct copy of Leap's Form 8-K, filed

10  with the SEC on November 13, 2007.

11  3.   Attached hereto as Exhibit B is a true and correct copy of excerpts from Leap

12  Wireless International, Inc's ("Leap") Form 10-K for the fiscal year ending December 31, 2005,

13  filed with the Securities and Exchange Commission ("SEC") on March 27, 2006.

14  4.   Attached hereto as Exhibit C is a true and correct copy of Exhibit 3.1 to Leap's

15  Form 8-K, filed with the SEC on August 20, 2004.

16  5.   Attached hereto as Exhibit D is a true and correct copy of the decision in *Scimeca*

17  *v. Amkor Technology, Inc.*, No. CV 06-0562-PHX-PGR, slip op. (D. Ariz. Aug. 28, 2007).

18  I declare under penalty of perjury under the laws of the State of California that the

19  foregoing is true and correct. Executed in Palo Alto, California on June 2, 2008.

20

21                    s/ Diane M. Walters

22                    Diane M. Walters

23

24

25

26

27

28

# TABLE OF CONTENTS - EXHIBITS

| Exhibit | Description | Page Number(s) |
|---------|-------------|----------------|
| Exhibit A | Leap's Form 8-K, filed with the SEC on November 13, 2007. | 1 - 13 |
| Exhibit B | Excerpts from Leap's Form 10-K for the fiscal year ending December 31, 2005, filed with the Securities and Exchange Commission ("SEC") on March 27, 2006. | 14 - 19 |
| Exhibit C | Exhibit 3.1 to Leap's Form 8-K, filed with the SEC on August 20, 2004. | 20 - 25 |
| Exhibit D | *Scimeca v. Amkor Technology, Inc.*, No. CV 06-0562-PHX-PGR, slip op. (D. Ariz. Aug. 28, 2007). | 26 - 44 |

Exhibit A

Table of Contents

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8–K
### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934**
Date of report (Date of earliest event reported): November 8, 2007

# LEAP WIRELESS INTERNATIONAL, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 000–29752 | 33–0811062 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**10307 Pacific Center Court
San Diego, California 92121**
(Address of Principal Executive Offices)

**(858) 882–6000**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)

☐  Pre-commencement communications pursuant to Rule 14d–2(b) under the Exchange Act (17 CFR 240.14d–2(b))

☐  Pre-commencement communications pursuant to Rule 13e–4(c) under the Exchange Act (17 CFR 240.13e–4(c))

Ex. A
1

## TABLE OF CONTENTS

Item 2.02    Results of Operations and Financial Condition.

Item 4.02    Non−Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

Item 9.01    Financial Statements and Exhibits.

SIGNATURES

EXHIBIT INDEX

EXHIBIT 99.1

**Ex. A**

**2**

Table of Contents

**Item 2.02    Results of Operations and Financial Condition.**

On November 9, 2007, Leap Wireless International, Inc. (the "Company") issued a press release announcing its intention to restate its financial statements for the periods discussed below under *Item 4.02, Non–Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review*, and announcing preliminary operating and financial results for the quarter ended September 30, 2007. A copy of the press release is furnished and attached hereto as Exhibit 99.1 and is incorporated herein by reference.

On November 13, 2007, the Company intends to deliver a presentation to lenders under the senior secured credit agreement among Cricket Communications, Inc., Leap Wireless International, Inc., Bank of America, N.A. and certain lenders. As part of the presentation, the Company will provide preliminary estimates indicating that the impact associated with the revisions to the Company's accounting described under *Item 4.02* below is projected to be between $3 million to $5 million for the quarter ended September 30, 2007 and $6 million to $10 million for the six months ending December 31, 2007.

The information in this Item 2.02 and the exhibit attached hereto are being furnished and shall not be deemed filed for purposes of the Securities Exchange Act of 1934, as amended, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, except as shall be expressly stated by specific reference in such filing.

**Item 4.02    Non–Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a)    On November 8, 2007, the Audit Committee of the Company's Board of Directors concluded that the Company's consolidated financial statements for the following periods (and for the applicable interim periods) should be restated and should no longer be relied upon: (i) the seven months ended July 31, 2004 (the period prior to the Company's emergence from Chapter 11 bankruptcy); (ii) the five months ended December 31, 2004 (the period after the Company's emergence); (iii) the fiscal year ended December 31, 2005; (iv) the fiscal year ended December 31, 2006; (v) the fiscal quarter ended March 31, 2007; and (vi) the fiscal quarter ended June 30, 2007.

The restatements are the result of an internal review of the Company's service revenue activity and forecasting process that was initiated by management in September 2007 and are not attributable to any misconduct by Company employees. The restatements correct errors in previously reported service revenues, equipment revenues, and operating expenses. The most significant adjustment relates to the Company's prior accounting for a group of customers who voluntarily disconnected service. These customers comprised a small percentage of the Company's disconnected customers. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected. The Company also identified other errors relating to the timing and recognition of certain service revenues and operating expenses. The effect of the timing errors varied across periods. The error with the largest variation across periods related to the reconciliation of billing system data for pay in arrears customers. This error resulted in an understatement of revenue in 2004 and 2005 and an overstatement of revenue in subsequent periods as the number of pay in arrears customers in the Company's customer base declined.

In connection with management's review, errors were also identified relating to the classification of certain components of equipment revenues and cost of equipment. Prior to June 2007, approximately $120 million of revenue from the sale of equipment was offset against related cost of equipment and reported on a net basis. The reclassification of these revenues and costs on a gross basis will not impact operating income.

The Company's preliminary estimates of the required adjustments to service revenues and operating income are set forth below. Changes in net income (loss) will be determined following the Company's completion of its tax expense calculations for these periods. Fiscal year 2004 results refer to the combined results for the seven months ended July 31, 2004 (the period prior to the Company's emergence from Chapter 11 bankruptcy) and the five months ended December 31, 2004 (the period after the Company's emergence). The effect of these errors on the results of the individual quarters contained in these periods varies (unaudited and in thousands):

Table of Contents

| | Six Months Ended June 30, 2007 | | Year Ended December 31, 2006 | | Years Ended December 11, 2005 and 2004 | |
|---|---|---|---|---|---|---|
| **Service Revenues:** | | | | | | |
| Previously Reported | $ | 677,021 | $ | 972,781 | $ | 1,447,778 |
| Adjustment (estimated) | $ | (14,000) | $ | (25,000) | $ | 19,300 |
| As Restated (estimated) | $ | 663,021 | $ | 947,781 | $ | 1,466,778 |
| **Operating Income:** | | | | | | |
| Previously Reported | $ | 41,260 | $ | 43,824 | $ | 39,557 |
| Adjustment (estimated) | $ | (12,000) | $ | (20,000) | $ | 12,300 |
| As Restated (estimated) | $ | 29,260 | $ | 23,824 | $ | 51,557 |

The pending restatements described above are subject to adjustment upon completion of the audit and review of the Company's restated financial statements by its independent registered public accounting firm.

The restatements described above may result in a default under the senior secured credit agreement among Cricket Communications, Inc., Leap Wireless International, Inc., Bank of America, N.A. and certain lenders, under which approximately $890 million in borrowings is currently outstanding. This potential default arises from the Company's potential breach of representations regarding the presentation of its prior financial statements and potential delays in filing its Form 10–Q for the third quarter of 2007 by November 29, 2007, and not as a result of any non–compliance with its financial covenants. Notwithstanding any potential default, the Company expects to continue to make scheduled payments of principal and interest under the credit agreement. The Company is pursuing a waiver of any potential default from the credit agreement lenders. Unless waived by the required lenders, a default would permit the administrative agent to exercise its remedies under the credit agreement, including declaring all outstanding debt under the credit agreement to be immediately due and payable. An acceleration of the outstanding debt under the credit agreement would also trigger a default under Cricket's indenture governing its $1.1 billion of 9.375% senior notes due 2014. The Company anticipates that the required lenders under the credit agreement will agree to waive any potential default that may occur as a result of the restatements; however, such actions cannot be assured. In conjunction with the waiver, the Company is also asking lenders to approve other amendments to the credit agreement, including an amendment that would provide that entry into an agreement leading to a change of control will no longer constitute an event of default, unless and until the change of control occurs.

Although the Company's management is still evaluating the implications of the restatements described above on its internal control over financial reporting, when the Company files its Quarterly Report on Form 10–Q for the quarter ended September 30, 2007 and amends certain of its previously filed periodic reports to effect the restatements, management expects the Company to report the existence of one or more material weaknesses in the Company's internal control over financial reporting relating to the restatements.

The Company's management and the Audit Committee have discussed the matters disclosed in this Current Report on Form 8–K with the Company's independent registered public accounting firm.

**Forward–Looking Statements**

This report contains "forward–looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements reflect management's current expectations based on currently available operating, financial and competitive information, but are subject to risks, uncertainties and assumptions that could cause actual results to differ materially from those anticipated in or implied by the forward–looking statements. Our forward–looking statements are generally identified with words such as "anticipate," "believe," "estimate," "intend," "plan," "could," "may" and similar expressions. Risks, uncertainties and assumptions that could affect our forward–looking statements include, among other things:

- finalization of the restatements described above and the review of such matters by the Company's independent registered public accounting firm;
- the risk that the Company may not obtain a waiver from the required lenders under the senior secured credit agreement among Cricket Communications, Inc., Leap Wireless International, Inc., Bank of America, N.A. and certain lenders;
- the ability of the Company to file its Quarterly Report on Form 10–Q for the quarter ended September 30, 2007 within the time period required by the credit agreement; and
- other factors detailed in the section entitled "Risk Factors" included in our periodic reports filed with the SEC, including our Annual Report on Form 10–K for the year ended December 31, 2006 and our Quarterly Report on Form 10–Q for the quarter ended June 30, 2007.

All forward–looking statements included in this report should be considered in the context of these risk factors. Except as required by law, we undertake no obligation to publicly update or revise any forward–looking statements, whether as a result of new information, future events or otherwise. Investors and prospective investors are cautioned not to place undue reliance on such forward–looking statements.

**Item 9.01    Financial Statements and Exhibits.**

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated November 9, 2007. |

Ex. A
4

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

LEAP WIRELESS INTERNATIONAL, INC.

Date: November 13, 2007

By /s/ S. DOUGLAS HUTCHESON

Name:  S. Douglas Hutcheson
Title:    President and Chief Executive Officer

**Ex. A**
**5**

Table of Contents

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release dated November 9, 2007. |

**Ex. A**

**6**



**EXHIBIT 99.1**

**FOR IMMEDIATE RELEASE**
Leap Contacts:
Greg Lund, Media Relations
858-882-9105
glund@leapwireless.com

Jim Seines, Investor Relations
858-882-6084
jseines@leapwireless.com

**Leap Announces Restatement of Prior Period Results**
*~ Company Also Releases Preliminary Financial Results for the Third Quarter and
Business Outlook for Fourth Quarter of 2007 ~*

SAN DIEGO — November 9, 2007 — Leap Wireless International, Inc. [NASDAQ: LEAP] today announced that it will restate its financial statements for fiscal years 2004, 2005 and 2006 and for the first and second quarters of 2007 to correct for errors in previously reported service revenues, equipment revenues, and operating expenses. Over these periods, the restatements are expected to result in a net cumulative reduction of approximately $20 million in service revenues and approximately $20 million in operating income. The estimated effect of these errors on the Company's prior period results for service revenues and operating income is set forth below. Changes in net income (loss) will be determined following the Company's completion of its tax expense calculations for these periods. As a result of the pending restatements, the Company's previously issued financial statements for periods from fiscal year 2004 through the second quarter of 2007 should not be relied upon. In reaching this conclusion, the Company's management and Audit Committee have discussed the matters described in this press release with the Company's independent registered public accounting firm.

The restatements are the result of an internal review of the Company's service revenue activity and forecasting process that was initiated by management in September 2007 and are not attributable to any misconduct by Company employees. The expected adjustments to historical financial results do not change unrestricted cash, cash equivalents and short term investments as of June 30, 2007. In addition, they do not materially change the overall trend in service revenues, nor do they materially change overall trends in ARPU, CPGA, CCU or capital expenditures. Finally, the expected adjustments do not impact previously reported results for net customer additions or churn.

**Description of Accounting Errors**
The most significant adjustment relates to the Company's prior accounting for a group of customers who voluntarily disconnected service. These customers comprised a small percentage of



the Company's disconnected customers. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected. The Company also identified other errors relating to the timing and recognition of certain service revenues and operating expenses. The effect of the timing errors varied across periods. The error with the largest variation across periods related to the reconciliation of billing system data for pay in arrears customers. This error resulted in an understatement of revenue in 2004 and 2005 and an overstatement of revenue in subsequent periods as the number of pay in arrears customers in the Company's customer base declined.

In connection with management's review, errors were also identified relating to the classification of certain components of equipment revenues and cost of equipment. Prior to June 2007, approximately $120 million of revenue from the sale of equipment was offset against related cost of equipment and reported on a net basis. The reclassification of these revenues and costs on a gross basis will not impact operating income.

**Estimated Adjustments to Prior Period Results**

The Company's preliminary estimates of the required adjustments to service revenues and operating income are set forth below. The effect of these errors on the results of the individual quarters contained in these periods varies:

| Unaudited and in thousands | Six Months Ended June 30, 2007 | | Year Ended December 31, 2006 | | Years Ended December 31, 2005 and 2004 | |
|---|---|---|---|---|---|---|
| **Service Revenues:** | | | | | | |
| Previously Reported | $ | 677,021 | $ | 972,781 | $ | 1,447,778 |
| Adjustment (estimated) | $ | (14,000) | $ | (25,000) | $ | 19,000 |
| As Restated (estimated) | $ | 663,021 | $ | 947,781 | $ | 1,466,778 |
| **Operating Income:** | | | | | | |
| Previously Reported | $ | 41,260 | $ | 43,824 | $ | 39,657 |
| Adjustment (estimated) | $ | (12,000) | $ | (20,000) | $ | 12,000 |
| As Restated (estimated) | $ | 29,260 | $ | 23,824 | $ | 51,657 |

Fiscal year 2004 results refer to the combined results for the seven months ended July 31, 2004 (the period prior to the Company's emergence from Chapter 11 bankruptcy) and the five months ended December 31, 2004 (the period after the Company's emergence).

**Preliminary Results for Third Quarter**

Based on preliminary data, Leap expects to report financial and operating results for the third



LEAP'

quarter of 2007 within the ranges provided below (unaudited and in thousands, except customer data and percentage):

|  | Three Months Ended September 30, 2007 |
|---|---|
| Service Revenues | $ 348,000 to $352,000 |
| Operating Income | $ 8,000 to $12,000 |
| Adjusted Operating Income Before Depreciation and Amortization (OIBDA) | $ 94,000 to $98,000 |
| Net Customer Additions | 36,434 |
| Churn | 5.2% |

The estimates for service revenues, operating income and adjusted OIBDA set forth above reflect the revisions in the Company's accounting described in this release, costs associated with the Company's major new initiatives, as well as approximately $4 million in aggregate costs incurred in connection with the unsolicited offer received from MetroPCS Communications, Inc. in September 2007 and other strategic M&A activities.

The date and time of the Company's third quarter earnings release and conference call will be provided in a separate press release.

The pending restatements and preliminary third quarter results described above are subject to adjustment upon finalization of third quarter financial and operational results and completion of the audit and review of the Company's restated financial statements by its independent registered public accounting firm.

**Business Outlook for Fourth Quarter of 2007**

- Net customer additions are expected to be between 70,000 and 130,000, reflecting normal seasonal rhythms and the maturation of the markets launched in 2006.
- Customer churn is expected to be in the range of 4.4 percent to 4.7 percent, reflecting typical seasonal rhythms and the effects of customer handset upgrades and improving trends related to the percentage of less~tenured customers within our overall customer base.
- Adjusted OIBDA is expected to be between $105 million and $115 million, bringing anticipated full year adjusted OIBDA to between $385 and $395 million. The Company's expectation for fourth quarter and full year adjusted OIBDA includes approximately $12 to $17 million of negative adjusted OIBDA we expect to incur to support our major new initiatives, including the

**Ex. A**
**9**



Company's planned coverage expansion, higher-speed data services, Auction #66 build activity and other strategic activities.

**Senior Secured Credit Agreement and Indenture**

The restatements described above may result in a default under the senior secured credit agreement among Cricket Communications, Inc., Leap Wireless International, Inc., Bank of America, N.A. and certain lenders, under which approximately $890 million in borrowings is currently outstanding. This potential default arises from the Company's potential breach of representations regarding the presentation of its prior financial statements and not as a result of any non-compliance with its financial covenants. Notwithstanding any potential default, the Company expects to continue to make scheduled payments of principal and interest under the credit agreement. The Company is pursuing a waiver of any potential default from the credit agreement lenders. Unless waived by the required lenders, a default would permit the administrative agent to exercise its remedies under the credit agreement, including declaring all outstanding debt under the credit agreement to be immediately due and payable. An acceleration of the outstanding debt under the credit agreement would also trigger a default under Cricket's indenture governing its $1.1 billion of 9.375% senior notes due 2014. The Company anticipates that the required lenders under the credit agreement will agree to waive any potential default that may occur as a result of the restatements; however, such actions cannot be assured.

In conjunction with the waiver, the Company is also asking lenders to approve other amendments to the credit agreement, including an amendment that would provide that entry into an agreement leading to a change of control will no longer constitute an event of default, unless and until the change of control occurs.

**About Leap**

Leap provides innovative, high-value wireless services to a fast-growing, young and ethnically diverse customer base. With the value of unlimited wireless services as the foundation of its business, Leap pioneered both the Cricket® and Jump™ Mobile services. The Company and its joint ventures now operate in 23 states and hold licenses in 35 of the top 50 U.S. markets. Through its affordable, flat-rate service plans, Cricket offers customers a choice of unlimited voice, text, data and mobile Web services. Jump Mobile is a unique prepaid wireless service designed for the mobile-dependent, urban youth market. Headquartered in San Diego, Calif., Leap is traded on the



**LEAP**

NASDAQ Global Select market under the ticker symbol "LEAP." For more information, please visit www.leapwireless.com.

**Forward-Looking Statements**

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements reflect management's current expectations based on currently available operating, financial and competitive information, but are subject to risks, uncertainties and assumptions that could cause actual results to differ materially from those anticipated in or implied by the forward-looking statements. Our forward-looking statements include our discussion of management's projection of preliminary results for the third quarter and outlook for the fourth quarter of 2007, and are generally identified with words such as "believe," "intend," "plan," "could," "may" and similar expressions. Risks, uncertainties and assumptions that could affect our forward-looking statements include, among other things:

- finalization of the restatements described above and the Company's third quarter financial results and the review of such matters by its independent registered public accounting firm;
- the risk that the Company may not obtain a waiver from the required lenders under the senior secured credit agreement among Cricket Communications, Inc., Leap Wireless International, Inc., Bank of America, N.A. and certain lenders;
- the ability of the Company to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 within the time period required by the credit agreement;
- our ability to attract and retain customers in an extremely competitive marketplace;
- changes in economic conditions that could adversely affect the market for wireless services;
- the impact of competitors' initiatives;
- our ability to successfully implement product offerings and execute market expansion plans;
- delays in our market expansion plans, including delays resulting from any difficulties in funding such expansion through cash from operations, our revolving credit facility or additional capital, delays in the availability of network equipment and handsets for the AWS spectrum we acquired in Auction #66, or delays by existing U.S. government and other private sector wireless operations in clearing the AWS spectrum, some of which users are permitted to continue using the spectrum for several years;
- our ability to attract, motivate and retain an experienced workforce;
- our ability to comply with the covenants in our senior secured credit facilities, indenture and any future credit agreement, indenture or similar instrument;
- failure of our network or information technology systems to perform according to expectations; and
- other factors detailed in the section entitled "Risk Factors" included in our periodic reports filed with the SEC, including our Annual Report on Form 10-K for the year ended December 31, 2006 and our Quarterly Report on Form 10-Q for the quarter ended June 30, 2007.

All forward-looking statements included in this news release should be considered in the context of these risk factors. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Investors and prospective investors are cautioned not to place undue reliance on such forward-looking statements.

Leap is a U.S. registered trademark and the Leap logo is a trademark of Leap. Cricket is a U.S. registered trademark of Cricket. In addition, the following are trademarks of Cricket: Unlimited Access Plus, Unlimited Access, Unlimited Plus, Unlimited Classic, By Week, Jump, Travel Time, Cricket Clicks and the Cricket "K." All other trademarks are the property of their respective owners.

**Notes Regarding Non-GAAP Financial Measures**

Information presented in this press release includes financial information prepared in accordance with generally accepted accounting principles in the U.S., or GAAP, as well as adjusted OIBDA,



which is a non-GAAP financial measure. Generally, a non-GAAP financial measure, within the meaning of Securities and Exchange Commission (SEC) Item 10 to Regulation S-K, is a numerical measure of a company's financial performance or cash flows that (a) excludes amounts, or is subject to adjustments that have the effect of excluding amounts, which are included in the most directly comparable measure calculated and presented in accordance with GAAP in the consolidated balance sheets, consolidated statements of operations or consolidated statements of cash flows; or (b) includes amounts, or is subject to adjustments that have the effect of including amounts, which are excluded from the most directly comparable measure so calculated and presented.

Adjusted OIBDA is defined as operating income less depreciation and amortization, adjusted to exclude the effects of: gain/loss on sale/disposal of wireless licenses and operating assets; impairment of indefinite-lived intangible assets; impairment of long-lived assets and related charges; and share-based compensation expense. In a capital-intensive industry such as wireless telecommunications, management believes that adjusted OIBDA is a meaningful measure of the Company's operating performance. We use adjusted OIBDA as a supplemental performance measure because management believes it facilitates comparisons of the Company's operating performance from period to period and comparisons of the Company's operating performance to that of other companies by backing out potential differences caused by the age and book depreciation of fixed assets (affecting relative depreciation expenses) as well as the items described above for which additional adjustments were made. While depreciation and amortization are considered operating costs under generally accepted accounting principles, these expenses primarily represent the non-cash current period allocation of costs associated with long-lived assets acquired or constructed in prior periods. Because adjusted OIBDA facilitates internal comparisons of our historical operating performance, management also uses this metric for business planning purposes and to measure our performance relative to that of our competitors. In addition, we believe that adjusted OIBDA and similar measures are widely used by investors, financial analysts and credit rating agencies as measures of our financial performance over time and to compare our financial performance with that of other companies in our industry.

Adjusted OIBDA has limitations as an analytical tool, and should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. Some of these limitations include:

**Ex. A**
**12**

*Leap Announces Restatement of Prior Period Results*



LEAP

- it does not reflect capital expenditures;
- although it does not include depreciation and amortization, the assets being depreciated and amortized will often have to be replaced in the future, and adjusted OIBDA does not reflect cash requirements for such replacements;
- it does not reflect costs associated with share-based awards exchanged for employee services;
- it does not reflect the interest expense necessary to service interest or principal payments on current or future indebtedness;
- it does not reflect expenses incurred for the payment of income taxes and other taxes; and
- other companies, including companies in our industry, may calculate this measure differently than we do, limiting its usefulness as a comparative measure.

Management understands these limitations and considers adjusted OIBDA as a financial performance measure that supplements but does not replace the information provided to management by our GAAP results.

The following table reconciles the estimated results for adjusted OIBDA described above to the estimated results for operating income, which we consider to be the most directly comparable GAAP financial measure. There can be no assurance that the final financial results or reconciliation will not differ materially from these preliminary estimates:

|  | Three Months Ended September 30, 2007 |
|---|---|
|  | (unaudited, in thousands) |
| Operating income | $8,000 – $12,000 |
| Plus depreciation and amortization, gain (loss) on sale of wireless licenses and disposal of operating assets and share-based compensation expense, net | $86,000 |
| Adjusted OIBDA | $94,000 – $98,000 |

# # #

Ex. A

13

Exhibit B

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10−K
### FOR ANNUAL AND TRANSITION REPORTS
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

(Mark One)

☑    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2005**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to          .**

Commission file number 0−29752

# LEAP WIRELESS INTERNATIONAL, INC.
#### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **33−0811062** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **10307 Pacific Center Court, San Diego, CA** | **92121** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(858) 882−6000**
(Registrant's Telephone Number, Including Area Code)

Securities registered pursuant to Section 12(b) of the Act:
**None.**

Securities registered pursuant to Section 12(g) of the Act:
**Common Stock, $.0001 par value**
(Title of Class)

Indicate by check mark whether the registrant is a well−known seasoned issuer as defined in Rule 405 of the Securities Act.    YES ☐    NO ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    YES ☐    NO ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding twelve months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    YES ☑    NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K or any amendment to this Form 10−K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non−accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b−2 of the Exchange Act.

Large accelerated filer ☑          Accelerated filer ☐          Non−accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act).    Yes ☐    No ☑

As of June 30, 2005, the aggregate market value of the registrant's voting and nonvoting common stock held by non−affiliates of the registrant was approximately $1,201,188,000, based on the closing price of Leap's common stock on the NASDAQ on June 30, 2005, of $27.75 per share.

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Section 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.    Yes ☑    No ☐

The number of shares of registrant's common stock outstanding on March 17, 2006 was 61,200,392.

Documents incorporated by reference: Portions of the definitive Proxy Statement relating to the 2006 Annual Meeting of Shareholders, which will be held on May 18, 2006 are incorporated by reference into Part III of this report.

**Ex. B**
**14**

Table of Contents

**EXPLANATORY NOTE**

Leap Wireless International, Inc. has restated the audited consolidated financial statements as of and for the five months ended December 31, 2004 previously included in our Annual Report on Form 10–K for the year ended December 31, 2004, and the unaudited interim consolidated financial information included in each of our Quarterly Reports on Form 10–Q for the interim period ended September 30, 2004 and the quarterly periods ended March 31, 2005, June 30, 2005 and September 30, 2005. This Annual Report on Form 10–K includes the restated financial information for all such periods.

The restatements result from: (i) errors in the calculation of the tax bases of certain wireless licenses and deferred taxes associated with tax deductible goodwill, (ii) errors in the accounting for the release of the valuation allowance on deferred tax assets recorded in fresh–start reporting, and (iii) the determination that the netting of deferred tax assets associated with wireless licenses against deferred tax liabilities associated with wireless licenses was not appropriate, as well as the resulting error in the calculation of the valuation allowance on the license–related deferred tax assets. These errors arose in connection with our implementation of fresh–start reporting on July 31, 2004. See Note 3 to our consolidated financial statements included in "Item 8. Financial Statements and Supplementary Data" of this report for additional information.

We plan to amend our Quarterly Reports on Form 10–Q for the fiscal quarters ended March 31, 2005, June 30, 2005 and September 30, 2005 to include the corresponding restated financial information subsequent to the filing of this report.

**LEAP WIRELESS INTERNATIONAL, INC.**
**ANNUAL REPORT ON FORM 10–K**
**For the Year Ended December 31, 2005**
**TABLE OF CONTENTS**

Page

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 20 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 31 |
| Item 3. | Legal Proceedings | 31 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 32 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 33 |
| Item 6. | Selected Financial Data | 35 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operation | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 57 |
| Item 8. | Financial Statements and Supplementary Data | 58 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 93 |
| Item 9A. | Controls and Procedures | 93 |
| Item 9B. | Other Information | 96 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 96 |
| Item 11. | Executive Compensation | 96 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 96 |
| Item 13. | Certain Relationships and Related Transactions | 96 |
| Item 14. | Principal Accounting Fees and Services | 96 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 97 |
| EXHIBIT 10.3.9 | | |
| EXHIBIT 10.4.4 | | |
| EXHIBIT 10.9.3 | | |
| EXHIBIT 10.9.4 | | |
| EXHIBIT 10.9.7 | | |
| EXHIBIT 10.9.11 | | |
| EXHIBIT 10.9.14 | | |
| EXHIBIT 10.9.15 | | |
| EXHIBIT 10.10.2 | | |
| EXHIBIT 10.11.7 | | |
| EXHIBIT 10.14.1 | | |
| EXHIBIT 21 | | |
| EXHIBIT 23 | | |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32 | | |

i

**Ex. B**
**16**

Table of Contents

**Item 1A.**   *Risk Factors*
*Risks Related to Our Business and Industry*
**We Have Experienced Net Losses, and We May Not Be Profitable in the Future.**

We experienced net losses of $8.4 million and $49.3 million (excluding reorganization items, net) for the five months ended December 31, 2004 and the seven months ended July 31, 2004, respectively. In addition, we experienced net losses of $597.4 million for the year ended December 31, 2003, $664.8 million for the year ended December 31, 2002 and $483.3 million for the year ended December 31, 2001. Although we had net income of $30.0 million for the year ended December 31, 2005, we may not generate profits in the future on a consistent basis, or at all. If we fail to achieve consistent profitability, that failure could have a negative effect on our financial condition.

**We May Not Be Successful in Increasing Our Customer Base Which Would Negatively Affect Our Business Plans and Financial Outlook.**

Our growth on a quarter-by-quarter basis has varied substantially in the past. We believe that this uneven growth generally reflects seasonal trends in customer activity, promotional activity, the competition in the wireless telecommunications market, our reduction in spending on capital investments and advertising while we were in bankruptcy, and varying national economic conditions. Our current business plans assume that we will increase our customer base over time, providing us with increased economies of scale. If we are unable to attract and retain a growing customer base, our current business plans and financial outlook may be harmed.

**If We Experience High Rates of Customer Turnover or Credit Card Subscription or Dealer Fraud, Our Ability to Become Profitable Will Decrease.**

Because we do not require customers to sign fixed-term contracts or pass a credit check, our service is available to a broader customer base than many other wireless providers and, as a result, some of our customers may be more likely to terminate service due to an inability to pay than the average industry customer, particularly during economic downturns. In addition, our rate of customer turnover may be affected by other factors, including the size of our calling areas, our handset or service offerings, customer care concerns, number portability and other competitive factors. Our strategies to address customer turnover may not be successful. A high rate of customer turnover would reduce revenues and increase the total marketing expenditures required to attract the minimum number of replacement customers required to sustain our business plan, which, in turn, could have a material adverse effect on our business, financial condition and results of operations.

Our operating costs can also increase substantially as a result of customer credit card and subscription fraud and dealer fraud. We have implemented a number of strategies and processes to detect and prevent efforts to defraud us, and we believe that our efforts have substantially reduced the types of fraud we have identified. However, if our strategies are not successful in detecting and controlling fraud in the future, it could have a material adverse impact on our financial condition and results of operations.

**We Have Made Significant Investment, and Will Continue to Invest, in Joint Ventures and Designated Entities, including ANB 1 and LCW Wireless, That We Do Not Control.**

In November 2004, we acquired a 75% non-controlling interest in ANB 1, whose wholly owned subsidiary was awarded certain licenses in Auction #58. In November 2005, we entered into an agreement pursuant to which we will acquire a 73.3% non-controlling interest in LCW Wireless, which owns a wireless license for the Portland, Oregon market and to which we expect to contribute two wireless licenses and our operating assets in Eugene and Salem, Oregon. Our participation in these joint ventures is structured as a non-controlling interest in order to comply with FCC rules and regulations. We have agreements with our joint venture partner in ANB 1 and we plan to have similar agreements in connection with future joint venture arrangements we may enter into that are intended to allow us to actively participate in the development of the business of the joint venture. However, these agreements do not provide us with control over the business strategy, financial goals, build-out plans or other operational aspects of any such joint venture. The FCC's rules restrict our

20

**Ex. B**
**17**

Table of Contents

ability to acquire controlling interests in such entities during the period that such entities must maintain their eligibility as a designated entity, as defined by the FCC. The entities that control the joint ventures may have interests and goals that are inconsistent or different from ours which could result in the joint venture taking actions that negatively impact our business or financial condition. In addition, if any of the other members of a joint venture files for bankruptcy or otherwise fails to perform its obligations or does not manage the joint venture effectively, we may lose our equity investment in, and any present or future rights to acquire the assets (including wireless licenses) of, such entity.

**We Face Increasing Competition Which Could Have a Material Adverse Effect on Demand for the Cricket Service.**

In general, the telecommunications industry is very competitive. Some competitors have announced rate plans substantially similar to Cricket's service plans (and have also introduced products that consumers perceive to be similar to Cricket's service plans) in markets in which we offer wireless service. In addition, the competitive pressures of the wireless telecommunications market have caused other carriers to offer service plans with large bundles of minutes of use at low prices which are competing with the predictable and unlimited Cricket calling plans. Some competitors also offer prepaid wireless plans that are being advertised heavily to demographic segments that are strongly represented in Cricket's customer base. These competitive offerings could adversely affect our ability to maintain our pricing and increase or maintain our market penetration. Our competitors may attract more customers because of their stronger market presence and geographic reach. Potential customers may perceive the Cricket service to be less appealing than other wireless plans, which offer more features and options. In addition, existing carriers and potential non-traditional carriers are exploring or have announced the launch of service using new technologies and/or alternative delivery plans.

In addition, some of our competitors are able to offer their customers roaming services on a nationwide basis and at lower rates. We currently offer roaming services on a prepaid basis. Many competitors have substantially greater financial and other resources than we have, and we may not be able to compete successfully. Because of their size and bargaining power, our larger competitors may be able to purchase equipment, supplies and services at lower prices than we can. As consolidation in the industry creates even larger competitors, any purchasing advantages our competitors have may increase, as well as their bargaining power as wholesale providers of roaming services.

We also compete as a wireless alternative to landline service providers in the telecommunications industry. Wireline carriers are also offering unlimited national calling plans and bundled offerings that include wireless and data services. We may not be successful in the long term, or continue to be successful, in our efforts to persuade potential customers to adopt our wireless service in addition to, or in replacement of, their current landline service.

The FCC is pursuing policies designed to increase the number of wireless licenses available in each of our markets. For example, the FCC has adopted rules that allow the partitioning, disaggregation or leasing of PCS and other wireless licenses, and continues to allocate and auction additional spectrum that can be used for wireless services, which may increase the number of our competitors.

**We Have Identified Material Weaknesses in Our Internal Control Over Financial Reporting, and Our Business and Stock Price May Be Adversely Affected If We Do Not Remediate All of These Material Weaknesses, or If We Have Other Material Weaknesses in Our Internal Control Over Financial Reporting.**

In connection with their evaluations of our disclosure controls and procedures, our CEO and CFO have concluded that certain material weaknesses in our internal control over financial reporting existed: (i) as of September 30, 2004, December 31, 2004, March 31, 2005, June 30, 2005, September 30, 2005 and December 31, 2005 with respect to turnover and staffing levels in our accounting, financial reporting and tax departments (arising in part in connection with our now completed bankruptcy proceedings) and the preparation of our income tax provision, and (ii) as of December 31, 2004 and March 31, 2005 with respect to

21

**Ex. B**
**18**

Table of Contents

the application of lease−related accounting principles, fresh−start reporting oversight, and account reconciliation procedures. We believe we have adequately remediated the material weaknesses associated with lease accounting, fresh−start reporting oversight and account reconciliation procedures. We are engaged in remediation efforts with respect to the material weaknesses related to staffing levels and income tax provision preparation. For a description of these material weaknesses and the steps we are undertaking to remediate them, see "Item 9A. Controls and Procedures" contained in Part II of this report. The existence of one or more material weaknesses could result in errors in our financial statements, and substantial costs and resources may be required to rectify any internal control deficiencies. If we cannot produce reliable financial reports, investors could lose confidence in our reported financial information, the market price of our stock could decline significantly, we may be unable to obtain additional financing to operate and expand our business, and our business and financial condition could be harmed.

**Our Internal Control Over Financial Reporting Was Not Effective as of December 31, 2005, and Our Business May Be Adversely Affected if We Are Not Able to Implement Effective Control Over Financial Reporting.**

Section 404 of the Sarbanes−Oxley Act of 2002 requires companies to do a comprehensive evaluation of their internal control over financial reporting. To comply with this statute, we are required to document and test our internal control over financial reporting; our management is required to assess and issue a report concerning our internal control over financial reporting; and our independent registered public accounting firm is required to attest to and report on management's assessment. We are required to comply with Section 404 of the Sarbanes−Oxley Act in connection with the filing of this Annual Report on Form 10−K for the fiscal year ending December 31, 2005. We have conducted a rigorous review of our internal control over financial reporting in order to become compliant with the requirements of Section 404. The standards that must be met for management to assess our internal control over financial reporting are new and require significant documentation and testing. Our assessment identified the need for remediation of some aspects of our internal control over financial reporting. Our internal control over financial reporting has been subject to certain material weaknesses in the past and is currently subject to material weaknesses related to staffing levels and preparation of our income tax provision as described above and in "Item 9A Controls and Procedures." Our management concluded and our independent registered public accounting firm has attested and reported that our internal control over financial reporting was not effective as of December 31, 2005. If we are unable to implement effective control over financial reporting, investors could lose confidence in our reported financial information, we may be unable to obtain additional financing to operate and expand our business, and our business and financial condition could be harmed.

**Our Primary Business Strategy May Not Succeed in the Long Term.**

A major element of our business strategy is to offer consumers service plans that allow unlimited calls for a flat monthly rate without entering into a fixed−term contract or passing a credit check. However, unlike national wireless carriers, we do not seek to provide ubiquitous coverage across the U.S. or all major metropolitan centers, and instead have a smaller network footprint covering only the principal population centers of our various markets. This strategy may not prove to be successful in the long term. From time to time, we also evaluate our service offerings and the demands of our target customers and may modify, change or adjust our service offerings or offer new services. We cannot assure you that these service offerings will be successful or prove to be profitable.

**We Expect to Incur Substantial Costs in Connection with the Build−Out of Our New Markets, and any Delays in the Build−Out of Our New Markets Could Adversely Affect Our Business.**

Our ability to achieve our strategic objectives will depend in part on the successful, timely and cost−effective build−out of the networks associated with newly acquired FCC licenses, including those owned by ANB 1 License and LCW Wireless, into new markets that complement our clustering strategy or provide strategic expansion opportunities. Large scale construction projects such as the build−out of our new markets may suffer cost−overruns. In addition, the build−out of the networks may be delayed or adversely affected by a

22

Exhibit C

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# Form 8−K

### Current Report
### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): August 16, 2004

# Leap Wireless International, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 0−29752 | 33−0811062 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 10307 Pacific Center Court, San Diego, California | 92121 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (858) 882−6000

Ex. C
20

# TABLE OF CONTENTS

Item 1. Changes in Control of Registrant
Item 7. Exhibits
SIGNATURES
EXHIBIT 3.1
EXHIBIT 3.2
EXHIBIT 4.1.1
EXHIBIT 4.1.2
EXHIBIT 4.1.3
EXHIBIT 10.1

EXHIBIT 3.1

AMENDED AND RESTATED

CERTIFICATE OF INCORPORATION
OF
LEAP WIRELESS INTERNATIONAL, INC.

Leap Wireless International, Inc., a corporation organized and existing under the laws of the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the corporation is Leap Wireless International, Inc. The corporation was originally incorporated under the name Qualcomm SpinCo Inc., and the original Certificate of Incorporation of the corporation was filed with the Secretary of State of the State of Delaware on June 24, 1998.

B.    Pursuant to Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware and the order dated October 22, 2003 of the United States Bankruptcy Court for the Southern District of California (the "Court"), which has jurisdiction over the Corporation in a case under Chapter 11 of Title 11 of the United States Code, this Amended and Restated Certificate of Incorporation restates and integrates and further amends the provisions of the Amended and Restated Certificate of Incorporation of the Corporation, as previously amended.

C.    The text of the Amended and Restated Certificate of Incorporation as previously amended or supplemented is restated and further amended to read in its entirety as follows:

FIRST: The name of the Corporation is Leap Wireless International, Inc.

SECOND: The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, 19808, County of New Castle. The name of its registered agent at such address is The Prentice-Hall Corporation System, Inc.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware.

FOURTH: The Corporation is authorized to issue two classes of stock to be designated, respectively, "Common Stock" and "Preferred Stock." The total number of shares of all classes of stock that the Corporation shall have authority to issue is One Hundred Seventy Million (170,000,000) shares. One Hundred Sixty Million (160,000,000) shares shall be Common Stock, each having a par value of $.0001 per share. Ten Million (10,000,000) shares shall be Preferred Stock, each having a par value of $.0001 per share. The Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby authorized, by filing a certificate (a "Preferred Stock Designation") pursuant to the General Corporation Law of the State of Delaware, to fix or alter from time to time the designation, powers, preferences and rights of the shares of each such series and the qualifications, limitations or restrictions of

**Ex. C**
**22**

any wholly unissued series of Preferred Stock, and to establish from time to time the number of shares constituting any such series or any of them, and to increase or decrease the number of shares of any series subsequent to the issuance of shares of that series, but not below the number of shares of such series then outstanding. In case the number of shares of any series shall be decreased in accordance with the foregoing sentence, the shares constituting such decrease shall resume the status they had prior to the adoption of the resolution originally fixing the number of shares of such series. To the extent required by Section 1123(a) of Title 11, Chapter 11 of the United States Code and notwithstanding anything to the contrary herein, in no event shall the Corporation be authorized to issue any class or series of nonvoting equity securities.

FIFTH: The management of the business and the conduct of the affairs of the Corporation shall be vested in its Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be fixed exclusively by one or more resolutions adopted by the Board of Directors.

SIXTH: Subject to Section 8 of Article IV of the bylaws of the Corporation, the bylaws of the Corporation may be altered or amended or new bylaws adopted by the affirmative vote of at least sixty-six and two-thirds percent (66-2/3%) of the voting power of all of the then-outstanding shares of voting stock of the Corporation, voting together as a single class. In furtherance and not in limitation of the powers conferred by statute, the Board of Directors also is expressly authorized to make, alter or repeal the bylaws of the Corporation.

SEVENTH: Election of directors need not be by written ballot unless the bylaws of the Corporation shall so provide.

EIGHTH: No action shall be taken by the stockholders of the Corporation except at an annual or special meeting of stockholders called in accordance with the bylaws of the Corporation or this Article EIGHTH. The stockholders of the Corporation may not take action by written consent. Special meetings of the stockholders of the Corporation may be called, for any purpose or purposes, by (i) the Chairman of the Board of Directors, (ii) the Chief Executive Officer or President, or (iii) the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board of Directors for adoption) and shall be held at such place, on such date, and at such time as the Board of Directors shall fix. Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the bylaws of the Corporation.

NINTH: No director of this Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. If the General Corporation Law of the State of Delaware is amended after the date hereof to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director shall be eliminated or limited to the fullest extent

permitted by the General Corporation Law of the State of Delaware, as so amended. Any repeal or modification of this Article NINTH shall be prospective and shall not affect the rights under this Article NINTH in effect at the time of the alleged occurrence of any act or omission to act giving rise to liability or indemnification. Notwithstanding any of the provisions of this Amended and Restated Certificate of Incorporation, this Amended and Restated Certificate of Incorporation shall not in any way countermand or otherwise affect provisions concerning indemnification set forth in the "Fifth Amended Joint Plan of Reorganization Dated as of July 30, 2003" of the Corporation (the "Plan") or the Order of the Court confirming the Plan, entered on October 22, 2003.

TENTH: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed by statute, except as provided in Article ELEVENTH, and all rights conferred upon the stockholders herein are granted subject to this reservation.

ELEVENTH: Notwithstanding any other provisions of this Amended and Restated Certificate of Incorporation or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of voting stock of the Corporation required by law, this Amended and Restated Certificate of Incorporation or any Preferred Stock Designation, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66-2/3%) of the voting power of all of the then-outstanding shares of voting stock of the Corporation, voting together as a single class, shall be required to alter, amend or repeal any of Articles FIFTH, SIXTH, SEVENTH, EIGHTH, NINTH, TENTH AND ELEVENTH of this Amended and Restated Certificate of Incorporation.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

      IN WITNESS WHEREOF, this Amended and Restated Certificate of Incorporation has been signed by Robert J. Irving, its authorized officer this 16th day of August 2004.

Leap Wireless International, Inc.

By: /s/ Robert J. Irving
    -------------------------------------

Name:  Robert J. Irving
Title:  Secretary

Exhibit D

**WO**

1

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9

10   Michael Scimeca, Derivatively         )
     and on behalf of Nominal              )
11   Defendant, Amkor Technology,          )
     Inc.,                                 )
12                                         )
                  Plaintiff,               )       No. CV 06-0562-PHX-PGR
13                                         )
             v.                            )       <u>ORDER</u>
14                                         )
     James J. Kim, et al.                  )
15                                         )
                  Defendants,              )
16                                         )
             and                           )
17                                         )
     Amkor Technology, Inc.,               )
18                                         )
                  Nominal Defendant.       )
19   _____)

20          On June 5, 2007, the Court heard oral argument on the Individual Defendants' and the

21   Nominal Defendant's Motions to Dismiss for failure to make a pre-suit litigation demand.

22   Having considered the arguments of the parties and the papers submitted, the Court now

23   issues the following ruling.

24   **I.      INTRODUCTION**

25          In this shareholder derivative action, the Individual Defendants and Nominal

26   Defendant move to dismiss Plaintiff's Verified Third Amended Shareholder Derivative

27   Complaint ("Complaint").  This action was brought by the Plaintiff on behalf of Amkor

28   Technology Inc. ("Amkor") against certain current or former officers and directors of the

1   corporation. The Plaintiff seeks to remedy the Defendants' alleged violations of various state

2   and federal laws, including violations of the Sarbanes-Oxley Act of 2002, violations of

3   Section 14(a) of the Securities Exchange Act of 1934, breaches of fiduciary duties, abuse of

4   control, gross mismanagement, waste of corporate assets, unjust enrichment and negligence,

5   that have caused substantial losses to the Company.  On behalf of Amkor, the derivative

6   Complaint seeks damages, corporate governance reforms, an accounting, rescission and the

7   declaration of a constructive trust to remedy the Defendants' alleged violations of state law.

8   **II.    BACKGROUND**

9          Nominal Defendant Amkor is a Delaware corporation with its principal place of

10  business and headquarters located in Chandler, Arizona. Amkor is one of the world's largest

11  subcontractors of semiconductor packaging and test services.  The semiconductors that

12  Amkor packages and tests ultimately become components in electronic systems used in

13  communications, computing, consumer, industrial and automotive applications. At the time

14  the Plaintiff filed this action, Amkor's Board of Directors consisted of seven members: James

15  Kim, John Kim, Winston J. Churchill, George K. Hinckley, James W. Zug, Roger A. Carolin

16  and Constantine N. Papadakis.  The named Defendants in this case include these seven

17  directors along with numerous other current and former Amkor officers and directors.

18         In his Complaint, the Plaintiff asserts that, beginning in 1998, Amkor's Board of

19  Directors approved stock option grants to Amkor executives that were improperly backdated

20  contrary to the Company's express policies and the purpose of granting stock options in

21  general. According to the Plaintiff, the Board then approved false and misleading financial

22  statements that failed to properly account for the compensation paid to the Company's

23  executives. The Plaintiff states that this illegal practice was first revealed in August of 2006

24  when the Company announced that it had identified several occasions on which the

25  "measurement date used for financial accounting and reporting purposes for option awards

26  granted to certain Amkor employees was different from the actual grant date."

27

28

- 2 -

**Ex. D**

27

In May of 2006, following a report by a financial analyst, Amkor's Board of Directors commenced a review of Amkor's historical stock option granting practices. On July 24, 2006, immediately following this initial review, the Board formed a Special Committee comprised of independent directors to conduct an investigation into Amkor's historical stock option granting practice from the time Amkor conducted its initial public offering in 1998 through the present. On July 26, 2006, the Company announced that the Special Committee's investigation had identified several occasions on which "the measurement date used for financial accounting and reporting purposes for option awards granted to certain Amkor employees was different from the actual grant date." To correct these errors, Amkor explained that it would "restate financial statements to record additional non-cash, stock-based compensation expense[s] related to these options in fiscal years 1998 through 2005 and the first quarter of 2006." The Plaintiff's Complaint states that this investigation commenced long after the backdating at Amkor had started and five months after news of backdating at numerous companies began to come to light.

On October 6, 2006, Amkor issued the financial restatement and made further announcements concerning findings from the Special Committee's review. For example, the Special Committee reported its conclusions concerning the causes of the accounting errors it had uncovered and specifically announced:

> that the evidence does not support a finding of internal manipulation of stock option grant pricing by any member of existing management. However, based on its review, the Special Committee identified evidence that supports a finding of intentional manipulation of stock option pricing with respect to the annual grants in 2001 and 2002 by a former executive and that other former executives may have been aware of, or participated in, this conduct.

The Special Committee identified other factors that it felt contributed to the accounting errors: (1) improper measurement dates for annual stock option grants; (2) modifications to stock option grants; (3) improper measurement dates for other stock option grants; and (4) stock option grants to non-employees.

- 3 -

Ex. D

28

1    The Board's Special Committee also issued findings concerning material weaknesses
2    in Amkor's internal controls. Specifically, the Special Committee concluded that Amkor had
3    failed to establish effective oversight by the Compensation Committee of the Company's
4    activities related to the granting of stock options. Furthermore, the Special Committee
5    concluded that the controls were not adequate to prevent or detect instances of potential
6    misconduct by members of senior management. This control deficiency led to the following
7    additional findings: (1) Evidence that supports a finding of intentional manipulation of stock
8    option pricing and associated stock-based compensation by a former executive; (2)
9    Compensation Committee procedures were inadequate; (3) Human resources personnel were
10   inappropriately allowed to control and administer Amkor's stock option grant process without
11   adequate input or supervision; (4) Amkor failed to recognize stock option grant practices as
12   a significant risk and to assure that personnel understood their appropriate roles and
13   responsibilities and the consequences of their actions; and (5) Amkor failed to assure that
14   personnel received adequate supervision and training on how to comply with the
15   requirements of generally accepted accounting principles applicable to stock options. On
16   October 6, 2006, the Special Committee issued a report to the full Board of Directors and
17   ordered immediate commencement of remediation of these material weaknesses.

18   In sum, the Plaintiff contends Amkor's Board caused or allowed Amkor to issue a
19   series of earnings' releases, disseminated to the investing public and the Company's
20   shareholders, that falsely portrayed the Company's true business prospects. These releases
21   in turn caused the value of Amkor's shares to be artificially inflated during the years ending
22   in 2003 and 2004. According to the Complaint, the Defendants caused or allowed Amkor
23   to improperly prop-up its financial results by shipping its customers' inventory far in excess
24   of the demand for its products. The Plaintiff's case rests partially upon the allegation that
25   this purported practice had an eventual adverse impact on Amkor's future sales.
26
27
28

- 4 -

**Ex. D**
**29**

III.    **LEGAL STANDARD AND ANALYSIS**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it "fails to state a claim upon which relief can be granted." The question presented by a motion to dismiss is not whether the plaintiff will prevail in an action, but whether the plaintiff is entitled to offer evidence in support of its claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In reaching a conclusion on whether the plaintiff will be permitted to pursue his claims, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *United States v. City of Redwood*, 640 F.2d 963, 966 (9th Cir. 1981).

A.    **Demand Futility**

Nominal Defendant Amkor moves this Court to dismiss this action for Plaintiff's failure to make a pre-litigation demand on the company's Board of Directors. Plaintiff responds that he has made a sufficient showing of demand futility under applicable law.

Under Federal Rule of Civil Procedure 23.1, shareholder derivative complaints must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors [i.e., pre-suit demand] and the reasons for the plaintiff's failure to obtain the action or for not making the effort [i.e., demand futility]." This federal rule mirrors Delaware law[1] which also requires a plaintiff who wishes to proceed derivatively on behalf of a corporation to make a demand on the corporation's board of directors prior to filing a lawsuit, or to demonstrate with specificity that demand is excused. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1990) (*following Delaware law and*

---

[1]Because Amkor is a Delaware corporation, Delaware state law governs the issue of whether the Plaintiff is excused from making such a pre-litigation demand. *See Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 108-09 (1991)(holding demand futility be determined by law of the state of incorporation).

- 5 -

**Ex. D**
**30**

1  *citing Aronson v. Lewis*, 472 A.2d 805, 815 (Del. 1984).). Rule 23.1, however, does not

2  establish the circumstances under which demand would be futile, which are instead

3  determined by Delaware law.   On a motion to dismiss for failure to comply with the

4  requirements of Rule 23.1, a Delaware court limits its consideration of the facts to the

5  particularized facts alleged in the complaint, thus the plaintiff's pleading burden is more

6  onerous than that required to withstand and ordinary motion to dismiss. *Aronson*, 473 A.2d

7  at 813.  Conclusory "allegations of facts or law not supported by allegations of specific fact

8  may not be taken as true." *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991).

9      In the case at hand, the Plaintiff admits that he did not make a demand on Amkor's

10  Board of Directors prior to initiating his own lawsuit on behalf of the corporation. In order

11  to evaluate whether said demand was futile and therefore excused, Delaware courts employ

12  two different tests.  When the alleged wrong constitutes a business decision by the whole

13  board of directors, a court should employ the *Aronson* test, which evaluates whether, under

14  the particularized facts alleged, a reasonable doubt is created that: (1) the directors are

15  disinterested and independent; or (2) the challenged transaction was otherwise the product

16  of a valid exercise of business judgment. *Aronson*, 473 A.2d at 812.  In contrast, when the

17  challenged act does not constitute a business decision by the board, a court should employ

18  the *Rales* test, which determines whether the particularized factual allegations create a

19  reasonable doubt that, as of the time the complaint was filed, a majority of the board could

20  have properly exercised its independent and disinterested business judgment in responding

21  to a demand. *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

22      Directorial interest exists whenever divided loyalties are present, or where the director

23  will receive a personal financial benefit from a transaction that is not equally shared by the

24  stockholders, or when a corporate decision will have a "materially detrimental impact" on

25  a director but not the corporation or its stockholders. *Rales,* 634 A.2d at 936. The personal

26  benefit must arise "from the challenged transaction." *Id.* at 933.  Director independence

27  exists when a director's decision is based on the "corporate merits of the subject before the

28

- 6 -

**Ex. D**

**31**

board" rather than on "extraneous considerations or influences." *Aronson*, 43 A.2d at 816. When lack of independence is charged, the plaintiff must show that the board is either dominated by an officer or director who is the proponent of the challenged transaction, perhaps by a close personal or familial relationship or by force of will, or the board is so under the director or officer's influence that its discretion is sterilized. *Rales*, 634 A.2d at 936; *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002).

In this case, the Plaintiff argues that since he is asserting claims concerning the Board's action and inaction both the *Aronson* test (with regard to the improper approvals of backdated stock options and the dissemination of the false and misleading executive compensation reports in the Company's annual proxy statements) and the *Rales* test (with regard to the Plaintiff's remaining allegations) apply to this action.   The Plaintiff maintains that he has alleged sufficient facts under either futility theory.  To survive dismissal, the Plaintiff's Complaint must allege particularized facts showing that at least four of the seven Amkor directors, a majority of the Board, could not have responded to a demand in a disinterested and independent manner.  As will be demonstrated below, the Plaintiff fails to make any such showing with respect to the five outside directors: Hinckley, Churchill, Zug, Papadakis and Carolin, who make up the majority of the Board.  To the extent that the Plaintiff takes issue with specific transactions and the Board approval thereof, the Plaintiff must allege particularized facts to overcome the presumption that the challenged option grant transactions were the product of a valid business judgment. The Plaintiff has also failed to meet this burden as well.

### 1.    Disqualifying Interest

In pleading demand futility, the Complaint states that each of the Board's seven members face a substantial likelihood of liability on the derivative claims alleged; therefore, said directors are in no position to render a disinterested judgment as to whether Amkor should bring such claims.  Accordingly, the Plaintiff maintains that he should be excused from making a demand on the Board.

- 7 -

**Ex. D**

**32**

1    In the litigation demand context, directors have a disqualifying interest only where the

2    complaint shows that a majority of the board faces "a substantial likelihood of director

3    liability," not just a mere threat or possibility of liability. *Seminaris v. Landa*, 662 A.2d

4    1350, 1354 (Del. Ch. Ct. 1995). The mere threat of liability is insufficient to excuse demand.

5    *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999). Furthermore,

6    demand will be excused "only if the plaintiff's allegations show the defendant's action were

7    so egregious that a substantial likelihood of director liability exists." *Aronson*, 473 A.2d at

8    815. A director is rendered interested if he will be materially affected, either to his benefit

9    or detriment, by a decision of the board, in a manner not shared by the corporation and the

10   stockholders.

11   Although the Complaint alleges a "substantial likelihood of liability" for each and all

12   of Amkor's directors, the Court finds that it does not sufficiently plead particularized facts

13   supporting this allegation such that this risk of liability constitutes an interestedness

14   preventing the Directors from impartially considering a demand. This is not the rare case,

15   envisioned by the Delaware Supreme Court in *Aronson*, where defendants' actions were so

16   egregious that a substantial likelihood of director liability exists. 473 A.2d at 815. The

17   Plaintiff makes conclusory allegations that the Outside Directors – Churchill, Zug,

18   Papadakis, Hinckley and Carolin – engaged in an unspecified "wrongful course of conduct"

19   thus face a "substantial likelihood of liability" due to their alleged failure to prevent the very

20   improprieties that their own internal investigation uncovered. The Plaintiff merely pleads

21   that the Outside Directors failed to inform themselves of the circumstances surrounding the

22   challenged option grants without the support of particularized facts.

### a.    Audit Committee

24   The Complaint alleges that Defendants Churchill, Hinkley and Zug face a substantial

25   likelihood of director liability for breach of their fiduciary duties because they were members

26   of the Audit Committee that participated in the preparation of earnings releases that

27   contained false and/or misleading information. Specifically, the Complaint states these

28

- 8 -

**Ex. D**

**33**

1  Defendants reviewed and then failed to correct Amkor's improper earnings releases issued

2  between October 27, 2003 and July 1, 2004 and its financial statements for the years ending

3  in 1998-2005 and the first quarter of 2006.   As a result, the Plaintiff maintains that these

4  Defendants face a substantial likelihood of liability for their breach of fiduciary duties and

5  any demand upon them would have been futile.   However, such conclusory allegations are

6  insufficient to show that these particular Directors have a disqualifying interest thereby

7  excusing the demand requirement.

8        Courts have dismissed similar complaints that lacked the specificity of defendants'

9  knowledge of accounting improprieties or the type of systematic lack of supervision that gives

10  rise to a breach of fiduciary duty. *See In re Sagent Tech., Inc. Derivative Litig*, 278 F. Supp.

11  2d 1079, 1093-04 (boiler plate allegations that audit committee failed to establish and

12  maintain accounting controls insufficient to excuse demand); *Citron v. United Tech. Corp.*,

13  796 F. Supp. 649, 652 (D. Conn. 1992) (rejecting as conclusory allegation that membership

14  on audit committee afforded opportunity to detect an correct improprieties); *see also In re*

15  *Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (holding "Only a

16  sustained or systematic failure of the board to exercise oversight . . . will establish the lack of

17  good faith that is a necessary condition of liability").   Furthermore, mere oversight or error

18  in detecting accounting irregularities does not establish a substantial likelihood of the Director

19  Defendants' liability. *See, e.g., Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003) (no

20  demand futility shown because allegations did not establish that audit committee members

21  could have been expected to discover accounting irregularities).   In addition, a Complaint

22  cannot establish director liability by making similarly conclusory allegations that a director

23  disseminated financial statements he knew to be false. *Id.* at 503-07.  With the exception of

24  Churchill, who also served on the Compensation Committee when the backdated option grants

25  occurred, the Court finds that the Complaint does not establish a reasonable doubt that the

26  Audit Committee Defendants are disinterested and able to impartially consider a demand.

27

28

1          **b.     Compensation Committee**

2          The Plaintiff also seeks to show, by virtue of their participation in the Compensation

3   Committee, that Directors Churchill and Papadakis face a substantial likelihood of director

4   liability thus rendering them interested and unable to properly consider a demand.   The

5   Complaint alleges that these Defendants breached their fiduciary duties because they did not

6   act to inform themselves of the circumstances surrounding the challenged stock option grants,

7   thereby causing or allowing the Company's insiders to obtain unreasonable and unsupported

8   compensation via the backdating of stock option grants.   Still, the Plaintiff offers no

9   particularized facts to support the conclusion that these Defendants did not properly inform

10  themselves.  Rather, the Plaintiff points to the Board's Special Committee findings that the

11  Compensation Committee's policies and procedures were inadequate.   However, merely

12  alleging membership on a committee found to lack adequate procedures is insufficient to

13  establish the substantial likelihood of liability.  *See, e.g., Guttman*, 823 A.2d at 503.  The

14  Plaintiff has failed to provide particularized allegations of fact detailing the precise roles the

15  directors played as members of the compensation committee, the information that would have

16  come to their attention in these roles, and any indication as to why they would have perceived

17  any irregularities.  *Id.*   As such, demand futility has not been established based on the

18  aforementioned allegations.

19         **c.     James Kim**

20         The Court concludes that the Complaint alleges with particularity facts to create a

21  reasonable doubt as to Director James Kim's disinterest and independence.  For example, the

22  Complaint alleges that James Kim was directly interested in the February 2002 stock option

23  grant as he received 250,000 stock options that are alleged to have been backdated.  As

24  previously noted in this opinion, a director is considered interested where he or she will

25  receive a personal financial benefit from a transaction that is not equally shared by the

26  stockholders. *Rales*, 634 A.2d at 936.

27

28

                                    - 10 -

                              **Ex. D**
                              **35**

With the exception of James Kim, Plaintiff cannot establish a disqualifying financial interest on behalf of the other Directors.  Directors are deemed interested in a challenged transaction where the director receives a personal financial benefit that is not equally shared by the stockholders.  *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d 244; *see also In re Sagent Tech., Inc. Derivative Litigation*, 278 F. Supp. 2d at 1087.  However, here none of the five Outside Directors received any of the tainted option grants, and not one of them is alleged to have sold any stock during the relevant time period.

### 2.    Lack of Independence

The Plaintiff also seeks to establish that demand should be excused because Amkor's Board lacked independence.  In order to meet this burden, the Plaintiff must show that the directors are "beholden to [other directors] or so under their influence that their discretion would be sterilized." *Rales*, 634 A.2d at 936.  Absent such allegations, directors are presumed to act independently and their decisions are presumed to be a proper exercise of their business judgment." *Odyssey Partners L.P. v. Fleming Cos.*, 735 A.2d 386, 407 (Del. Ch. 1999).

In the Complaint, the Plaintiff summarily alleges that James Kim, with the James J. Kim Family Control Group, owning forty-six percent of the Company's outstanding common stock, "completely controls and dominates the Board of the Company."  A party alleging domination and control of a company's board of directors bears the burden of proving such control by showing a lack of independence on the part of a majority of the board.  *Odyssey*, 735 A.2d at 407.  In this case, four out of the seven members of the Amkor Board of Directors. Theoretically, a director can be controlled by another, for purposes of determining whether the director lacked the independence necessary to consider the challenged transactions objectively.  A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will. *Telxon Corp.*, 802 A.2d at 265.

1    In this case, the Plaintiff has alleged that as a result of his relationship with his father,

2  James Kim, John Kim served in various capacities at Amkor between 1992 and 2005 (as an

3  employee of Amkor and Amkor's predecessor, Amkor Electronics, Inc.) including as Director

4  of Investor Relations, Director of Corporate Development and Director of Procurement

5  (where he made $120,000 per years), and became a director of the Company in 2005.  The

6  Plaintiff contends that Defendant James Kim faces serious liability in this action, as he

7  approved backdated stock option grants, personally received at least $250,000 in backdated

8  stock option grants, reaped over $38 million in proceeds from insider sales, is named in

9  numerous securities class actions stemming from the wrongdoing alleged herein and is under

10  investigation by the SEC.  Accordingly, the Plaintiff reasons that any decision by John Kim

11  to bring suit against his father would expose James Kim to enormous civil and criminal

12  liability.  In light of the close family and business relationships between John and James Kim,

13  along with the serious liability that James Kim faces, the Plaintiff pleads that John Kim is not

14  sufficiently independent to consider a demand, and any demand on him would, therefore, have

15  been futile.

16    The Court accepts the Plaintiff's assertion that there is a serious reason to doubt

17  whether John Kim could impartially consider a demand to bring suit against his father, James

18  Kim, due to the close personal and business relationship between the two.  A reasonable doubt

19  as to a director's independence may arise due to familial affinity.  *Beam ex rel. Martha*

20  *Stewart Living Omnimedia Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004).  Based on the

21  foregoing, the Court concludes that the Complaint does indeed allege with particularity facts

22  that establish, by virtue of his familial relationship with James Kim,  Director John Kim's

23  independence is compromised.

24    The Plaintiff also argues that other members of the Amkor Board cannot be considered

25  independent because James Kim dominates and controls the entire Board of Directors.

26  According to the Complaint, James Kim has used his positions of power at Amkor to ensure

27  that his son, John Kim, made substantial compensation and prestigious positions within the

28

- 12 -

**Ex. D**
**37**

1   company, culminating in John Kim's appointment to the Board in 2005. Furthermore the

2   James J. Kim Family Group beneficially owns 46% of the Amkor's outstanding common

3   stock, can substantially control the outcome of all matters requiring stockholder approval,

4   including elections of members of the Board, and can substantially influence matters decided

5   upon by the Board. The Complaint also details the plethora of business relationships and

6   business transactions between the Kim family and Amkor that allegedly demonstrate the

7   never-ending acquiescence to the wishes of James Kim at the expense of the best interests of

8   the Company and its shareholders.    The Complaint alleges the following Kim family

9   relationships and business transactions:

10  •       The executive position and compensation of JooHoo Kim, brother of Defendant James
            Kim;

11

12  •       Anam Information Technology, Inc., which provided computer hardware and software
            components to an Amkor subsidiary and of which JooHoo Kim is 58% owner, received
            1.8 million, 1.2 million, and 2.9 million in 2005, 2004, and 2003, respectively, from
13          their dealings with that Amkor subsidiary;

14  •       Jesung C&M, which provides cafeteria services to an Amkor subsidiary which JooHoo
            Kim and family are 96% owners, received $6.5 million, $6.4 million and 5.6 million
15          is 2005, 2004 and 2003, respectively, pursuant to an exclusive contract with that
            Amkor subsidiary;

16

17  •       Dongon Engineering Co., Ltd., which provides construction and maintenance services
            to two Amkor subsidiaries and of which JooHoo Kim (and another brother of
            Defendant of James Kim) is a 100% owner, received $500,000, $3 million and 1.3
18          million in 2005, 2004 and 2003 respectively, pursuant to services provided to that
            Amkor subsidiary;

19

20  •       Acqutek Semiconductor & Technology Company, Ltd., which provides lead frame
            inventory to Amkor and of which defendant James Kim is a 17.7% owner, received
            $11.7 million, $11.8 million, $ 11.8 million and $16.1 million in 2006, 2005, 2004 and
21          2003, respectively;

22  •       Amkor leases office space in Westchester, PA from trusts related to defendant James
            Kim, sold 100,000,000 of its 6.25% convertible subordinated notes due 2013 in a
23          private placement to defendant James Kim and certain Kim Family Trusts, approved
            by purportedly independent members of the board;

24

25          The independence test for futility necessarily focuses on whether the directors, for any

26  substantial reason, cannot act with only the best interests of the corporation in mind. *In re*

27  *Oracle Corp. Derivative Litig.*, 824 A.2d 917, 937 (Del. Ch. 2003). A critical inquiry is

28
                                        -  13  -

                                        **Ex. D**
                                        **38**

1    whether the director was conflicted in his loyalties with respect to the challenged transaction.

2         Despite the Complaint's list of family relationships and business transactions, the

3    Plaintiff still fails to show how these public disclosures translate into James Kim's domination

4    over Outside Directors Zug, Hinckley, Carolin and Papadakis – a majority of Amkor's Board.

5    Furthermore, the Plaintiff also fails to allege any facts to demonstrate how these publicly

6    disclosed relationships render those Board members beholden to James Kim as required by

7    law.  To create a reasonable doubt about an Outside Director's independence, a plaintiff must

8    plead facts that would support the inference that because of the nature of the relationship or

9    additional circumstances other than the interested director's stock ownership or voting power,

10   the non-interested director would be more willing to risk his or her reputation than risk the

11   relationship with the interested director.  *Beam*, 845 A.2d at 1052.  Rather than make a general

12   allegation of "domination and control," a Complaint must allege that the purported controlling

13   person had "the direct or indirect unilateral power to decide whether the director continues

14   to receive a benefit upon which the director is so dependent or is of such subjective material

15   importance that its threatened loss might create a reason to question whether the director is

16   able to consider the corporate merits" of the demand objectively.  *Telxon*, 802 A.2d at 264.

17   The Plaintiff has made no such showing here.

18        The Complaint also alleges that Director Carolin lacks sufficient independence due to

19   his professional relationship with Director Churchill.  The two Defendants have shared

20   investments in several closely held companies, including participation as lead investors in

21   several deals.  As such, the Plaintiff maintains that Director Carolin could not have rendered

22   a disinterested decision on whether to pursue a derivative claim against Director Churchill.

23   However, such an allegation based on a mere outside business relationship, standing alone,

24   fails to create a reasonable doubt as to Director Carolin's independence.  *See, e.g., Beam*, 845

25   A.2d at 1050.  Although some professional relationships may raise a reasonable doubt as to

26   whether a director can appropriately consider demand, not all, or even most, rise to this level.

27   *Id.*  "Business dealings seldom take place between complete strangers and it would be a

28

- 14 -

Ex. D
39

1    strained and artificial rule which required a director to be unacquainted or uninvolved with

2    fellow directors in order to be regarded as independent." *In re Oracle Sec. Litig.*, 852 F.

3    Supp. 1437, 1442 (N.D. Cal. 1994).

4         The Complaint goes on to generically allege that demand would also be futile as to the

5    whole Board as the Director Defendants, because of their inter-related business, professional

6    and personal relationships, have developed debilitating conflicts of interest that prevent the

7    Amkor Board members from taking the necessary and proper action on behalf of the

8    Company. The Complaint further asserts that in making the decision to bring suit, a majority

9    of the directors would be forced to sue themselves and persons with whom they have

10    extensive business and personal entanglements. According to the Plaintiff, the Board

11    members clearly would choose not to do so therefore demand should be excused.

12         Delaware Courts routinely reject claims that demand is excused "just because directors

13    would have to sue 'their friends, family and business associates.'" *In re Walt Disney Co.*

14    *Derivative Litig.*, 731 A.2d 342, 355 n. 18 (Del. Ch. 1998), *aff'd in part, rev'd in part on other*

15    *grounds by Brehm*, 746 A.2d 244. Such bare allegations are insufficient to cast a reasonable

16    doubt that the directors' independence is compromised due to unspecified business or personal

17    relationships with each other. As noted by the Defendant, courts have refused to excuse the

18    demand requirement where there are particularized allegations far more substantial than those

19    alleged in the Plaintiff's Complaint. *Cf. Beam*, 845 A.2d at 1040.

20         The Plaintiff makes an equally tenuous allegation regarding Directors Churchill and

21    Papadakis. As members of the Compensation Committee, the Complaint alleges these

22    Defendants control the other Defendants' compensation. As such, the Plaintiff states that the

23    remaining members would not institute an action against Churchill or Papadakis as to do so

24    would jeopardize each director's personal financial compensation. The Court finds such

25    allegations insufficient to excuse demand. The Plaintiff has not alleged that any of the

26    Outside Directors derives a substantial portion of his income from his service as a director of

27    Amkor's Board. Further, demand futility cannot be pled by merely asserting that the

28

**Ex. D**
**40**

1  Directors would act to preserve their current positions and compensation. *See, e.g., Grobov*

2  *v. Perot*, 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d at

3  244.

4          **3.    Business Judgment Rule**

5          Under *Aronson,* as pointed out above, where a challenged transaction is at issue,

6  demand is excused where the facts alleged raise a reasonable doubt that "the challenged

7  transaction was . . . the product of a valid exercise of business judgment." 473 A.2d at 814.

8  Under Delaware law, a corporation's directors are presumed to have "acted on an informed

9  basis [i.e., with due care], in good faith and in the honest belief that the action taken was in

10  the best interests of the company." *Aronson*, 473 A.2d at 812. This presumption is typically

11  referred to as the "business judgment rule." *Id.* This presumption places on the one attacking

12  the action of the Board, the burden of demonstrating bad faith. *Id.* Furthermore, where a

13  majority of the board of directors are independent or outside directors receiving no income

14  other than usual directors' fees, the presumption of good faith is heightened. *Moran v.*

15  *Household Int'l, Inc.*, 409 A.2d 1059, 1074-75 (Del. Ch. 1985). If a plaintiff cannot meet his

16  burden of producing evidence that the directors, "in reaching their challenged decision,

17  breached any one of the triads of their fiduciary duty – good faith, loyalty or due care . . . the

18  business judgment rule attaches to protect corporate officers and directors and the decisions

19  they make." *Cede & Co. v. Technicolor, Inc.* , 634 A.2d 345, 361 (Del. 1993).  Courts are not

20  to second-guess those business judgments. *Id.*

21          Through his Complaint, the Plaintiff alleges that "[t]he Board's decision to approve the

22  [stock] options was not the product of valid business judgment." The Plaintiff maintains that

23  the Board was responsible for approving the challenged stock options grants and (1) had a

24  duty to properly inform themselves of the circumstances surrounding the options before

25  approving them and (2) to refuse to approve grants that were in violation of the Company's

26  stock option plans and/or were not being properly recorded. Since the improper approvals of

27  backdated stock option grants were outside the Board's authority, the Complaint alleges that

28

        - 16 -

**Ex. D**

**41**

1  Defendants James Kim, Hinckley and Churchill are, therefore, not afforded the protections

2  of the business judgment rule with respect to those transactions, rendering demand upon them

3  futile.

4          Plaintiff's generic allegations are insufficient to overcome the presumption of the

5  Board's compliance with the business judgment rule.  Indeed, the Plaintiff has failed to allege

6  particularized facts that the Outside Directors Hinckley, Carolin, Zug and Papadakis made any

7  decision that fell outside the protection of the business judgment rule.  In an effort to show

8  that  he has plead facts demonstrating bad faith on the part of the majority of the Board, the

9  Plaintiff relies upon *Sanders v. Want*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999).

10  However, the *Sanders* decision can be easily distinguished.  The *Sanders'* court found that the

11  board violated the company's shareholder-approved stock ownership and that the board's

12  decision could not have resulted from a valid exercise of business judgment.  However, in

13  *Sanders* there was evidence that the board **knew** it was issuing 20.25 million shares while it

14  was only authorized to issue six million.  In contrast, the Complaint before the Court contains

15  no facts reflecting that directors Zug, Carolin, Papadakis and Hinckley were on the

16  Compensation Committee during the relevant time period, or that they knew that any incorrect

17  measurement dates had been used for the challenged options. [2]  Accordingly, the Plaintiff has

18  failed to allege facts to undercut the presumption of the business judgment rule as required

19  by *Aronson*.

20          **B.     Section 14(a) Claim**

21          The Plaintiff maintains that his claim pursuant to Section 14(a) of the Exchange Act

22  does not require a demonstration of demand futility, citing *Vides v. Amelio* a district court case

23  from the Southern District of New York.  265 F. Supp. 2d 273 (S.D.N.Y. 2003).  The *Vides'*

24  _____

25          [2]Although the Complaint states that Dr. Papadakis served on the Compensation Committee
        for the challenged February 13, 2006 options grants, the Plaintiff still fails to plead facts sufficient
26      to overcome the presumption of the business judgment rule.  The Plaintiff fails to plead facts
        demonstrating any impropriety concerning these grants and these grants were not part of the
27      restatement.

28                                        - 17 -

                                        **Ex. D**
                                        **42**

1   court found that there was no demand requirement for a derivative Section 14(a) claim by

2   looking at "Delaware law and federal policy." *Id.* at 276. However, subsequent cases from

3   that district have disagreed with the holding and reasoning of the *Vides* case, finding instead

4   that Second Circuit case law clearly supported the application of the demand requirement to

5   derivative Section 14(a) claims. *See, e.g., St. Clair Shores Gen. Employees Ret. Sys. (St.*

6   *Clair) v. Libeler*, 2006 WL 2849783, at *3-7 (S.D.N.Y. Oct. 4, 2006) (*citing Lewis v. Graves*,

7   701 F.2d 245, 247-50 (2d Cir. 1983). The parties to this case have not cited to, and the Court

8   is not aware of, any Ninth Circuit or other binding precedent that speaks to this issue. After

9   reviewing the cases cited by both Plaintiff and Defendants, the Court finds more persuasive

10  those requiring a demand for derivative Section 14(a) claims for the reasons stated in *St. Clair*

11  *v. Libeler*. Accordingly, a demand is required for Plaintiff's derivative Section 14(a) claim.

12          **C.      Standing**

13          Federal Rule of Civil Procedure 23.1 requires that a derivative plaintiff "shall allege

14  (1) that the plaintiff was a shareholder or member at the time of the transaction of which the

15  plaintiff complains." The Plaintiff's Verified Third Amended Shareholder Complaint asserts

16  that the Plaintiff is "a current holder of Amkor Technology, Inc. Common Stock and was a

17  holder during the time period of the wrongful conduct alleged in the Complaint through the

18  present." This general allegation is insufficient to allege contemporaneous ownership during

19  the period in which the questioned transactions occurred. As the Ninth Circuit reasoned in

20  *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983), Rule 23.1's continuous stock ownership

21  requirement in a derivative lawsuit "reflects a shareholder's real interest in obtaining recovery

22  for the corporation which increases the value of his holdings." Thus, the Complaint must

23  indicate when plaintiffs bought stock in Amkor, and must state that they have owned stock

24  continuously since the date of the filing of the lawsuit. *In re Sagent Tech.*, 278 F. Supp. 2d

25  at 1096. The Plaintiff does not allege any facts to show he has owned Amkor stock

26  continuously for the past eight years. *See Kona Enters., Inc. v. Estate of Bishop*, 179 F.3d

27  767, 769 (9th Cir. 1999).

28

- 18 -

**Ex. D**
**43**

## IV.    CONCLUSION

The Plaintiff has not made particularized allegations raising a reasonable doubt as to the independence and disinterestedness of a majority of Amkor's Board of Directors. The Plaintiff has likewise failed to allege particularized facts sufficient to under cut the presumption of the business judgment rule as to the specific Board actions he challenges. As such, the Plaintiff has not shown that demand in this case is excused under Rule 23.1 and other applicable law. Further, Plaintiffs have not established standing by sufficiently alleging that they owned Amkor stock during all periods relevant to the questioned transactions and during the pendency of this suit as required by Rule 23.1. For the above stated reasons, the Court orders:

Nominal Defendant Amkor Technology Inc.'s Motion to Dismiss Plaintiff's Third Amended Shareholder Derivative Complaint (Doc. 57) is GRANTED.

Individual Defendant' Motion to Dismiss Plaintiff's Third Amended Shareholder Derivative Complaint (Doc. 59 ) is DENIED as MOOT.

Motion to Strike Portions of Plaintiff's Third Amended Shareholder Derivative Complaint and Motion for a More Definite Statement (Doc. 81) is DENIED as MOOT.

DATED this 28th day of August, 2007.


Paul G. Rosenblatt
United States District Judge

**Ex. D**
**44**