1  GERGOSIAN & GRALEWSKI LLP
   Edward M. Gergosian (105679)
2  655 West Broadway, Suite 1410
   San Diego, CA 92101
3  Telephone: (619) 237-9500
   Facsimile: (619) 237-9555
4
   *Counsel for Plaintiff*
5
   (additional counsel on signature page)
6

7

8

9

10                **UNITED STATES DISTRICT COURT**

11              **SOUTHERN DISTRICT OF CALIFORNIA**

12  _____
    CHARLES GRAHAM, Derivatively on Behalf    )   Case No.: 08-CV-0246
13  of Nominal Defendant LEAP WIRELESS         )
    INTERNATIONAL, INC.,                       )   **VERIFIED CONSOLIDATED**
14                                             )   **SHAREHOLDER DERIVATIVE**
                         Plaintiff,            )   **COMPLAINT**
15                                             )
            vs.                                )
16                                             )   **JURY TRIAL DEMANDED**
    S. DOUGLAS HUTCHESON, AMIN                 )
17  KHALIFA, GRANT BURTON, DEAN M.             )
    LUVISA, MICHAEL B. TARGOFF, JOHN D.        )
18  HARKEY, JR., ROBERT V. LAPENTA,            )
    MARK H. RACHESKY, M.D., and JAMES D.       )
19  DONDERO,                                   )
                                               )
20                       Defendants,           )
                                               )
21          and                                )
                                               )
22  LEAP WIRELESS INTERNATIONAL, INC.,         )
                                               )
23                       Nominal Defendant.    )
                                               )
24  _____   )

25

26

27

28
    _____
    VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
    Case No. 08-CV-0246

1    <u>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

2    Plaintiff Charles Graham, by the undersigned attorneys, derivatively on behalf of Leap

3    Wireless International, Inc. ("Leap" or the "Company"), alleges upon personal knowledge as to

4    himself and his own acts, and upon information and belief as to all other matters, based upon, *inter*

5    *alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other

6    things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press

7    releases, and other publicly available documents regarding Leap, as follows.

8    <u>**NATURE OF THE ACTION**</u>

9    1.    This is a derivative action brought on behalf of nominal defendant Leap by one of its

10    shareholders against certain executive officers and Leap's Board of Directors (collectively, the

11    "Individual Defendants") during the relevant time period, for breach of fiduciary duties and

12    violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), arising from the

13    Individual Defendants' undisclosed and improper accounting practices, false and misleading

14    statements and omissions resulting therefrom, rejection of a buyout offer while in possession of

15    material adverse information about the true business and financial condition of the Company, and

16    insider selling totaling over $47 million in proceeds during the relevant period.

17    2.    Through the retail outlets of its subsidiary, Cricket Communications Inc. ("Cricket"),

18    Leap provides discount wireless services and offers customers unlimited wireless service for a flat

19    monthly rate without requiring a fixed term contract or a credit check.

20    3.    Because LEAP targets low income and young customers with poor credit who could

21    only make a month-to-month commitment, many customers terminate their service soon after

22    signing up and/or fail to make timely payments.

23    4.    From 2004 to 2007 (the "Relevant Period"), the Individual Defendants knowingly

24    failed to establish procedures and policies to accurately record and account for customer

25    terminations and non-payments. As a result, the Individual Defendants knowingly caused or allowed

26    Leap to continue recognizing revenue for customers who ceased payment and/or use of Leap's

27    service in violation of Generally Accepted Accounting Principles ("GAAP"). In addition to

28    allowing improper revenue recognition practices, the Individual Defendants also knowingly allowed

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    1
Case No. 08-CV-0246

1  the improper accounting of certain operating expenses and failed to maintain adequate internal

2  accounting and financial reporting controls.

3        5.      The Individual Defendants knowingly engaged in these unlawful practices to create

4  the impression that the Company was profitable and growing and to falsely portray the Company's

5  actual performance.  As a result, as known by the Individual Defendants, during the Relevant Period,

6  the Company's financial statements overstated revenues and net income and thus were false and

7  misleading.

8        6.      The Individual Defendants knowingly concealed from shareholders Leap's improper

9  accounting practices and the material impact those practices had on the Company's financial

10 statements.  The Individual Defendants publicly disclosed that Leap had a policy of only recognizing

11 revenue upon receipt of payment.  However, the Individual Defendants knowingly violated their own

12 revenue recognition policy time and time again.

13       7.      In late 2007, the improper accounting practices were finally brought to light.  On

14 November 9, 2007, Leap suddenly disclosed that it would restate its financial statements for fiscal

15 years 2004, 2005, and 2006, and the first two quarters of 2007.[1]  The Company admitted that the

16 restatement largely involved improper revenue recognition practices whereby the Company's

17 revenue and operating income were improperly overstated by counting revenue from customers who

18 terminated their service and by recording other revenue in the wrong periods, in violation of GAAP

19 and Leap's own stated revenue recognition policy.

20       8.      After the shocking November 9, 2007 announcement, Leap's stock price plummeted

21 over $21 dollars per share, or 36.8%, to $36.72 on extremely high volume, wiping out more than

22 $1.2 billion of Leap's market capitalization.

23       9.      As a result of the Individual Defendants' misconduct and breaches of fiduciary duties,

24 the Company was required to make material adjustments, which affected its historical financial

25 results.  In fact, on December 14, 2007, the Company restated its financial statements for the

26
[1]      The Company's fiscal year conforms to the calendar year, ending on December 31.  Each
27 quarter constitutes the three months ending March 31 ("1Q"), June 30 ("2Q"), September 30 ("3Q")
   and December 31 ("4Q").

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                    2
Case No. 08-CV-0246

1  quarters ending March 31, 2007 and June 30, 2007, the years ending December 31, 2006 and 2005

2  (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 and

3  for the period from January 1, 2004 to July 31, 2004.  Over these periods, the restatement had a net

4  cumulative impact of approximately $8 million on service revenues and approximately $23 million

5  on operating income.  In a November 9, 2007 article, the Motley Fool remarked the restatement's

6  impact on revenues is "hardly chump change for a business that booked just $30.5 million in

7  operating income over the trailing 12 months."   A Jefferies & Company analyst stated the

8  restatement raises a "fundamental concern" as to the effectiveness of Leap's internal controls.

9          10.     As Leap's officers and/or directors, the Individual Defendants were obligated by their

10  fiduciary duties to ensure that revenues were properly recognized under GAAP, that the Company's

11  financial statements were not false and misleading, and that the Company maintained adequate

12  internal controls over financial reporting and accounting.  By breaching their fiduciary duties, the

13  Individual Defendants subjected the Company to damages including, but not limited to, costs and

14  expenses incurred in connection with its internal investigation, costs and expenses incurred in

15  connection with the Company's restatement, higher interest expenses under Leap's $1.1 billion

16  secured loan and credit facility, risk of substantial loss of its money and assets, damage to its

17  reputation, and other potential harm.

18          11.     In addition to the above, the Individual Defendants also breached their fiduciary

19  duties to Leap and its shareholders by rejecting a buyout offer from MetroPCS Communications,

20  Inc. ("MetroPCS") less than two months before announcing the restatement in November 2007,

21  while knowing the Company's true business and financial condition, and/or by putting the Company

22  in a precarious position so that it could not accept the offer or negotiate a higher price.  Although

23  acceptance of the MetroPCS offer would have been in the best interests of the shareholders in light

24  of the Company's true financial condition, the Individual Defendants nonetheless spurned the

25  MetroPCS offer without any reasonable basis in breach of their fiduciary duties.

26          12.     Additionally, Company insiders, including several of the Individual Defendants, took

27  advantage of the artificial inflation of the price of the Company's stock caused by materially false

28  and misleading statements and financials by selling their personally-held shares of Leap stock for

1   millions of dollars in proceeds.  Specifically, defendants Hutcheson, Dondero and Targoff, all of

2   whom knew about Leap's improper accounting practices and participated in the dissemination of the

3   false and misleading statements and financials outlined herein, sold over 500,000 shares of Leap

4   stock, reaping over *$47 million* in proceeds.

5                              **JURISDICTION AND VENUE**

6          13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this

7   Complaint states a federal question.  This Court has supplemental jurisdiction over the state law

8   claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer

9   jurisdiction on a court of the United States, which it would not otherwise have.

10         14.    Venue is proper in this district because a substantial portion of the transactions and

11  wrongs complained of herein, including the defendants' primary participation in the wrongful acts

12  detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains

13  executive offices in this district, and defendants have received substantial compensation in this

14  district by engaging in numerous activities and conducting business here, which had an effect in this

15  district.

16                                    **PARTIES**

17  **Plaintiff Charles Graham**

18         15.    Plaintiff Charles Graham is a shareholder of Nominal Defendant Leap, was a

19  shareholder of Leap at the time of the wrongdoing alleged herein, and has been a shareholder of

20  Leap continuously since that time.

21  **Nominal Defendant Leap**

22         16.    Nominal Defendant Leap is incorporated in the State of Delaware and is

23  headquartered at 10307 Pacific Center Court, San Diego, California.  Leap is a wireless

24  communications carrier that offers digital wireless service in the United States under the Cricket and

25  Jump Mobile ("Jump") brands.  Cricket service offers customers unlimited wireless service for a flat

26  monthly rate without requiring a fixed-term contract or credit check, and Jump offers customers a

27  per-minute prepaid wireless service.  Leap conducts operations through its subsidiaries and has no

28

---

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    4
Case No. 08-CV-0246

1  independent operations or sources of operating revenue other than through dividends, if any, from its

2  subsidiaries.

3  **Defendant Hutcheson**

4        17.    Defendant Stewart Douglas Hutcheson ("Hutcheson") has been Chief Executive

5  Officer ("CEO") and President of the Company and Cricket since February 2005.  Hutcheson also

6  serves as a Director of the Company.  As of September 6, 2007, Hutcheson became the Company's

7  and Cricket's interim Chief Financial Officer ("CFO") in addition to serving as CEO and President

8  of the Company and Cricket.  Hutcheson previously served as President and CFO of the Company

9  and Cricket from January 2005 through February 2005, as Executive Vice President and CFO from

10  January 2004 through January 2005, and as Senior Vice President and CFO from August 2002 to

11  January 2004.  Hutcheson also served as Senior Vice President, Chief Strategy Officer of the

12  Company from March 2002 to August 2002, as Senior Vice President, Product Development and

13  Strategic Planning from July 2000 to March 2002, as Senior Vice President, Business Development

14  from March 1999 to July 2000 and as Vice President, Business Development from September 1998

15  to March 1999.

16        18.    In 2006, Hutcheson received compensation valued at over $3.2 million, including

17  $541,346 in salary, bonuses, stock and option awards, and other compensation.

18        19.    In 2007, defendant Hutcheson, based on his knowledge of material non-public

19  information concerning the Company's accounting improprieties, sold approximately 23,923 of his

20  personally held shares of Leap common stock for proceeds of approximately $1.9 million.

21  **Defendant Khalifa**

22        20.    Defendant Amin Khalifa ("Khalifa") was the Executive Vice President and CFO of

23  the Company, Cricket and their domestic subsidiaries, from July 25, 2006 until his resignation on or

24  about September 6, 2007.

25  **Defendant Burton**

26        21.    Defendant Grant Burton ("Burton") was, at all relevant times, Vice President, Chief

27  Accounting Officer and Controller of the Company.

28

**Defendant Luvisa**

22.     Defendant Dean M. Luvisa ("Luvisa") was the Company's acting CFO and Vice President, Finance from March 2006 to July 25, 2006, having previously served as its acting CFO, Vice President, Finance and Treasurer from February 2005 to March 2006, as its Vice President, Finance, and Treasurer from May 2002 to February 2005 and as its Vice President, Finance from September 1998 to May 2002.

### Officer Defendants

23.     Collectively, defendants Hutcheson, Khalifa, Burton, and Luvisa are referred to herein as the "Officer Defendants."

**Defendant Targoff**

24.     Defendant Michael B. Targoff ("Targoff") has served as a director of the Company and a member of the Board's Audit Committee and Compensation Committee since September 1998.

25.     In 2006, Targoff received $421,714 in compensation from the Company. Additionally, in 2007, defendant Targoff, based on his knowledge of material non-public information concerning the Company's accounting improprieties, sold 35,000 of his personally held shares of Leap common stock for proceeds of approximately $2.9 million.

**Defendant Harkey**

26.     Defendant John D. Harkey, Jr. ("Harkey") has served as a director of the Company and as a member of the Board's Audit Committee since March 2005.

27.     In 2006, Harkey received $110,261 in compensation from the Company.

**Defendant LaPenta**

28.     Defendant Robert V. LaPenta ("LaPenta") has served as a director of the Company and as a member of the Board's Audit Committee since March 2005.

29.     In 2006, LaPenta received $110,299 in compensation from the Company.

### Audit Committee Defendants

30.     Collectively, defendants Targoff, Harkey, and LaPenta are referred to herein as the "Audit Committee Defendants."

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 08-CV-0246

6

**Defendant Rachesky**

31.    Defendant Mark H. Rachesky, M.D. ("Rachesky") was, at all relevant times, Chairman of the Board and a member of the Board's Compensation Committee.  Rachesky is the founder and President of MHR Fund Management LLC.  According to the Company's 2008 proxy statement, Rachesky is an indirect beneficial owner of approximately 22.5 percent of the Company's common stock through his affiliation with MHR Fund Management LLC.

32.    In 2006, Rachesky received $418,377 in compensation from the Company.

**Defendant Dondero**

33.    Defendant James D. Dondero ("Dondero") joined the Board in 2004 and served as Chairman of the Board's Compensation Committee until he resigned on or about September 10, 2007.  Dondero was, at all relevant times, President of Highland Capital Management, L.P. ("Highland").  According to the Company's 2007 proxy statement, Dondero is an indirect beneficial owner of approximately 6.9 percent of the Company's common stock through his affiliation with Highland.

34.    In 2006, Dondero received $329,954 in compensation from the Company. Defendant Dondero is also managing partner and founder of Highland, which has engaged in interested transactions with Leap, through its participation in the syndication of Leap's credit agreements for which it received a fee.

35.    In 2007, Dondero sold 505,000 Leap shares for proceeds of over $42 million, some of which he indirectly beneficially owned through his affiliation with Highland and related entities.

<div align="center"><b>Director Defendants</b></div>

36.    Collectively, defendants Hutcheson, Targoff, Harkey, LaPenta, Rachesky, and Dondero are referred to herein as the "Director Defendants."

<div align="center"><b>Individual Defendants</b></div>

37.    Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers, directors, and/or fiduciaries of Leap and because of their ability to control the business and corporate affairs of Leap, the Individual Defendants owed Leap and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Leap in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Leap and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Leap and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Leap, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Leap, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

40.     To discharge their duties, the officers and directors of Leap were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Leap were required to, among other things:

a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP;

      d.     exercise good faith, when put on notice of problems with the Company's business practices and operations, in taking appropriate action to correct the misconduct and prevent its recurrence; and

      e.     refrain from acting upon material inside corporate information to benefit themselves.

41.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and for ensuring that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

      a.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

      b.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

          (i)     transactions are executed in accordance with management's general or specific authorization; and

          (ii)    transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

42.    Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

43.    According to SAS 55.13, "[e]stablishing and maintaining an internal control structure is an important management responsibility.  To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by

1 | management to determine that it is operating as intended and that it is modified as appropriate for

2 | changes in conditions."

3 | 44.    Each of the Individual Defendants was responsible for the effectiveness of the

4 | Company's internal controls and the accuracy of the Company's financial statements through their

5 | obligation, as provided under the Corporate Governance Guidelines, to oversee the conduct of the

6 | Company's business, ensure appropriate accounting principles and practices are utilized in the

7 | preparation of financial statements, evaluate whether the business is being properly managed, and

8 | ensure that the Company's business is conducted with high standards of ethical conduct and in

9 | conformity with applicable laws and regulations.

10 | 45.    Each of the Individual Defendants had knowledge of and actively participated in,

11 | acquiesced in and/or approved of the wrongdoings alleged or abdicated their responsibilities with

12 | respect to these wrongdoings.  Specifically, the conduct of the Individual Defendants complained of

13 | herein involves a knowing and culpable violation of their obligations as officers and/or directors of

14 | Leap, the absence of good faith on their part, and a reckless disregard for their fiduciary duties,

15 | which the Individual Defendants themselves were aware or should have been aware posed a risk of

16 | serious injury to the Company and its shareholders.  The improper and injurious conduct as outlined

17 | herein has been ratified by the Individual Defendants who failed to take any timely action against

18 | them.

19 | 46.    Leap's Audit Committee Charter provides that the Audit Committee, comprised of

20 | defendants Targoff, Harkey, and LaPenta, shall, among other things:

21 | a.    "[O]versee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;"

22 |

23 | b.    "[M]eet with management, the independent auditor and the senior internal audit executive in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit;"

24 |

25 | c.    "[R]eview and discuss with management and the independent auditor: (A) major issues regarding accounting principles and financial

26 | statement presentations, including any significant changes in the Company's selection or application of accounting principles, complex

27 | or unusual transactions, highly judgmental areas and major issues as to the adequacy of the Company's internal controls and any special

28 | audit steps adopted in light of material control deficiencies; (B) any

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 08-CV-0246

10

analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (C) the effect of recent regulatory and professional accounting pronouncements, as well as off-balance sheet structures, on the Company's financial statements;"

d.     "[R]eview and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations' and consider whether they are complete and consistent with information known to committee members;"

e.     "[R]eview and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;" and

f.     "[B]e directly responsible for the appointment, compensation and oversight of the Company's senior internal audit executive, and the senior internal audit executive shall report directly to the Committee. In furtherance of this responsibility, the Committee shall have the sole authority to appoint or replace the senior internal audit executive. The Committee shall consult with management but shall not delegate these responsibilities. The Committee shall periodically review the effectiveness of the internal audit function."

47.    An audit committee financial expert must also possess all of the following attributes:

(a)    An understanding of GAAP and financial statements;

(b)    The ability to assess the general application of such principles in the accounting for estimates, accruals and reserves;

(c)    Experience preparing, auditing, analyzing, or evaluating financial statements that present a complexity of accounting issues that is generally comparable in breadth and level to the complexity of the issues that the company's financial statements can reasonably be expected to raise;

(d)    An understanding of internal control for financial reporting; and

(e)    An understanding of audit committee functions.

48.    Each of the Individual Defendants in this action, individually or jointly, as alleged herein, breached his fiduciary duty to the Company by participating in, permitting and/or acquiescing in the conduct alleged herein, failing to exercise reasonable diligence, due care and good faith and loyalty, and was, at the very least, grossly negligent and/or reckless. Each of the Individual Defendants in this action, individually or jointly, committed and/or is responsible for one or more of

1  the actions or omissions alleged herein, constituting waste, mismanagement and breaches of

2  fiduciary duty by authorizing, causing, and/or permitting Leap to conduct its business in an unsafe,

3  imprudent and dangerous manner by pursuing unsound business, sales, and other practices, and

4  concealed their reckless, unsafe and unsound practices and the serious adverse impact of these

5  practices upon the Company and its shareholders.  Moreover, disregarding their positions of trust,

6  loyalty and fidelity, during the Relevant Period, while in the possession of materially adverse non-

7  public information regarding Leap, several of the Individual Defendants either sold and/or permitted

8  or acquiesced in the sale of significant amounts of Company stock.

9      49.    By reason of their membership on Leap's Board and/or positions as executive officers

10  of the Company, the Individual Defendants were each controlling persons of Leap and had the power

11  and influence to cause, and did cause, the Company to engage in and/or permit the conduct

12  complained of herein, including failing to establish and maintain adequate internal control systems,

13  thereby causing and/or allowing the Company to issue false and misleading financial statements.

14      50.    As alleged in detail herein, the Individual Defendants (particularly the Officer

15  Defendants Hutcheson, Khalifa, Burton, and Luvisa and the Audit Committee Defendants Targoff,

16  Harkey and LaPenta), failed to implement and maintain adequate internal control systems for the

17  Company, and thereby violated: (i) their fiduciary duties of good faith and loyalty; (ii) GAAP; and

18  (iii) as to the Audit Committee Defendants, the Audit Committee Charter.

19  **CONFIDENTIAL WITNESSES**

20      51.    Plaintiff's allegations are supported by, among other things, the information provided

21  by confidential witnesses who are former Leap employees:

22      (a)    Confidential Witness ("CW") 1 is a former Director of Marketing who
       attended monthly financial review meetings with senior management,
23              including defendant Hutcheson, at Leap's San Diego headquarters and is
       knowledgeable of Leap's financial practices.
24

25      (b)    CW2 is a former Market Research Manager who worked at Leap during most
       of the restated periods.

26      (c)    CW3 is a former Manager of Procurement and Fixed Assets who worked at
       Leap for over four years until mid-2005.

27

28

(d)     CW4 is a former Acting Controller during the Relevant Period. CW4 attended monthly forecast meetings with senior management and attended at least one Audit Committee meeting.

(e)     CW5 is a former Chief Marketing Officer. CW5 worked at Leap prior to its emergence from bankruptcy.

(f)     CW6 is a former Accounting Supervisor who is familiar with Leap's accounting practices for expenses.

(g)     CW7 is a former Indirect Account Manager who worked at Leap for approximately one year following the Company's emergence from bankruptcy. CW7 is familiar with Leap's revenue and subscriber recognition practices.

(h)     CW8 is a former Operations Manager who worked at Leap for five years, including during the Relevant Period. CW8 is familiar with Leap's methods of accounting for customers and churn (measuring customer turnover).

52.     These confidential witnesses confirm that there were significant problems with Leap's financial controls and that Leap's financial results were manipulated, and corroborate many of the material deficiencies identified by Leap through its admissions and restatement.

## **FACTUAL ALLEGATIONS**

### ***Background of the Company***

53.     The Company began as a spin-off of Qualcomm Inc. in 1998. Leap was started with the idea to provide affordable wireless services to a wide range of customers, without credit checks or long-term commitments. Under that principle, the Company founded Cricket in 1999. Leap offers two types of payment plans: (1) prepaid service through Jump and (2) flat monthly fee through Cricket.

54.     Through Cricket, the Company offers unlimited local calling plans for a flat fee and seeks to target customers underserved by traditional phone companies, including young people and those with low income or with limited or imperfect credit, as Leap's Cricket service is offered without long-term commitments or credit checks.

55.     Leap achieved initial success, growing steadily for several years. The Company, however, spiraled into Chapter 11 bankruptcy in April 2003.

56.     On August 16, 2004, the Company reorganized and emerged from bankruptcy. Upon its emergence, Leap issued 60 million shares of new Leap common stock for distribution to two

1   classes of creditors, and its securities traded on the OTC Bulletin Board ("OTCBB"). On June 29,

2   2005, Leap securities began trading on the NASDAQ National Market ("NASDAQ").

3          57.    When Leap emerged from bankruptcy, defendant Hutcheson stated that with the

4   Company's adoption of "fresh start accounting," Leap was a company with a "clean, strong balance

5   sheet." Further, Hutcheson and other officers portrayed Leap as a high growth company with strong

6   revenue and customer growth. As a result of Leap's purportedly strong financial performance,

7   analysts touted the stock. For example, in Prudential Equity Group's April 2007 analyst report

8   regarding Leap, analyst Richard Klugman enthusiastically wrote: "[w]e view Leap as a compelling

9   growth story and expect revenues to quintuple over the next decade . . . Leap shares have tripled over

10  the last two years and are now valued substantially above peers – 14.5 times our 2007 EBITDA

11  estimate and $2,900 per subscriber. We expect the company to grow into its valuation and rally

12  further on a successful business expansion. We value Leap shares at $90."

13         58.    Not long after its emergence from bankruptcy, on May 9, 2005, Leap restated its

14  financial results for the quarter ended September 30, 2004 to correct for errors resulting from: (1)

15  insufficient staffing in the accounting and financial reporting functions; (2) improper application of

16  lease-related accounting principles; (3) fresh-start reporting adjustments; and 4) inadequate account

17  reconciliation procedures.

18         59.    Again, on March 6, 2006, Leap announced another restatement to correct errors in

19  deferred income tax accounting. Specifically, the restatements resulted from: (1) errors in the

20  calculation of the tax bases of certain wireless licenses and deferred taxes associated with tax

21  deductible goodwill, (2) errors in the accounting for the release of the valuation allowance on

22  deferred tax assets recorded in fresh-start reporting, and (3) the determination that the netting of

23  deferred tax assets associated with wireless licenses against deferred tax liabilities associated with

24  wireless licenses was not appropriate, as well as the resulting error in the calculation of the valuation

25  allowance on the license-related deferred tax assets.

26                **The HO Billing System and Provisioning System**

27         60.    During the Relevant Period, to keep track of subscribers and services, the Company

28  used an internal accounting revenue recognition application known as the HO Billing System, which

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    14
Case No. 08-CV-0246

1  was operated through Leap's San Diego offices and was linked to all retail Cricket outlets.  When

2  customers signed up for Leap services, their information was entered directly into the HO Billing

3  System.  The HO Billing System was used by Leap to record and maintain subscriber metrics,

4  account information and billing information.  It also tracked customers' usage of airtime minutes.

5      61.    Another separate and independent application called the Provisioning System was

6  used to record termination of service.  The Provisioning System was a mainframe computer

7  application located in San Diego and was accessible through Leap's sales centers and customer

8  service call centers.  When customers wanted to cancel their service, they would be redirected to the

9  call centers, which would then enter the termination data into the Provisioning System.

10     62.    The HO Billing System and Provisioning System were not linked, so a manual entry

11 in the HO Billing System was required in order to stop Leap's recognition and tracking of wireless

12 usage of a terminated subscriber.

13     63.    However, termination of customer service in the Provisioning System was not always

14 reflected in the HO Billing System.  As a result, Leap continued to recognize revenue for customers

15 who had already cancelled their service.  This practice was well-known among Leap's executives,

16 directors, managers and other employees.

17     64.    Daily, weekly and monthly Minutes Reports were generated from the HO Billing

18 System and were used to, among other things, prepare current and projected metrics for the

19 Company.  Daily Minutes Reports, which provided a snap-shot of the Company's subscriber totals

20 and service revenues, were provided to Hutcheson, Burton, Luvisa, Khalifa and Glenn T. Umetsu

21 ("Umetsu"), former Chief Operating Officer and current Chief Technical Officer.  Weekly and

22 monthly Minutes Reports, which were more detailed reports, were distributed to the Officer

23 Defendants, Director Defendants, management, senior staff and other Leap employees.  These

24 Minutes Reports were also discussed at meetings attended by the Individual Defendants and other

25 Leap employees.

26     65.    The Minutes Reports revealed that Leap was recognizing service revenues for

27 subscribers who used zero minutes—clear evidence that these subscribers had already terminated

28 their service plan.

1

***Improper Revenue Recognition***

2      66.    The Individual Defendants purportedly adopted a revenue recognition policy that no

3 revenue would be recognized until it was earned and payment was received. The Company's Form

4 10-K filed with the SEC on May 13, 2004 stated, "[r]evenues for customers who pay in arrears are

5 recognized only after the service has been rendered and payment has been received." The Forms 10-

6 K filed on May 16, 2005, March 27, 2006 and March 1, 2007 all contain similar statements.

7      67.    However, despite this clear policy, Leap recognized revenues after services were

8 cancelled and before payments were received. Indeed, the Individual Defendants knowingly

9 established procedures and policies to improperly recognize revenue for terminated services in order

10 to create a false impression of the Company's actual performance. This misconduct resulted in the

11 $31 million restatement of Leap's financial results.

12      68.    Specifically, among other things, the Individual Defendants knowingly caused or

13 allowed Leap to defer "hot-lining," which refers to the removal of subscribers who terminated

14 service from the HO Billing System. The Individual Defendants, especially Hutcheson, Burton and

15 Khalifa, knowingly caused or allowed the delay of hot-lining until after the close of the quarter or

16 year, a scheme that was employed by Leap's account managers and supervisors. As such, the

17 Provisioning System and the HO Billing System did not always correspond. Notably, the "service

18 revenues" recorded in the HO Billing System could not be reconciled with the cash received by the

19 Company.

20      69.    Furthermore, the Individual Defendants knowingly caused or permitted their

21 employees to take shortcuts to reduce costs related to "porting," which refers to the process of

22 transferring an existing telephone number to another service provider. At the direction of the

23 Individual Defendants, Leap employees would transfer a terminated customer's number out of the

24 Provisioning System but not the Billing System. As such, the Billing System would continue to

25 record revenue from that customer and to recognize that customer in Leap's subscriber and revenue

26 metrics.

27

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT          16
Case No. 08-CV-0246

70.    These short-cuts led to numerous discrepancies, *e.g.*, certain billing accounts were not associated with a telephone number and had no user activity or minute usage.  The Individual Defendants were made aware of these discrepancies but chose not to correct or prevent them.

71.    As such, the Company's revenues and net income were artificially inflated because revenues for terminated customers were recorded

72.    Indeed, several confidential witnesses indicated that Leap improperly accounted for revenue and for its customers in other ways.

73.    For example, CW1 stated that Leap lacked the controls to accurately account for "win-back" customers, which refer to customers who recently disconnected whom the Company tried to win-back by re-connecting them without their approval.  During CW1's tenure, s/he recalled that "[w]e would slam, re-activate their service without them opting in, count them as a customer who is still active who did not disconnect, give them free service for 30 days and then wait for the customer to call and disconnect. . . .So these weren't true customers."

74.    According to CW1, this practice was widespread at the Company and occurred on a monthly basis affecting at least 10 percent of Leap's customer base of approximately 1.2 million customers.  While CW1 acknowledged that "win-back" is a standard industry practice, all of the other telecommunications companies CW1 worked for were capable of properly tracking true customers versus "win-back" customers, which Leap did not have the capacity to do.  According to CW1, Leap recognized approximately $30 per customer each month.  Based on CW1's statements, this would have led to improper recognition of about $3 million of service revenue, which approximately equates to the restated amount of $2.8 million for the restated service revenue for Leap in 2006.

75.    CW1 also explained that the "win-back" process was a tool used to manage churn.  "Churn" is a measure of customer attrition in the wireless telecommunications industry, and is defined as the number of customers who discontinue a service during a specified time period divided by the average total number of customers over that same time period.  The churn rate is an important business metric for any subscription-based or other account-driven service.  If the churn rate exceeds the growth rate of new accounts, the number of customers falls.

76.    According to CW1, during Leap's monthly meetings, Hutcheson would express the view that, for example, the churn was coming in at 8% versus Leap's guidance of 4%, which meant Leap had to win-back a certain percentage of customers so that it could reduce its churn by 4% to be at 4% churn.  According to CW1, "it was all a numbers game with Doug."

77.    CW3, former Manager of Procurement and Fixed Assets, also said that the Company's churn rates were extremely high and that the reported growth of the Company was artificial.  According to CW3, "they were losing more customers than they were adding."

78.    Similarly, CW5 confirmed that Leap re-signed customers who cancelled accounts and recognized revenue on such accounts.  CW5 claimed that the Company was "stringing customers along who were really deactivated, but saying that they're still part of [its] customer base."

79.    CW7 recalls a similar practice that when customers called to cancel their traditional plan, Leap would place the customer on the Jump product, which was their "secondary, prepaid type of product, in order to eliminate the churn and show additional activation revenue for that secondary product which usually wouldn't stick."

80.    CW7 explained that Leap took the contract customers and converted them over as prepaid (Jump) customers and gave them a free month of service to show that they were new subscribers.  In reality, they were not new subscribers but instead existing subscribers who no longer wanted the service or had terminated their service.  These subscribers obviously accepted the prepaid service because they received one month free.  "It made their [Leap's] report look good, because now they had additional numbers to report."

81.    CW8 recalls similar practices at Leap that allowed the Company to manipulate churn and customer additions by re-activating customers as "new" even though they were repeat customers or customers who had terminated their service.  Some of these customers even had past due amounts on their old accounts.  These customers would let their bill lapse, close the account, and call Leap back to reactivate, giving these "new" customers two additional months of free service.  With respect to customers who cancelled service or whose service was deactivated, Leap would activate them under a new account.  "If the customer had a previous account with us, they weren't reactivating the (old) account.  They were setting them up as a new account."

82.    Leap failed to identify the cancelled accounts because "it just shows better on their books as a gross activation, as a new activation." CW8 further stated, "You're showing that you're selling a lot more phones and you're selling a lot more new account activations, but the reality is that these are the same customers." Additionally, CW8 maintained that the Company's average revenue per user, ARPU, was inflated because Leap was including late payments and other figures that inflated ARPU.

### *The Individual Defendants' Improper Accounting Practices*

83.    The Individual Defendants breached their fiduciary duties by knowingly causing and/or permitting the improper accounting practices, described herein. Furthermore, during the Relevant Period, the Individual Defendants knew that the Company's internal financial controls were ineffective. The Individual Defendants' failure to ensure effective internal controls at Leap resulted in the Company materially overstating its financial results by improperly recognizing revenue.

84.    Since 2004, the Individual Defendants received numerous reports regarding problems and errors with Leap's accounting and financial reporting practices and internal controls. Through their receipt of weekly, monthly, and quarterly reports, attendance at Board and Audit Committee meetings, review of the Company's financial statements, and conversations with the Company's management, internal auditors, and external auditors, the Individual Defendants knew that Leap's accounting and financial reporting practices were improper, and its internal controls were materially deficient.

85.    In breach of their fiduciary duties of good faith and loyalty, the Individual Defendants ignored the obvious and pervasive problems with Leap's accounting and internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. The material non-public information discussed above was well known among Leap insiders, including the Officer Defendants and Director Defendants, who comprise the entire executive corps of the Company and its entire Board, and was discussed formally and informally during Leap Board and committee meetings, management meetings, and other meetings attended by the Individual Defendants. Indeed, the Individual Defendants were keenly aware that the Company

1    was engaging in improper accounting practices, which resulted in the $31 million restatement of the

2    Company's historical financial results.

3        86.    The Individual Defendants, particularly the Audit Committee Defendants, prepared

4    and/or reviewed the 2004-2007 financial statements, which were disseminated to shareholders and

5    filed with the SEC.   Moreover, the Individual Defendants, because of their knowledge and

6    participation in the improper accounting practices, knew that 2004-2007 financial statements were

7    materially false and misleading.

8        87.    As such, during the Relevant Period, the Individual Defendants, especially the Audit

9    Committee  Defendants, knowingly caused the Company to make a series of false and misleading

10   statements concerning the Company's financial condition, materially misrepresenting that the

11   Company's financial condition was better than it actually was.   Furthermore, the Individual

12   Defendants made a series of false and misleading statements concerning the condition of the

13   Company's internal controls, materially misrepresenting that the Company maintained sound

14   internal controls and was able to regulate its business in accordance with applicable laws and

15   regulations.  As a result of these materially false and misleading statements that they knew were

16   untrue, the Individual Defendants caused the Company's stock price to be artificially inflated.

17   Furthermore, the Individual Defendants engaged in an improper practice knowing that it would and

18   did cause harm to the Company and subject the Company to costs, fines, and other damages

19   associated with their unlawful and improper business practices.

20       88.    Specifically, since 2004, the Company, with the knowledge, approval, and/or

21   acquiescence of the Individual Defendants, regularly and systematically violated GAAP by, among

22   other things:

23               a.    improperly recognizing revenue from customers who had voluntarily
                       discontinued or terminated service;
24
                b.    improperly accounting for the timing and recognition of certain service
25                     revenues and operating expenses; and

26               c.    improperly failing to maintain adequate internal accounting and financial
                       reporting controls.
27

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                              20
Case No. 08-CV-0246

89.    As a result of the Company's improper and materially misleading financial statements, Leap's stock price soared in 2007. The Company's common stock peaked in 2007 at $98.33 per share on July 23, 2007, far above the mid-$20s at which it was trading in August 2004.

90.    This dramatic stock increase is a direct result of the Individual Defendants' materially false and misleading statements to the public, improper accounting of the Company's financials and subscriber metrics and the deliberate overstatement of the Company's financial performance in the Company's Forms 10-K and 10-Q.

### *The Individual Defendants' Insider Selling*

91.    Based on their knowledge of the Company's improper accounting practices and its effect on the Company's financial statements, during the Relevant Period, certain of the Individual Defendants sold their personal shares of Leap stock at artificially inflated prices.

92.    The Individual Defendants knew that once the truth regarding their misconduct came to light, Leap's stock price would fall significantly. Indeed, on November 9, 2007 when the Individual Defendants were forced to disclose the problems at Leap, the price of Leap common stock plummeted $21.38, or 36.8%, from $58.10 to a low of $36.72, and has continued its downward slide.

93.    Specifically, in contravention of their fiduciary duties of good faith and loyalty, defendants Dondero, Hutcheson and Targoff, based on their knowledge that the Company's financial statements were false and materially misstated, sold more than *$47 million* worth of Company stock in order to line their own pockets and while the Individual Defendants continued to further impair the Company's financial and operating condition.

94.    The below table depicts the stock sales by defendants Dondero, Hutcheson and Targoff in 2007 based upon unlawful inside information:

| Defendant Name | Transaction Date | Number of Shares Sold | Price | Total Proceeds |
|---|---|---|---|---|
| Dondero | 05/23/07 | 90,000 | $85.68 | $7,711,200.00 |
| | 05/30/07 | 200,000 | $84.89 | $16,978,000.00 |
| | 06/07/07 | 75,000 | $83.29 | $6,246,750.00 |
| | 06/08/07 | 140,000 | $83.93 | $11,750,200.00 |
| | | **505,000** | | **$42,686,150.00** |
| Hutcheson | 02/27/07 | 6,277 | $67.32 | $422,567.64 |
| | 02/27/07 | 625 | $67.32 | $42,075.00 |
| | 05/23/07 | 17,021 | $85.61 | $1,457,167.81 |
| | | **23,923** | | **$1,921,810.45** |
| Targoff | 06/06/07 | 35,000 | $83.52 | $2,923,200.00 |
| | | **35,000** | | **$2,923,200.00** |
| | **TOTAL =** | **563,923** | | **$47,531,160.45** |

95.     The stock sales described above were not part of any normal or regular pattern or practice of such sales by defendants Dondero, Hutcheson and Targoff, but rather were unusual in that:

   a.     All of these defendants' stock sales occurred during the same time period;

   b.     All of these defendants' stock sales occurred soon after the Company's positive earnings releases, which contained false and misleading statements.

96.     At the time of each of the stock sales, each of these defendants knew that the Company's financial statements were false and materially overstated, and that the Company's stock price was materially inflated as a result thereof.

### *The Individual Defendants' Unjust Enrichment*

97.     Based on the Company's materially misleading and inaccurate financial results for fiscal years 2004 through 2007, the Officer Defendants have received salaries, cash bonuses, restricted stock awards and stock option grants to purchase Leap common stock.

98.     Specifically, defendants Hutcheson, Khalifa and Luvisa, based on the Company's inflated financial statements resulting from their own misconduct, received the following compensation, including stock and option awards:

| Defendant | Year | Salary | Cash Bonus | Stock Award | Number of Options Granted |
|-----------|------|--------|-----------|-------------|---------------------------|
| Hutcheson | 2006 | $541,346.00 | $100,000.00 | $926,452.00 | 116,000 |
|           | 2005 | $349,154.00 | $133,682.00 | $3,651,520.00 | 161,007 |
|           | 2004 | $334,816.00 | $602,785.00 | - | - |
| Khalifa   | 2006 | $115,385.00 | $50,000.00 | $108,081.00 | 175,000 |
| Luvisa    | 2006 | $282,654.00 | $50,000.00 | $242,806.00 | 17,500 |
|           | 2005 | $266,255.00 | $166,864.00 | $823,437.00 | 17,140 |
|           | 2004 | $200,667.00 | $235,878.00 | - | - |

99.    As a direct and proximate result of their breaches of fiduciary duties, as alleged herein, the Officer Defendants were unjustly enriched by their receipt of the salaries, cash bonuses, and stock-based awards set forth above, the amounts of which would have been substantially lower had the Company's financial results been accurately recorded.

### *Dissemination of False and Misleading Financial Statements*

100.    During the Relevant Period, the Individual Defendants, with knowledge of the improper accounting and financial practices at Leap, made false and misleading representations about Leap's business performance. They knowingly failed to disclose to Leap shareholders that the Company's outstanding financial performance was due mostly to the improper revenue recognition practices established and/or condoned by the Individual Defendants. Furthermore, the Individual Defendants knew that their misconduct was illegal and unsustainable.

101.    As such, the following statements, as known by the Individual Defendants, were false and misleading when made.

102.    On May 9, 2006, Leap reported its financial results for first quarter 2006 in a press release in which Leap's "***strong financial and operational performance***" was highlighted. For first quarter 2006, the Company reported service revenues of $215.8 million, operating expenses of $246.8 million, operating income of $19.8 million, and net income of $17.7 million. The Company also represented that the financial results reported were prepared in accordance with GAAP.

103.    In connection with the release of its first quarter 2006 financial results, defendant Hutcheson stated:

The Company had a *successful quarter, delivering strong customer growth and record-breaking adjusted OIBDA performance*…. The business continues to execute well on our strategic growth plans. *Our total net customer growth for the quarter included approximately 82,000 new subscribers in markets operating at the end of 2005, with approximately 28,000 additional new customers coming from the markets launched during the quarter.* We are looking forward to improving results over the coming quarters in our existing markets and from the launch of additional new markets planned for 2006. We expect our customer behavior will continue to have a seasonal rhythm and may be affected by rising energy prices in the short-term.

Acting CFO Dean Luvisa also stated:

The Company has proven *its ability to deliver strong year-over-year growth in adjusted OIBDA* even after the absorption of start-up losses associated with our new market launch activity…. When considering the nearly $6 million of negative OIBDA associated with new market activity during the quarter, the underlying strength of the financial performance we delivered becomes even more evident. *The improvement in adjusted OIBDA is a product of solid growth in total revenues combined with our ongoing focus on cost leadership. As a result, the business has started the year on track, performing above our expectations.*

*       *       *

We believe that the *favorable financial and operating results* delivered during the quarter validate the strategic plans we are following to advance the long-term growth prospects of our business…. The Company expects to continue driving our growth initiatives forward, building on the recent re-introduction of "pay-in-advance" billing for new and reactivating Cricket customers and the continuing efficient launch of the new markets that are currently under development. What we have done has worked, and we intend to apply the lessons learned throughout the expansion process to new opportunities for development as they arise.

Remarking on Leap's outlook, defendant Hutcheson further remarked:

Over the past several quarters we have developed and started to implement a vision for our Company's future that has touched all facets of our business - a vision that has not only strengthened the performance of our existing business but also established a solid foundation for our future growth and expansion…. We believe that *it is increasingly evident from the results we have delivered to date that we are making substantial progress* in efficiently building, launching, and bringing to cash flow positive the new markets we began acquiring nearly two years ago. The fundamental improvements that we are making to the Company's footprint provide us with the unique opportunity to provide our customers more value and also increase the operational efficiencies of our business.

104.    On May 10, 2006, Leap filed its Form 10-Q with the SEC for its first quarter 2006. The Form 10-Q included the financial results that were previously announced by the Company in its press release. The Form 10-Q was signed by defendant Hutcheson. Hutcheson also certified that the information contained in the Form 10-Q fairly presented, in all material respects, the financial condition and operations of the Company.

105.    On August 3, 2006, Leap issued a press release entitled "Leap Reports Consolidated Results for Second Quarter 2006; Strong Performance Led by Growth in Service Revenues and Operating Income."   Leap reportedly achieved service revenues of $230.7 million, incurred operating expenses of $251.4 million, and achieved operating income of $16.4 million.  Leap also represented that these financial results were in accordance with GAAP.

106.    In connection with its second quarter 2006 financial results, defendant Hutcheson remarked:

> The Company executed very well on its major initiatives, ***posting strong financial results*** as it expanded the footprint of Cricket(R) service to more than 37.3 million potential covered subscribers by the end of the second quarter…. ***The Company delivered continuing attractive customer growth*** despite some unanticipated disruptions, which have been addressed.  We remain very pleased with the pace and performance of our new market launches and we look forward to additional strong growth in the second half of the year.  We believe that the continued performance improvements we have seen in our existing markets and the progress of new market launches during the quarter indicate that the business is ***well-positioned to deliver continued growth and attractive financial performance in the coming quarters.***

Acting CFO Dean Luvisa also noted:

> The business delivered ***strong year-over-year and sequential improvements in adjusted OIBDA*** in our existing markets, as we launched and began operations in new markets well within our expected costs for capital expenditures and operating expenses….

<div align="center">*        *        *</div>

> We believe that the ***strong financial results delivered during the first half of 2006*** demonstrate the capability of the Company to deliver on our strategic plans for growth while producing strong consolidated performance in our operating business…. These results also highlight the inherent advantages of scale that exist within our business and the cash-flow generating potential we believe our business provides.  The Company is executing on the capital market activities we previously outlined with the completion of an amendment and restatement of our senior secured debt facility that allows us to continue to build our business in a thoughtful and disciplined manner.  We believe the steps we are taking to further enhance our access to capital, when combined with our expected strong cash-flow generation, put us in a solid position to achieve our strategic goals and to realize the growth opportunities for our business.

107.    On August 8, 2006, Leap filed its Form 10-Q with the SEC for its second quarter 2006.  The Form 10-Q, signed by defendant Hutcheson, contained the financial results announced by the Company in its press release.  Hutcheson also certified, pursuant to Section 302 and 906 of

1    Sarbanes-Oxley Act of 2002 ("SOX"), that the financial statements and financial information

2    contained in the Form 10-Q fairly presented, in all material respects, the financial condition of Leap.

3        108.    On November 7, 2006, Leap issued a press release regarding its third quarter 2006

4    financial results, announcing that the Company had service revenues of $249 million, total operating

5    expenses of $292.5 million, operating income of $17 million, and net income of $9.9 million.  It also

6    represented that the financial information was prepared in accordance with GAAP.

7        109.    In connection with the third quarter 2006 financial results, defendant Hutcheson

8    remarked:

> **The Company produced attractive operating results**, successfully launched a series of new markets, achieved outstanding results in Auction #66 and completed a series of capital market activities on favorable terms…. **The Company continues to see good uptake of our products and services, with our third quarter growth alone approaching the customer activity we achieved in the first half of the year.** Additionally, the Company and Denali were successful bidders on new wireless licenses in Auction #66 that will allow the Company and Denali to provide service to additional markets, and also will allow the Company to enrich its offerings in existing markets as a result of the purchase of additional spectrum in those markets. In conjunction with our capital market activities, we also announced a fully funded plan to launch up to an additional 24 million new covered POPs beginning in 2008. I am extremely proud of what our team has accomplished over the past few months. Chief Financial Officer Amin Khalifa also commented:

> We are pleased to see our continued focus on operations drive attractive results in a quarter that had several large efforts underway…. We believe that **the results we are reporting today show that Leap has continued to drive significant growth.**  For the quarter, consolidated service revenues grew a robust 29 percent year-over-year, driven primarily by a solid improvement in average revenue per user.  In addition, we saw a significant acceleration in customer growth during the quarter, achieving the highest level of net additions in over four years. Looking forward to the remainder of 2006, we expect seasonally strengthening growth in net additions during the fourth quarter from markets in operation as of December 31, 2005 (our existing markets) and continued strong customer demand in new and recently launched Cricket markets.

> *        *        *

> **The business delivered another quarter of strong growth in estimated adjusted OIBDA in our existing markets**, with a year-over-year improvement of approximately 33 percent….  In addition, the launch and operation of new Cricket markets continues to be within our expected costs for capital expenditures and operating expenses.  Looking forward to the coming year, we expect further improvements in existing market performance which, when coupled with the expected growth of newly launched markets, is anticipated to contribute to substantial adjusted consolidated OIBDA growth for 2007.  In addition to the resulting improvements in our debt ratios, we anticipate that the business will be at or near free cash-flow break-even for 2007 before any significant Auction #66 launch expenses and after servicing our debt and capital spending.

110.    On November 9, 2006, Leap filed its Form 10-Q for its third quarter 2006 financial results with the SEC, which contained the financial metrics in the November 7, 2006 press release and was signed by CEO Hutcheson.  Hutcheson certified that the financial information contained in the Form 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company, pursuant to Sections 302 and 906 of SOX.

111.    On February 27, 2007, Leap announced its fourth quarter 2006 and fiscal 2006 financial results.  Leap reported that, for fourth quarter 2006, it achieved service revenues of $277.1 million, incurred total operating expenses of $324 million, operating loss of $9.5 million, and net loss of $39 million.  For fiscal 2006, Leap reported service revenues of $972.8 million, operating expenses of $1.1 billion, operating income of $43.8 million, and net loss of $4.1 million.  Leap also represented that these financial results were prepared in accordance with GAAP.

112.    In connection with its fourth quarter and year end 2006 financial results, defendant Hutcheson noted:

> Our 2006 results reflect **well-executed strategies for growth**, anchored on the distinct value of our unlimited service propositions and the low-cost structure supporting these strategies….  In 2006, Leap and its joint ventures expanded Cricket(R) coverage to approximately 48 million covered POPs, completing this process on time and within budget.  Our fourth quarter and full year 2006 results reflect the contributions of this new market activity on customer additions, as well as the expected initial negative impact of new market launch activity on consolidated operating and net income.

CFO Khalifa expanded on Hutcheson's remarks, stating:

> **Our adjusted OIBDA performance was solid**, even as we absorbed the initial costs associated with stronger than anticipated new customer growth without the full benefit of the recurring margin these customers are expected to generate….  **Our existing markets, which we define as those markets in operation at the end of 2005, delivered another solid quarter, underscored by an all-time high ARPU of $44.68 in the fourth quarter, and estimated existing market adjusted OIBDA up 35 percent over the prior year period.**  We believe that the operational and financial results reported today continue to demonstrate our commitment to balancing our growth opportunities with cost management efforts across all dimensions of the business.

113.    On March 1, 2007, the Company filed its Form 10-K for fiscal year 2006 (period ending December 31, 2006) in which the Individual Defendants represented that the Company's "disclosure controls and procedures [have been designed] to provide reasonable assurance of achieving desired objectives" and that the "disclosure controls and procedures were effective at the

reasonable assurance level." The 2006 Form 10-K also represented that steps had been taken to remediate material weaknesses in internal controls, and that internal controls over financial reporting was effective as of December 31, 2006.

114.    On May 8, 2007, Leap issued a press release regarding its first quarter 2007 financial results, reporting "*service revenues of $326.8 million, a 51 percent increase over the prior year quarter*," operating expenses of $385.9 million, operating income of $4.3 million, and net loss of $8.1 million. Once again, Leap stated that these figures conformed to GAAP.

115.    In connection with Leap's first quarter 2007 financial results, defendant Hutcheson commented:

> *During the [first] quarter [2007], we saw continued strong customer acceptance* of our unlimited value proposition as demonstrated not only by customer additions, but also by the continued acceptance of our higher-value service plans…. *Our first quarter net customer additions were achieved from both the new markets launched in 2006 and our existing markets, which added approximately 102,000 net customers, a 24 percent increase over the prior year quarter.* In addition, more than two-thirds of our customers now subscribe to our $45 and higher service plans, resulting in *record ARPU of $45.52* for the quarter.

CFO Khalifa further elaborated:

> *Our adjusted OIBDA performance improved*, even as we continued to absorb the expected costs of acquiring new customers and the initial negative impact associated with the 2006 market launches. Additionally, we expect our 2006 market launches, in the aggregate, to turn adjusted OIBDA positive by mid year 2007. Our existing markets, defined as those in operation at the end of 2005, delivered accelerated customer growth, along with improved revenues and adjusted OIBDA. By mid year, we expect to launch new markets totaling approximately three million covered POPs, bringing our total covered POPs to approximately 51 million.

116.    The May 8, 2007 press release also included the Company's outlook for the second quarter 2007 and fiscal year 2007. The Company expected second quarter 2007 net customer additions between 125,000 and 175,000, fueled by both existing and new market customer activity, customer churn in the range of 4.1 to 4.4 percent, and adjusted OIBDA between $105 million and $115 million.

117.    On May 10, 2007, Leap also issued a Form 10-Q with the SEC for its first quarter 2007. The Form 10-Q contained the financial information previously announced by the Company and was signed by CEO Hutcheson, who also certified that the financial information in the Form 10-Q fairly presented the financial condition of Leap.

118.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

    a.    Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on May 16, 2005 and signed by defendants Hutcheson, Luvisa, Dondero, Harkey, LaPenta, Rachesky, and Targoff;

    b.    Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 27, 2006 and signed by defendants Hutcheson, Luvisa, Burton, Dondero, Harkey, LaPenta, Rachesky, and Targoff; and

    c.    Form 10-K for the fiscal year ended December 31, 2006, filed with the SEC on March 1, 2007 and signed by defendants Hutcheson, Khalifa, Burton, Dondero, Harkey, LaPenta, Rachesky, and Targoff.

119.    The foregoing financial statements were false and misleading because the Individual Defendants accounted for service revenues, equipment revenues, and operating expenses incorrectly during the Relevant Period, thus overstating net income.  Specifically, the Individual Defendants caused the Company to report the following inaccurate financial information:

| | Year Ended Dec. 31, 2006 | Year Ended Dec. 31, 2005 | Five Months Ended Dec. 31, 2004 | Seven Months Ended July 31, 2004 |
|---|---|---|---|---|
| **REVENUES** | | | | |
| **Service Revenues** | $972,781 | $763,680 | $285,647 | $398,451 |
| **Equipment Revenues** | $163,919 | $150,983 | $58,713 | $83,196 |
| **Total Revenues** | $1,136,700 | $914,663 | $344,360 | $481,647 |
| **OPERATING EXPENSES (loss)** | | | | |
| **Cost of Service** | ($261,614) | ($200,430) | ($79,148) | ($113,988) |
| **Cost of Equipment** | ($262,330) | ($192,205) | ($82,402) | ($97,160) |
| **General and Administrative** | ($197,070) | ($159,249) | ($57,110) | ($81,514) |
| **Total Operating Expenses** | ($1,114,930) | ($859,431) | ($333,922) | ($522,779) |
| **Operating Income (loss)** | $43,824 | $69,819 | $10,438 | ($40,600) |

120.    In each of Leap's Forms 10-K for fiscal years 2004 to 2006, the Individual Defendants falsely stated that the Company's consolidated financial statements were prepared in conformity with GAAP.

121.    Moreover, during the relevant period, defendants Hutcheson, Luvisa and Khalifa signed Certifications of the CEO and CFO pursuant to 18 U.S.C. Section 1350, as adopted pursuant

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                29
Case No. 08-CV-0246

to Section 906 of SOX ("Certifications"), which attested to the purported accuracy of the financial statements contained in the 2004-2006 annual reports, the effectiveness of the internal controls, and compliance with Section 13(a) of the Exchange Act, when they knew that these Certifications was false and misleading.  Because of their involvement with the improprieties, defendants Hutcheson, Luvisa and Khalifa knew that the 2004-2006 financial results overstated net income.   In the following Certifications, defendants Hutcheson, Luvisa and Khalifa falsely certified that: "(i) the accompanying Annual Report on Form 10-K of the Company . . . (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and (ii)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company:"

       a.    Defendants Hutcheson and Luvisa signed the Certification for the Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on May 16, 2005;

       b.    Defendants Hutcheson and Luvisa signed the Certification for the Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 27, 2006; and

       c.    Defendants Hutcheson and Khalifa signed the Certification for the Form 10-K for the fiscal year ended December 31, 2006, filed with the SEC on March 1, 2007.

### ***Revelation of the Individual Defendants' Wrongdoing***

122.    On August 7, 2007, the truth concerning Leap's financial condition was gradually unveiled when Leap announced disappointing results for the second quarter 2007, which caused the stock to plummet 25.3%, from $80.36 to $60, on unusually high volume.  Leap reported service revenues of $350.2 million, operating expenses of $356.3 million, operating income of $36.8 million, total revenues of $393.2 million, and net income of $3.2 million.  However, the Company's second quarter 2007 profits fell 57%, while net customer additions of 127,000 was in the low end of management's earlier projection of 125,000 to 175,000, and lower than analysts' consensus estimate of 150,000.  Churn, which management estimated at 4.1-4.4%, came in at a disappointingly high 4.3%, up 0.7% from the same quarter a year prior.

123.    During the earnings conference call with analysts following the release of second quarter 2007 financial results, analyst David Barden of Banc of America Securities inquired whether

the disappointing results should be reason for "deeper concern" about the business model. Defendant Hutcheson reassuringly responded "[w]e feel we're doing pretty good [sic]. I have to tell you. We're pleased with where we see things going."

124. On August 9, 2007, Leap filed its Form 10-Q for the second quarter 2007 with the SEC. The Form 10-Q included the financial information previously disclosed by the Company in the press release and was signed by defendant Hutcheson. Pursuant to Sections 302 and 906 of SOX, Hutcheson also certified that the financial information contained in the Form 10-Q fairly presented Leap's financial condition.

125. On September 4, 2007, MetroPCS announced in a press release that it proposed to buy Leap in a strategic stock-for-stock tax-free merger to create a fifth national wireless carrier in a deal valued at about $5.5 billion. The press release contained the text of a letter from the CEO and Chairman of MetroPCS to defendants Rachesky (Leap's Chairman) and Hutcheson (Leap's President, CEO and a director) in connection with the proposal.

126. Under the terms of the proposal, each outstanding share of Leap common stock would be exchanged for 2.75 shares of MetroPCS stock, and MetroPCS would assume or refinance about $2 billion worth of Leap's existing debt. "We believe that the combination of MetroPCS and Leap is extremely compelling and will create significant value for the stakeholders of both companies," MetroPCS chief Roger Linquist said in the press release. "The combined company will create a new national wireless carrier with licenses covering nearly all of the top 200 markets in the United States. The shareholders of both companies will have the opportunity to participate in the upside potential of the combined company and our respective employees will benefit from being a part of a larger, more diversified organization. We are excited about the prospects this opportunity creates and plan to work diligently to enter into a transaction quickly."

127. Following the announcement of MetroPCS's proposal, shares of Leap surged $10.97, or 15%, to $83.47.

128. Three days later, on September 7, 2007, Leap issued a press release announcing that the Board would review the unsolicited proposal received on September 4, 2007 from MetroPCS to acquire all of Leap. The press release also separately announced that Leap's CFO, Khalifa, had

1    resigned from the Company "to pursue other interests" and that Hutcheson would be taking on

2    Khalifa's duties as interim CFO.

3        129.    Five days later, on September 12, 2007, Leap announced that one of its directors,

4    defendant Dondero, who joined Leap's Board in 2004, resigned effective September 10, 2007. Prior

5    to resigning, Dondero sold $42 million worth of Leap stock in 2007.

6        130.    Around this time, Leap's head of investor relations also departed the Company.

7        131.    Significantly, around the time of these events in September 2007, Leap was

8    conducting a review of its service revenue activity and forecasting process.

9        132.    On September 16, 2007, Leap issued a press release stating that the Board had

10   concluded its review of the proposal from MetroPCS to merge with Leap in a stock-for-stock merger

11   transaction and determined that the proposal was not in the best interests of Leap and its

12   shareholders.

13       133.    The press release included the text of a letter written by defendant Hutcheson to

14   Roger Linquist, CEO and Chairman of MetroPCS. In his letter, Hutcheson explained that the

15   proposal "[did] not properly reflect Leap's strong growth and significant growth potential and would

16   severely undercompensate [sic] Leap's shareholders;" the proposal "offer[ed] our shareholders no

17   premium on their shares and misallocates the value of synergies to your own shareholders;" and the

18   "offer of $69.03 of value per share to our shareholders represents a 14.4% discount to Leap's 60-day

19   average trading price prior to the date of your proposal. ***We believe that there is no reason for Leap***

20   ***to abandon its bright future prospects for such insufficient consideration***." The letter concluded

21   by stating:

22           Accordingly, our Board has unanimously determined that your proposal is not in the
             best interests of Leap and our shareholders. ***Leap is well-positioned to take***
23           ***advantage of strong organic growth and strategic opportunities and your proposal***
             ***would unfairly dilute the ability of our shareholders to recognize these benefits.***
24           Our experienced management team is supported by a dedicated and highly motivated
             employee base. Indeed, our people are what give us even greater confidence that we
25           can achieve our goals in delivering significant shareholder returns as we look ahead.

26       134.    On September 16, 2007, following Leap's announcement that the Board had rejected

27   MetroPCS's merger proposal, MetroPCS responded to Leap Wireless in a press release. The press

28   release stated:

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                          32
Case No. 08-CV-0246

On September 4, 2007, MetroPCS announced its proposal to merge with Leap in a strategic stock-for-stock tax-free transaction that would create a new national wireless carrier. Under the terms of the proposal, each outstanding share of Leap common stock would be exchanged for 2.7500 shares of MetroPCS common stock.

- The proposed exchange ratio represents implied premiums of approximately 23% based on the trailing 20-day volume-weighted average stock prices for both companies for the period ending August 31, 2007 (which was the last day of trading prior to MetroPCS' proposal to Leap) as well as based on MetroPCS' and Leap's closing stock prices on August 28 2007 (which was three trading days prior to MetroPCS' announcement of its merger proposal).

- In addition, MetroPCS' proposed exchange ratio of 2.7500 shares of MetroPCS for each share of Leap common stock represents a premium valuation to Leap shareholders based on the closing stock prices for both companies on every trading day since the week following MetroPCS' initial public offering (IPO) in April 2007 through August 31, 2007.

- Most importantly, the total value implied by MetroPCS' proposed exchange ratio and Leap's shareholders' proportionate share of the approximately $2.5 billion estimated transaction synergies, which MetroPCS believes could be achieved, represents implied premiums of approximately 35% and 30% based on the trailing 20-day and the trailing 60-day volume-weighted average stock prices, respectively, for both companies for the period ending August 31, 2007.

- However, MetroPCS believes that since its IPO, Leap's stock price has traded in part in anticipation of a merger between the two companies. Accordingly, MetroPCS believes that any calculation of the premiums represented by its proposal over Leap's spot or trailing volume-weighted average trading prices on selected days or for selected periods necessarily understates the value to Leap's shareholders of this proposal in terms of premium-to-unaffected market stock price.

MetroPCS notes that within the past two months, representatives of MetroPCS held discussions, including an in-person meeting, with representatives of Leap, including Leap's Chairman of the Board, to discuss merger prospects. These talks did not lead to further substantive discussions given Leap's highly unrealistic valuation expectations.

135.    The above press release also quoted MetroPCS's CEO and Chairman, Roger Linquist, as stating, "[w]e are disappointed that Leap has chosen to reject our strategic stock-for-stock tax-free merger proposal to create a new national wireless carrier…. The contacts we have had with a number of Leap's shareholders indicate that they want to see a combination of our two companies happen without unnecessary delay. It appears that Leap's Board is ignoring the will of its shareholder base."

136.    Following Leap's rejection of the MetroPCS offer, several stock analysts downgraded Leap's stock, including analyst Ric Prentiss of Raymond James who downgraded Leap to "Market Perform" from "Outperform."

137.    On November 1, 2007, MetroPCS withdrew its bid for Leap.

138.    In a surprising turn, on November 9, 2007, Leap issued a press release announcing that it would undertake a massive restatement of the Company's financial results for fiscal years 2004, 2005 and 2006 and for the first and second quarters of 2007 to "correct for errors in previously reported service revenues, equipment revenues, and operating expenses." In addition, Leap warned the investing public that "the Company's previously issued financial statements for periods from fiscal year 2004 through the second quarter of 2007 **should not be relied upon**."

139.    In addition, the November 9, 2007 press release reported that:

> The most significant adjustment relates to the Company's prior accounting for a group of customers who voluntarily disconnected service. These customers comprised a small percentage of the Company's disconnected customers. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected. The Company also identified other errors relating to the timing and recognition of certain service revenues and operating expenses. The effect of the timing errors varied across periods. The error with the largest variation across periods related to the reconciliation of billing system data for pay in arrears customers. This error resulted in an understatement of revenue in 2004 and 2005 and an overstatement of revenue in subsequent periods as the number of pay in arrears customers in the Company's customer base declined.

> In connection with management's review, errors were also identified relating to the classification of certain components of equipment revenues and cost of equipment. Prior to June 2007, approximately $120 million of revenue from the sale of equipment was offset against related cost of equipment and reported on a net basis. The reclassification of these revenues and costs on a gross basis will not impact operating income.

> Estimated Adjustments to Prior Period Results

> The Company's preliminary estimates of the required adjustments to service revenues and operating income are set forth below. The effect of these errors on the results of the individual quarters contained in these periods varies:

| Unaudited and in thousands | Six Months Ended June 30, 2007 | Year Ended December 31, 2006 | Years Ended December 31, 2005 and 2004 |
|---|---|---|---|
| Service Revenues: | | | |
| Previously Reported | $677,021 | $972,781 | $1,447,778 |
| Adjustment (estimated) | $(14,000) | $(25,000) | $ 19,000 |

```
                              ------------  ----------  ----------------------
As Restated (estimated)          $663,021     $947,781       $1,466,778

Operating Income:
Previously Reported           $ 41,260     $ 43,824     $    39,657
Adjustment (estimated)        $(12,000)    $(20,000)    $    12,000
                              ------------  ----------  ----------------------
As Restated (estimated)       $ 29,260     $ 23,824     $    51,657
```

140.    In addition, Leap cautioned investors that its pending restatement could result in the

Company's default under certain credit agreements, as follows:

> The restatements described above may result in a default under the senior secured
> credit agreement among Cricket Communications, Inc., Leap Wireless International,
> Inc., Bank of America, N.A. and certain lenders, under which approximately $890
> million in borrowings is currently outstanding. This potential default arises from the
> Company's potential breach of representations regarding the presentation of its prior
> financial statements and not as a result of any non-compliance with its financial
> covenants.

141.    On November 16, 2007, Leap issued a press release announcing receipt of a

NASDAQ Staff Determination Letter due to failure to file its Form 10-Q.

142.    On December 13, 2007, Leap issued a press release reporting the results for the third

quarter 2007 and announcing the approximately **$31 million restatement**:

> Leap Wireless International, Inc. (NASDAQ: LEAP), a leading provider of
> innovative and value-driven wireless communications services, today announced
> financial and operational results for the third quarter of 2007. The Company reported
> service revenues for the third quarter of $354.5 million, an increase of 47 percent
> from the prior year quarter, driven by a 42 percent increase in weighted-average
> customers and an increase of $1.64 in average monthly service revenue per user
> (ARPU). Operating income for the third quarter of 2007 was $9.4 million compared
> to operating income of $7.1 million for the third quarter of 2006. Adjusted operating
> income before depreciation and amortization (OIBDA) for the third quarter of 2007
> was $95.7 million, up 87 percent from $51.2 million for the third quarter of 2006.
> The Company ended the period with 2.71 million customers, an increase of 37.8
> percent from the prior year quarter, and reported net customer additions for the
> quarter of 36,500.

> * * *

> "In September, the Company initiated a comprehensive review of our service
> revenue activity and forecasting process, which ultimately resulted in our
> announcement that we would restate financial statements for fiscal years 2004, 2005,
> 2006 and the first two quarters of 2007," continued Hutcheson. "***Over these periods,
> the restatement had a net cumulative impact of approximately $8 million on service
> revenues and approximately $23 million on operating income over these periods.***
> We have been working with our independent auditors to finalize our financial
> statements and expect to file the third quarter Form 10-Q by December 14, 2007 and
> complete the necessary amendments and restatements of the required prior annual
> and quarterly reports on or before December 31, 2007."

1        143.    On December 14, 2007, the Company filed with the SEC its quarterly report on Form

2  10-Q containing the restated financial results:

> The Company has announced it will restate its historical consolidated financial statements as of and for the years ended December 31, 2006 and 2005 (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 (Successor Company) and for the period from January 1, 2004 to July 31, 2004 (Predecessor Company). In addition, the Company will restate its condensed consolidated financial statements as of and for the quarterly periods ended June 30, 2007 and March 31, 2007.

> The determination to restate these consolidated financial statements and quarterly condensed consolidated financial statements was made by the Company's Audit Committee upon management's recommendation following the identification of errors related to the Company's accounting for revenues and operating expenses. The general nature and scope of the related errors and adjustments are summarized as follows:

> • *Errors in the Timing of Recognition of Service Revenues ("Revenue — Timing Adjustments")* — **The Company identified several timing errors in the recognition of service revenues that generally resulted from errors in the processes that the Company used to ensure that revenues were not recognized until service had been provided to customers and cash had been received from them.** The nature of these timing errors generally was that revenue that was recognized in a particular month should have been recognized in either the preceding or the following month. These errors resulted in an understatement of service revenues of $6.2 million, $2.3 million and $0.9 million in the seven months ended July 31, 2004, the five months ended December 31, 2004 and the year ended December 31, 2005, respectively, and an overstatement of service revenues of $16.1 million, $2.8 million and $2.2 million in the year ended December 31, 2006 and the quarters ended March 31, 2007 and June 30, 2007, respectively.

> • *Other Errors in the Recognition of Service Revenues ("Other — Revenue Adjustments")* — The Company incorrectly recognized revenue for a group of customers who voluntarily disconnected their service. **For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected, due to the fact that one of the key reports used to validate that revenue is not recognized for customers who have not yet paid erroneously excluded this subset of disconnected customer balances.** These customers comprised a small percentage of the Company's disconnected customers, and the error arose in connection with the Company's re-implementation of the pay-in-advance billing method for new and reactivating customers in May 2006. This error resulted in an overstatement of service revenues of $2.8 million, $2.0 million and $2.6 million in the year ended December 31, 2006 and the quarters ended March 31, 2007 and June 30, 2007, respectively. In addition, certain other errors were made in the recognition of revenue and revenue-related accounts, resulting in an understatement of service revenues of $0.8 million in the year ended December 31, 2005, an overstatement of service revenues of $2.3 million and $1.8 million in the year ended December 31, 2006 and the quarter ended March 31, 2007, respectively, and an understatement of service revenues of $0.3 million in the quarter ended June 30, 2007.

- *Errors in the Classification of Certain Components of Service Revenues, Equipment Revenues and Operating Expenses ("Reclassification Adjustments")* — The Company identified errors relating to the classification of certain components of service revenues, equipment revenues and operating expenses. **The Company incorrectly classified certain customer service fees as equipment revenue rather than service revenue. The Company incorrectly classified certain costs related to handset insurance purchased by some pay-in-arrears customers as a reduction of service revenues rather than as a cost of service. The Company incorrectly classified certain revenues received by the Company in connection with handsets sold to Company customers under insurance or other handset replacement programs as a reduction in handset costs rather than as equipment revenues.** These classification errors resulted from deficiencies in certain account analyses that resulted in the Company incorrectly analyzing certain types of transactions for their classification impacts. The errors resulted in a net understatement of total revenues and understatement of operating expenses of $4.9 million, $4.2 million, $41.4 million, $51.7 million, $10.5 million and $9.9 million in the seven months ended July 31, 2004, the five months ended December 31, 2004, the years ended December 31, 2005 and 2006 and the quarters ended March 31, 2007 and June 30, 2007, respectively. These errors had no impact on operating income or net income.

- *Other Non-Material Items ("Other Adjustments")* — The Company identified other errors that were not material, individually or in the aggregate, to its financial statements taken as a whole. However, because the Company is restating its financial statements for the effects of the items noted above, the Company revised its previously reported financial statements to correct all identified errors, including those that were not material. These items resulted in a net understatement of operating expenses of $0.5 million in the year ended December 31, 2005, a net overstatement of operating expenses of $1.1 million in the year ended December 31, 2006, a net overstatement of operating expenses of $0.5 million in the three months ended March 31, 2007 and a net understatement of operating expenses of $1.0 million in the three months ended June 30, 2007.

- *Income Tax Adjustments* — The State of Texas made certain technical corrections to the Texas Margins Tax (TMT) credit in June 2007 which confirmed that the Company was eligible for a $2.5 million TMT credit against future tax liabilities. The Company believes that it is more likely than not that the TMT credit will be realized and therefore a valuation allowance should not have been established for this item during the second quarter of 2007. Accordingly, the Company has recorded an adjustment to release that valuation allowance in the second quarter of 2007, which resulted in the realization of a $2.5 million income tax benefit and a $2.5 million increase in net income for such period.

The Company is also restating its income tax provisions for the historical periods described above to reflect the tax impact of the adjustments to pre-tax income. In particular, the Company's tax provision for the quarter ended March 31, 2007 was originally computed using an annual effective tax rate. As a result of the adjustments made to the Company's historical financial statements, the Company's revised income forecast at March 31, 2007 was lowered to a level close to break even. Under the revised forecast, a small change in the pre-tax book income projection would produce a significant variance in the effective tax rate and, therefore, it would be difficult to make a reliable estimate of the annual effective tax

rate. As a result and in accordance with Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 18, "Accounting for Income Taxes in Interim Periods — An Interpretation of APB Opinion No. 28" ("FIN 18"), the Company's restated income tax provision for the quarter ended March 31, 2007 has been calculated by applying the actual effective tax rate to the year-to-date income.

(emphasis added).

144.    On December 26, 2007, Leap filed an amended Form 10-K for fiscal year ended December 31, 2006.

This Amendment No. 1 on Form 10-K/A to the Leap Wireless International, Inc. (the "Company") Annual Report on Form 10-K for the year ended December 31, 2006 includes restated audited consolidated financial statements for the years ended December 31, 2006 and 2005 (including unaudited restated financial information as of and for the interim periods therein), for the period from August 1, 2004 to December 31, 2004 (Successor Company) and for the period from January 1, 2004 to July 31, 2004 (Predecessor Company) previously included in our Annual Report on Form 10-K for the year ended December 31, 2006 (the "Original Form 10-K").

***These previously issued audited consolidated financial statements and unaudited condensed consolidated financial statements of the Company have been restated to correct errors relating to (i) the timing of recognition of certain service revenues prior to or subsequent to the period in which they were earned, (ii) the recognition of service revenues for certain customers that voluntarily disconnected service and (iii) the classification of certain components of service revenues, equipment revenues and operating expenses.*** See Note 2 to the Company's audited consolidated financial statements included in "Part II — Item 8. Financial Statements and Supplementary Data" of this report and the information set forth in "Part II — Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations — Adjustments to Quarterly Condensed Consolidated Financial Statements (Unaudited)" for additional information. The Company also has restated its unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31 and June 30, 2007.

The Company has amended and restated in its entirety each item of the Original Form 10-K filed with the Securities and Exchange Commission (the "SEC") on March 1, 2007 (the "Original Filing Date") that required a change to reflect this restatement and to include certain additional information. These items include Item 1A of Part I and Items 6, 7, 8 and 9A of Part II. The Company has supplemented Item 15 of Part IV to include current certifications of the Company's Chief Executive Officer and Acting Chief Financial Officer pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, included as Exhibits 31 and 32 to this Amendment. No other information included in the Original Form 10-K is amended hereby.

* * *

As previously disclosed in the Company's Current Report on Form 8-K filed on November 8, 2007, the Company's consolidated financial statements previously included in the Original Form 10-K (and other SEC filings in which such financial statements were included) and in the Company's Annual Report on Form 10-K for the year ended December 31, 2005 filed with the SEC on March 27, 2006, and the Company's unaudited interim condensed consolidated financial statements previously included in the Company's Quarterly Reports on Form 10-Q for the

1  quarterly periods ended September 30, June 30, and March 31, 2006 and 2005,
2  should not be relied upon.

3     145.   On the same date, Leap filed amended Forms 10-Q for the fiscal quarters ended

4  March 31, 2007 and June 30, 2007.

5     146.   This restatement was the third time Leap restated its financial results since emerging

6  from bankruptcy in 2004. The Company previously announced restatements in May 2005 for third

7  quarter 2004, and in March 2006 for the five months ending December 31, 2004 and nine months

8  ending September 30, 2005. Despite these early warnings, the Director Defendants continued to

9  allow the Company to maintain ineffective internal controls and did not take the necessary steps to

10  correct for such material deficiencies, in breach of their fiduciary duties, resulting in material

11  misstatement of the Company's financial results.

12     147.   Through the restatement, not only did Leap admit that the 2004-2006 financial reports

13  were materially false and misleading, subjecting it to various liabilities, but the restatement also

14  caused Leap to violate certain terms of a $1.1 billion secured loan and credit facility funded by Bank

15  of America and a group of partners. While the Company managed to secure a waiver of the defaults

16  and potential defaults, the Company was required to pay a 25 basis point fee (or roughly $2.25

17  million) and a 75 basis point interest rate increase (at a cost of approximately $7 million per year).

18  The additional costs arose as a direct result of the directors' breaches of fiduciary duties.

19     148.   Then, three months after the third restatement, on February 27, 2008, Leap announced

20  the appointment of new officers to oversee its finances. Notably, defendant Burton, who served as

21  Leap's chief accounting officer and controller since June 2005, was essentially demoted to Vice

22  President, Financial Systems and Process.

23     149.   In a Form 10-K filed with the SEC on February 28, 2008, the Company identified the

24  following weaknesses in its internal controls over financial reporting as of December 31, 2007:

25       There were deficiencies in our internal controls over the existence, completeness and
        accuracy of revenues, cost of revenues and deferred revenues. Specifically, the
26       design of controls over the preparation and review of the account reconciliations and
        analysis of revenues, cost of revenues and deferred revenues did not detect the errors
27       in revenues, cost of revenues and deferred revenues. *A contributing factor was the*
        *ineffective operation of our user acceptance testing (i.e., ineffective testing) of*
28       *changes made to our revenue and billing systems in connection with the*

***introduction or modification of service offerings.*** This material weakness resulted in the accounting errors which caused us to restate our consolidated financial statements as of and for the years ended December 31, 2006 and 2005 (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 and for the period from January 1, 2004 to July 31, 2004, and our condensed consolidated financial statements as of and for the quarterly periods ended June 30, 2007 and March 31, 2007. In addition, this material weakness resulted in an adjustment recorded in the three months ended December 31, 2007, which we determined was not material to our previously reported 2006 annual or 2007 interim periods. ***The material weakness described above could result in a misstatement of revenues, cost of revenues and deferred revenues that would result in a material misstatement to the Company's interim or annual consolidated financial statements that would not be prevented or detected on a timely basis.***

## *The Individual Defendants' Failure to Ensure Adequate Internal Controls*

150.    The Individual Defendants failed to take reasonable measures to ensure the adequacy and effectiveness of the Company's controls over financial reporting, which led to Leap's three restatements and the significant decline in the value of the Company and subjected the Company to potential liability and penalties. In addition, the Company was damaged to the extent that certain of the Individual Defendants received compensation based on the Company's artificially inflated financial results.

151.    As known by the Individual Defendants, Leap has suffered material weaknesses with its internal controls since its emergence from bankruptcy, rendering its disclosure controls and procedures ineffective. A material weakness is defined as a significant deficiency, or a combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the entity's financial statements will not be prevented or detected. *See* Statement of Auditing Standard 112, Communicating Internal Control Related Matters Identified in an Audit (May 2006). The following material weaknesses existed at Leap during the Relevant Period:

   a.    ineffective account reconciliations and management analyses for recording and reporting revenue, cost of revenue and deferred revenue;

   b.    processes for ensuring revenue was recorded only when payment was received and services were provided were highly manual, involved estimates and therefore were inaccurate;

   c.    inadequate controls and procedures over changes made to Leap's revenue and billing systems;

d.      inadequate controls and procedures in place, including appropriate management or third party review, to ensure that the basis for Leap's projections were reasonable;

e.      inadequate controls to ensure the completeness and accuracy of the deferred income tax provision and the related deferred tax assets and liabilities and the related goodwill in conformity with GAAP;

f.      lack of sufficient and competent personnel to identify and address the application of GAAP and tax issues;

g.      inadequate controls surrounding the Company's application of fresh start accounting; and

h.      inadequate processes and controls in place to ensure that Leap's leases were accurately reported and recorded.

152.    Since each of their respective appointments to Leap's Board, the Director Defendants have regularly received information regarding the Company's internal controls and accounting and financial reporting practices, including any problems or material weaknesses.  Through their attendance at Board and committee meetings, conversations with management, internal auditors, and independent auditors, and receipt of reports, forecasts, and other information pertinent to the Company, the Director Defendants knew that Leap's internal controls were ineffective and, nevertheless, caused or allowed the Company to issue false and misleading financial reports that did not conform to GAAP.

153.    In announcing its third and latest restatement, Leap again admitted that its internal controls were weak and ineffective.  Leap disclosed deficiencies in the design of controls over the preparation and review of account reconciliations and analysis of revenues that Leap had previously claimed to have remediated.  Despite each of the Individual Defendants' knowledge of significant deficiencies with Leap's internal controls since at least May 2005, the Individual Defendants nonetheless failed to take reasonable measures to identify problems and allowed the Company to continue maintaining ineffective controls, which led to the $31 million restatement.

154.    Certain CWs confirm that there were significant problems with Leap's internal controls.

155.    For example, CW1, a former Director of Marketing who was knowledgeable in all marketing related expenses and was responsible for coding and entering them into Leap's financial

1    management system, stated that Leap had extremely poor financial practices throughout CW1's

2    tenure from 2002 to 2005.  Specifically, CW1 remarked there were no financial controls over the

3    coding and input of operating expenses.  CW1 further stated that "there was no executive sort of sign

4    off or approval on the particular coding of the expense.  So although they would approve in terms of

5    signatory responsibility . . . the coding in the general ledger accounts that the expense was hitting

6    was not verified or checked ever.  It was a concern."  Likewise, CW6, a former Accounting

7    Supervisor, corroborates that Leap's method of documenting operating expenses lacked consistency.

8    CW6 noted that expenses would be handled one way one month and differently the next month.

9    CW6 also raised concerns regarding the incorrect recording of expenses to his/her bosses.

10        156.    CW1 also noted that Leap's executives were well aware of the Company's problems

11   with its internal controls and accounting practices.  Concerns regarding the Company's financial

12   practices were raised in monthly financial review meetings in San Diego, which lasted about an hour

13   and a half with 20-25 people participating.  In particular, Hutcheson, Leap's vice presidents and

14   executive management attended these meetings.  At these meetings, CW1 and others expressed

15   concerns regarding the Company's lack of controls, in particular, with respect to the method of

16   coding expenses.  Defendant Hutcheson, who ran these meetings, was aware of the problems but did

17   nothing in response.  One time, after finding out that the numbers were off, Hutcheson told CW1 that

18   "the systems are the way they are.  If there is a problem, you're going to have to find it."

19        157.    CW4 also attended these monthly meetings and noted similar problems with

20   accounting for expenses and senior management's apathy towards remedying the problems.  CW4

21   recalls that members of management would often capitalize costs when they should have been

22   immediately expensed.  When CW4 raised these concerns during monthly meetings, s/he was often

23   met with hostility.  Indeed, at one monthly meeting, CW4 was publicly reprimanded by two vice

24   presidents, including the Vice President of Forecasting, for attempting to require justification for

25   capitalization of expenses.  Defendant Hutcheson, who was at the meeting, communicated that the

26   items should be capitalized.

27        158.    CW4 also personally brought these issues up with defendant Hutcheson and, in one

28   instance, explained to Hutcheson and Umetsu that the free maintenance associated with Leap's

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT          42
Case No. 08-CV-0246

1  purchase of heavy capital telecommunications equipment should not be capitalized but expensed.

2  However, CW4 was told that "in essence, they wanted to follow industry rather than GAAP. This is

3  the way we've always done it and we're going to continue to do it, because this is the way the

4  industry does it."

5       159.  CW4 also recalls that Leap's Chief Information Officer manipulated wording in

6  contracts to allow for the capitalization, rather than the immediate expensing, of costs associated

7  with software. Other senior management, including defendants Hutcheson and Luvisa and General

8  Counsel Robert Irving, Jr., were also involved in such decisions.

9       160.  Additionally, CW2 recalls that Leap had a long history of lacking leadership in the

10  finance and accounting areas. CW2 noted that Leap could not find a CFO and "decided to give up,"

11  appointing defendant Hutcheson as CFO by default despite his lack of accounting expertise or CFO

12  experience. Further, according to CW4, a former Acting Controller, Leap hired defendant Burton as

13  a controller so he could "handle" the PricewaterhouseCoopers partner auditing the company. CW4

14  maintained that "when someone says you want to 'handle your auditors,' that's a red flag."

15       **DISSEMINATION OF FALSE AND MISLEADING PROXY STATEMENTS**

16       161.  In 2006 and 2007, the Individual Defendants caused Leap to issue false and

17  misleading proxy statements in connection with the Company's annual shareholder meetings. The

18  Individual Defendants prepared and/or reviewed the 2006 and 2007 proxy statements before the

19  statements were disseminated to shareholders and filed with the SEC. Moreover, the Individual

20  Defendants knew that the proxies were materially false and misleading as they participated in the

21  improper revenue recognition practices from 2004 to 2007, described herein.

22  2006 Proxy Statement

23       162.  The Company's proxy statement disseminated to Leap's shareholders and filed with

24  the SEC on April 12, 2006 included false and misleading financial results for 2004 and 2005.

25       163.  The 2006 proxy statement falsely represented that "[o]ur discussion and analysis of

26  our results of operations and liquidity and capital resources are based on our consolidated financial

27  statements which have been prepared in accordance with accounting principles generally accepted in

28  the United States of America."

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 08-CV-0246

43

164.    The 2006 proxy statement also reiterated the Company's purported revenue recognition policy: "[s]ervice revenues for customers who pay in arrears are recognized only after the service has been rendered and payment has been received. This is because we do not require any of our customers to sign fixed-term service commitments or submit to a credit check, and therefore some of our customers may be more likely to terminate service for inability to pay than the customers of other wireless providers."

165.    The 2006 proxy statement provided the following false and misleading statement regarding the service revenues of 2004: "During the year ended December 31, 2004, service revenues increased $40.5 million, or 6%, compared to the year ended December 31, 2003. The increase in service revenues was due to a combination of the increase in net customers and an increase in average revenue per customer."

166.    The 2006 proxy statement provided the following false and misleading statement regarding the service revenues of 2005: "During the year ended December 31, 2005, service revenues increased $79.6 million, or 12%, compared to the year ended December 31, 2004. The increase in service revenues resulted from the higher average number of customers and higher average revenues per customer compared to the prior year. The higher average revenues per customer primarily reflects increased customer adoption of higher-value, higher-priced service offerings and reduced utilization of service-based mail-in rebate promotions in 2005."

167.    The 2006 proxy statement also provided Management's Report on Internal Controls over Financial Reporting, discussing its internal controls before its 2006 restatement. Management acknowledged that "[b]ased on [management's] assessment, and because of the material weaknesses described above, management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2005 . . . ." Management claimed that it implemented remediation initiatives, stating that "[t]he Company is in the process of actively addressing and remediating the material weaknesses in internal control over financial reporting described above."

168.    As known by the Individual Defendants, the foregoing statements were false and misleading because: (1) from 2004 to 2007, the Individual Defendants were improperly recognizing

1  revenue for customers who had terminated their service plan; (2) service revenues were not

2  recognized in accordance with the Company's stated policy; (3) the Individual Defendants' improper

3  accounting practices did not comply with GAAP; (4) as a result, the Company's revenues and net

4  income were overstated for 2004 and 2005, and (5) management of the Company did not maintain

5  effective internal controls and did not properly remediate the material weaknesses in internal

6  controls, as they had claimed.

7  2007 Proxy Statement

8      169.  The Company's proxy statement filed with the SEC on April 6, 2007 and

9  disseminated to Leap's shareholders included false and misleading financial results for 2004 through

10  2006.

11      170.  The 2007 proxy statement falsely represented that "[o]ur discussion and analysis of

12  our results of operations and liquidity and capital resources are based on our consolidated financial

13  statements which have been prepared in accordance with accounting principles generally accepted in

14  the United States of America."

15      171.  The 2007 proxy statement also reiterated the Company's purported revenue

16  recognition policy: "Service revenues for customers who pay in arrears are recognized only after the

17  service has been rendered and payment has been received."

18      172.  The 2007 proxy statement provided the following false and misleading statement

19  regarding the service revenues of 2006: "Service revenues increased $209.1 million, or 27.4%, for

20  the year ended December 31, 2006 compared to the corresponding period of the prior year. This

21  increase resulted from the 15.7% increase in average total customers and a 10.1% increase in

22  average revenues per customer. The increase in average revenues per customer was due primarily to

23  the continued increase in customer adoption of our higher value, higher priced service plans and add-

24  on features."

25      173.  As known by the Individual Defendants, the foregoing statements were false and

26  misleading because: (1) from 2004 to 2007, the Individual Defendants were improperly recognizing

27  revenue for customers who had terminated their service plan; (2) service revenues were not

28  recognized in accordance with the Company's stated policy; (3) the Individual Defendants' improper

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 08-CV-0246

45

1  accounting practices did not comply with GAAP; and (4) as a result, the Company's revenues and

2  net income were overstated for 2004-2006.

3               **LEAP'S REPORTED FINANCIAL RESULTS VIOLATED GAAP**

4        174.    At all relevant times, Leap's consolidated financial statements when issued, were

5  represented to be prepared in accordance with GAAP.  However, due to improper accounting

6  practices that falsely reported revenue and expenses in violation of GAAP and SEC reporting

7  requirements, Leap was required to restate its consolidated financial statements on December 26,

8  2007, for the quarters ended June 30, 2007 and March 31, 2007, for the years ended December 31,

9  2006 and 2005 and for the period from August 1, 2004 to December 31, 2004, and the period

10 January 1, 2004 to July 31, 2004.

11       175.    The same improper accounting practices were used to falsely report Leap's non-

12 GAAP financial measures.  These improper accounting practices, which were caused and/or

13 sanctioned by the Individual Defendants, resulted in the restatement of non-GAAP financial

14 measures for the quarters ended June 30, 2007 and March 31, 2007 and years ended December 31,

15 2006 and 2005.  Moreover, due to the Company's ineffective internal controls, Leap had no

16 reasonable basis to make projections and statements about net customer additions, churn and

17 operating income before depreciation and amortization ("OIBDA") during the Relevant Period.  That

18 Leap lacked a reasonable basis for its projections is significant because these non-GAAP financial

19 measures, such as ARPU, cost per gross addition ("CPGA"), churn, and net customer additions, are

20 key operating benchmarks used by Wall Street and the investing public to evaluate a carrier's

21 performance and earnings potential.  Indeed, one industry insider has noted that such metrics are

22 often just as important to the investing public as the financial statements themselves.

23       176.    As set forth in Financial Accounting Standards Board ("FASB"), Statement of

24 Concepts No. 1 ("CON 1") Objectives of Financial Reporting by Business Enterprises (November

25 1978), one of the fundamental objectives of financial reporting is that it provides accurate and

26 reliable information concerning an entity's financial performance during the period being presented.

27 CON 1, ¶ 42, states:

28

---

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    46
Case No. 08-CV-0246

Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

177.    SEC Regulation S-X requires that publicly traded companies present their annual and interim financial statements in accordance with GAAP. Financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

178.    Management is ultimately responsible for preparing financial statements that conform to GAAP. As noted by AICPA professional standards:

[F]inancial statements are management's responsibility…. [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions…are within the direct knowledge and control of management…. Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

179.    The Individual Defendants' representations made during the Relevant Period concerning revenue, operating expenses and non-GAAP financial measures of Leap were materially false and misleading when made. The representations were a series of deliberate management decisions designed to conceal the truth regarding Leap's deteriorating customer base. Both CW1 and CW4 stated that senior management was well aware of the internal control problems and issues with the Company's expense and revenue practices. The representations were also made as part of an effort to meet the unreasonable financial projections for Leap made to analysts and investors throughout the Relevant Period. Such misleading projections led to the disappointing results for the second and third quarter 2007.

180.    Specifically, the Individual Defendants, in breach of their fiduciary duties, caused or allowed Leap to violate GAAP and SEC requirements and its own accounting policies as follows:

a.    Leap improperly recognized service revenues before service had been provided to customers. This resulted in an overstatement of service revenue of $16.1 million and $5 million for the year ended December 31, 2006, and the six months ended June 30, 2007, respectively as outlined in the Company's Form 10-K/A and Form10-Q/A filed with the SEC on December 26, 2007;

b.    Leap improperly recognized service revenue from a group of customers after they had disconnected their service.  This resulted in an overstatement of service revenue of $2.8 million and $4.6 million for the year ended December 31, 2006 and the six months ended June 30, 2007, respectively;

c.    Leap improperly classified the cost of handset insurance as a reduction in revenue rather than as a cost of equipment.  This resulted in an understatement of operating expenses of $51.7 million, $20.4 million, $41.4 million, $4.2 million and $4.9 million for the year ended December 31, 2006, the six months ended June 30, 2007, the year ended December 31, 2005, the five months ended December 31, 2004 and the seven months ended July 31, 2004, respectively;

d.    Leap improperly stated non-GAAP financial measures.  Specifically, certain of the ARPU, CPGA, cash costs per month ("CCU") and churn metrics for the six months ended June 30, 2007 and the years ended December 31, 2006 and 2005 were restated and were false and misleading when made;

e.    Leap made projections and statements about net customer additions, churn and OIBDA that had no reasonable basis in an economic downturn, intensely competitive market and in a company undergoing erratic growth in 2006 and 2007; and

f.    Leap operated with a material breakdown in its accounting controls over revenue, expenses, tax, leases and the process used to issue financial projections.

181.    In addition to the accounting improprieties stated above, the presentation of Leap's financial statements during the Relevant Period also violated the following provisions of GAAP:

a.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (CON1 ¶ 34);

b.    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (CON1 ¶ 40);

c.    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON1 ¶ 50);

d.    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (CON1 ¶ 42);

e.    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (CON2 ¶¶ 58-59);

f.    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON2 ¶ 79); and

g.    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON2 ¶¶ 95, 97).

### ***Improper Recognition of Service Revenue Under GAAP***

182.    Generally, GAAP provides that revenue should not be recognized until it is realized or realizable and earned.  *See* FASB Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises ("CON 5") (December 1984), ¶83-84; Accounting Research Bulletin No. 43, Restatement and Revision of Accounting Research Bulletins (June 1953) Chapter 1A ¶1; Accounting Principles Board Opinion No. 10 Omnibus Opinion, (December 1966) ¶12.  The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller price to the buyer is fixed or determinable, collectability is reasonably assured, and the seller has substantially accomplished what it must do to be entitled to the benefits represented by the revenues which usually occurs upon delivery or performance of the services.  *See* Staff Accounting Bulletin No. 104 Revenue Recognition in Financial Statements (December 2003) and CON 5 ¶83.  Leap also had an affirmative duty to recognize revenue in interim periods in accordance with APB Opinion No. 28, Interim Financial Reporting (December 1973) ¶22, "[r]evenue from products sold or services rendered should be recognized as earned during an interim period on the same basis as followed for the full year."

183.    With the knowledge and approval of the Individual Defendants, Leap disclosed its revenue recognition policy, *i.e.*, that service revenues for customers who pay in arrears are recognized only after the service has been rendered and payment has been received.  CFO Khalifa specifically noted during the August 7, 2007 earnings conference call that "the company does not

1   recognize revenue associated with the bill until payment has been received, and services provided to
2   the customer."

3       184.    However, the Individual Defendants caused or allowed Leap to recognize service
4   revenue before service had been rendered to customers and/or before payment had been received for
5   the service, in direct violation of GAAP, SEC regulations, Leap's own disclosed accounting policy,
6   and the Company's own statements.  In other words, Leap recognized revenue that it had not earned.

7       185.    According to CW4, "revenue had been a mess for years."  She explained that
8   defendant Hutcheson was aware of issues with deferred revenue but did not want to address them,
9   directly telling CW4 "the auditors are just making a big deal of this deferred revenue.  It's not really
10  something that we need to look into."  This, among other things, resulted in revenue being
11  improperly recognized in Leap's financial statements and delayed more timely resolution of these
12  known issues.

13  ### *Improper Classification of Operating Expenses under GAAP*

14      186.    GAAP provides that expenses should be recognized as soon as it is evident that a
15  liability or expense has been incurred.  CON 5 ¶85 states that "expenses and losses are generally
16  recognized when an entity's economic benefits are used up in delivering or producing goods,
17  rendering services . . ." and "an expense or loss is recognized if it becomes evident that previously
18  recorded future economic benefits of an asset has been reduced or eliminated, or that a liability had
19  been incurred or increased, without associated economic benefits."

20      187.    In violation of GAAP and SEC regulations, Leap improperly classified costs related
21  to handset insurance as a reduction in service revenue rather than a cost of service.  In other words,
22  Leap understated operating expenses.  Although this had no effect on Leap's net income (as revenue
23  was understated by the same amount), investors and analysts relied on this information being
24  correctly classified in making investment decisions.  As stated by the Chief Accountant of the SEC,
25  Lynn E. Turner in December 1999 in a letter to the AICPA:

26          The staff believes that appropriate classification of amounts within the income
            statement or balance sheet is as important as the appropriate measurement or
27          recognition of such amounts. The staff reminds registrants that they should apply
            strictly the guidance provided in Regulation S-X regarding classification of amounts.
28          In addition, auditors should ensure that all such classifications are materially correct.

188.    Mr. Turner reiterated this point in another letter to the AICPA in October 2000:

The appropriate classification of amounts within the income statement or balance sheet can be as important as the appropriate measurement or recognition of such amounts. Recently, financial statement users have placed greater importance and reliance on individual income statement captions and subtotals such as revenues, gross profit, marketing expense, research and development expense, and operating income. SEC registrants should apply the guidance provided in SEC Regulation S-X regarding classification of amounts in financial statements.

### *Improper Statement of Non-GAAP Financial Measures*

189.    Leap disclosed non-GAAP (*i.e.*, proforma) financial metrics called ARPU, CPGA, CCU and churn, which it used to distinguish itself favorably from its competitors. During the Relevant Period, these non-GAAP financial measures were used to tout Leap's performance and were heavily relied upon by investors and Wall Street analysts.

190.    As noted by Harvey Pitt, former Chairman of the SEC, in October 2001 in a speech before the AICPA's Governing Council: "Unstructured and undisciplined, this form of financial disclosure (proforma) starts by rejecting the bedrock of all our financial disclosure requirements … Investors anxious for current, simplified, and comprehensive financial reporting, are today more likely to rely upon a company's 'proforma' disclosures than … mandated GAAP disclosures."

191.    Additionally, SEC regulations require companies that present non-GAAP (*i.e.* proforma) financial measures to do so in a meaningful manner, clearly disclose the basis of presentation and not omit material information in the presentation of the measures. *See* SEC Release Nos. 33-8039, 34-45124, FR-59. SEC Regulation S-K Item 10 also requires companies to present a reconciliation of non-GAAP measures to the most directly comparable financial measure and be presented in accordance with GAAP: "A reconciliation (by schedule or other clearly understandable method), which shall be quantitative for historical non-GAAP measures presented … of the differences between the non-GAAP financial measure disclosed or released with the most directly comparable financial measure or measures calculated and presented in accordance with GAAP."

192.    Additionally, as stated by CON1 paragraph 5: "Financial reporting includes not only financial statements but other means of communicating information that relates, directly or indirectly, to the information provided by the accounting systems - that is, information about an enterprises resources, obligations, earnings, etc."

193.    CON1, paragraph 34 goes on to state that: "Financial reporting should provide information that is useful to present and potential future investors and creditors and others in making rational investment…decisions." Financial reporting should also include explanations and interpretations to help users understand financial information provided. *See* CON1 ¶54.

194.    Contrary to these requirements, Leap, with the knowledge and acquiescence of the Individual Defendants, consistently reported false and misleading information regarding its non-GAAP financial measures. For every quarter in 2005, 2006 and the first two quarters of 2007, the Individual Defendants caused Leap to incorrectly report ARPU, CCU and CPGA, leading to the restatement of ARPU and CCU on December 26, 2007 for ten consecutive quarters. As set forth herein, Leap used improper accounting practices to falsely report service revenues and operating expenses during this period. This directly impacted the calculation of these metrics, which the Individual Defendants knew or recklessly disregarded. As a result, Leap improperly failed to present the reconciliation in accordance with GAAP as required by Item 10 of Regulation S-K.

195.    The Individual Defendants caused or allowed Leap to publish deceptively misleading ARPU, CPGA and CCU figures in violation of GAAP and SEC requirements. As discussed herein by various CWs, the Company engaged in deceptive practices to manipulate revenues and churn.

### *Leap's Misleading Projections*

196.    Throughout the Relevant Period, Leap made projections and statements about net customer additions, churn and OIBDA. SEC Regulation S-K Item 10 requires that management must have a reasonable basis and a good faith assessment of future performance to present projections. It also requires that "management should take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." SEC Regulation S-K Item 10 also states the following:

> The disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections. Investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend.

197.    The Individual Defendants did not have a reasonable basis to present projections and caused the Company to present misleading information through selective projection of only favorable items during the Relevant Period.   Indeed, CW2 who worked with the accounting department to obtain subscriber metrics stated the department had frequently revised its numbers, even for simple items.  Former Director of Marketing, CW5, remarked that the Company's method of calculating churn was indeterminable and questioned how the Company accounted for deactivations.  Also, CW1 stated that "it was all a numbers game" with defendant Hutcheson who stressed the importance of meeting numbers during the monthly meetings.  CW1 remarked, for example, the "win-back" process allowed the Company to manipulate churn and improperly recognize service revenue, which are key metrics in the telecommunications industry.

198.    Specifically, the Individual Defendants' failure to appropriately forecast growth and its effect on projections led to the disappointing results for the first two quarters of 2007.  They also failed to recognize that Leap was operating in a severe economic slowdown and an intensely competitive wireless market in 2006 and 2007 and failed to consider the impact on Leap's sub-prime customer base.  The Individual Defendants were aware of this and were improperly recognizing revenue for customers who terminated their service.

199.    Moreover, in 2006 and 2007, Leap's existing customers were disconnecting service at a rate higher than Leap had seen in the past.  Although Leap had met its churn projections in 2006 and the first two quarters of 2007, there were obvious negative patterns in Leap's customer statistics, which the Individual Defendants selectively failed to disclose:

|  | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Total 2007 |
|---|---|---|---|---|---|
| **Gross Additions** | 565,055 | 462,434 | 450,954 | 496,061 | 1,974,504 |
| **Customer Disconnected** | (246,709) | (335,643) | (414,470) | (343,989) | (1,340,811) |
| **Net Customer Additions** | 318,346 | 126,791 | 36,484 | 152,072 | 633,693 |

200.    The percentage of customers who disconnected compared to gross customer additions in 2007 was a staggering 68% -- 9% more than in 2006.  This table also shows that Leap's gross customer additions for the first three quarters of 2007 were decreasing while the number of customers who were disconnecting was increasing.  This trend was extremely unusual in an environment in which Leap and its management claimed was growing and successful.  The pattern

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 08-CV-0246

53

1  shows that the Individual Defendants knew or recklessly disregarded that Leap's customer base was

2  crumbling at least as early as the first quarter of 2007. Had the Individual Defendants appropriately

3  disclosed this trend, Leap's projections and financial results would have been more transparent and

4  useful to investors.

5      201.    On August 7, 2007, Leap stunned the market with disappointing results and

6  announced dismally low projections for net customer additions and OIBDA for the third quarter

7  ended September 30, 2007.

|  | Net Customer Additions | Churn | Adjusted OIBDA |
|---|---|---|---|
| Actual | 36,484 | 5.2% | $95.7 m |
| Estimate | 40,000-120,000 | 4.9%-5.4% | $110-120 million |

11      202.    On December 13, 2007, Leap announced that it failed to meet its projections for net

12  customer additions and adjusted OIBDA. Although, Leap met its churn projection, this was only

13  after revising the estimate significantly upwards after barely managing to meet its net customer

14  additions projection for the second quarter of 2007.

15      203.    In violation of SEC regulations, Leap did not have a reasonable basis to present

16  projections causing it to present misleading information through selective projection of favorable

17  items.

## THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY REJECTING THE METROPCS OFFER

204.    Despite knowing that the Company maintained inadequate internal controls and the

Company's financial results were materially misstated, the Individual Defendants, particularly

Hutcheson, spurned the buyout offer from MetroPCS. The Individual Defendants breached their

fiduciary duties to Leap and its shareholders in rejecting the offer and/or by putting the Company in

a precarious position so that it could not accept or negotiate a higher deal.

205.    The $4.7 billion offer by MetroPCS in which Leap was valued at $69.03 per share

was a good offer in light of Leap's true financial condition. Leap shareholders would have shared in

the tremendous upside potential of the combined company, synergies of which were valued at $2.5

1    billion.  A combination would have created a new national wireless carrier with licenses covering

2    nearly all of the top 200 markets in the U.S.

3         206.    Despite the tremendous value a combined company would have been to Leap and its

4    shareholders, the Individual Defendants rejected the offer.  The Individual Defendants knew that the

5    Company was suffering from deficiencies and material weaknesses in its internal controls and would

6    have to restate its financial results shortly, yet defendant Hutcheson nonetheless falsely represented

7    that the proposal was simply not in the best interests of Leap and its shareholders because, among

8    other things, the offer "[did] not properly reflect Leap's strong growth and significant growth

9    potential and would severely undercompensate [sic] Leap's shareholders."

10        207.    In and around the time of the MetroPCS offer, the Individual Defendants initiated an

11   "internal review of the Company's service revenue activity and forecasting process," which

12   ultimately led to the November 2007 revelation of the restatement.  The Individual Defendants could

13   not risk accepting the MetroPCS offer as the necessary due diligence review of the Company's

14   business and financials would have unveiled the deficiencies in the Company's internal controls.

15   Rather than having Leap's biggest competitor discover and/or reveal the Company's internal control

16   deficiencies, the Individual Defendants simply rejected the offer.

17        208.    In anticipation of the Company's impending restatement, defendant Dondero, Khalifa

18   and Leap's head of investor relations resigned just months before the November 2007 restatement

19   announcement.

20        209.    Defendants Rachesky, Harkey, LaPenta, and Targoff further abdicated their fiduciary

21   duties by allowing defendant Hutcheson to handle the MetroPCS offer.  Rather than encourage a

22   negotiation, defendant Hutcheson instead let his ego get in the way of the best interests of the

23   shareholders and effectively shutdown any chance for negotiations.  As CW1 stated, Hutcheson

24   "always believed that Leap was the stronger of the two players and that Leap would buy Metro.  It

25   would never be the other way around."  CW2 concurred, further stating that "[Hutcheson] was the

26   inventor of the Cricket Wireless business model.  He thought of it as his child.  MetroPCS copied the

27   Cricket model. . . . [Hutcheson] didn't want to sell to somebody who copied him"

28

210.    Additionally, while MetroPCS stated that it saw "great opportunities" for Leap employees in the combined company, the potential fate of Leap's officers, including defendant Hutcheson, was unclear.  Given the uncertainty of his role, if any, in the combined company, defendant Hutcheson was even more reluctant to accept any offer.

211.    When the $31 million restatement was revealed on November 9, 2007, Leap's stock dropped to $36.72 per share – a far cry from the $69.03 per share offered by MetroPCS, just two months before.

## THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

212.    The Company's pervasive accounting and financial reporting problems were the direct result of the Individual Defendants' breaches of fiduciary duties.

213.    In breach of their fiduciary duties, the Individual Defendants, especially the Audit Committee Defendants, knowingly accounted for the Company's revenues and expenses improperly, as described above, and failed to implement proper financial reporting and oversight procedures.

214.    In particular, the Officer Defendants and Director Defendants failed in good faith to:

a.    evaluate and ensure the adequacy of the Company's internal controls and accounting and financial reporting systems and practices;

b.    evaluate and ensure the adequacy of the Company's compliance with laws and regulations relating to financial reporting; and

c.    ensure that the financial statements were prepared in accordance with GAAP.

215.    The Audit Committee Defendants, from 2004 to 2007, prepared and reviewed all financial statements of the Company, held committee meetings and met with management regularly regarding the Company's accounting practices and compliance with applicable regulations.  As such, the Audit Committee Defendants knew of the accounting problems but did nothing to rectify or prevent them.

216.    According to the Company's proxy statement filed with the SEC on August 10, 2005, "[t]he Audit Committee held nine meetings during the 2004 fiscal year."  Moreover, the Audit Committee's responsibilities include "meeting with [the Company's] management, [its] independent auditors and [its] senior internal audit executive to discuss: (i) each annual audit, major issues

1  regarding accounting principles and financial statement presentations, complex or unusual

2  transactions, and other special financial issues; (ii) analyses prepared by management or the

3  independent auditors of significant financial reporting issues and judgments made in connection with

4  the preparation of the financial statements; and (iii) the effect of recent regulatory and professional

5  accounting pronouncements and off-balance sheet structures on the financial statements." As stated

6  in the Report of the Audit Committee for fiscal year 2004, "the Audit Committee has reviewed and

7  discussed the audited financial statements of Leap as of December 31, 2004 and for the periods from

8  January 1, 2004 to July 31, 2004 and from August 1, 2004 to December 31, 2004 with both

9  management and PricewaterhouseCoopers LLP."

10      217.    According to the Company's proxy statement filed with the SEC on April 12, 2006,

11  "[t]he Audit Committee held ten meetings during the 2005 fiscal year." In the Report of the Audit

12  Committee, the Audit Committee stated that "the Audit Committee has reviewed and discussed the

13  audited financial statements of Leap as of and for the year ended December 31, 2005 with both

14  management and PricewaterhouseCoopers LLP."

15      218.    According to the Company's proxy statement filed with the SEC on April 6, 2007,

16  "[t]he Audit Committee held seven meetings during the 2006 fiscal year." As stated in the Report of

17  the Audit Committee for fiscal year 2006, "the Audit Committee has reviewed and discussed the

18  audited financial statements of Leap as of and for the year ended December 31, 2006 with both

19  management and PricewaterhouseCoopers LLP."

20      219.    The Audit Committee Defendants breached their fiduciary duties by knowingly

21  employing improper accounting practices at the Company in violation of GAAP and disseminating

22  false and misleading financial statements resulting therefrom.

23      220.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary

24  duties, Leap has sustained damages, including, but not limited to, costs and expenses incurred in

25  connection with the Company's internal review and restatement of historical financial statements.

26

27

28

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

221.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment and other violations of law.

222.    Plaintiff is an owner of Leap common stock and was an owner of Leap common stock at all times relevant hereto.

223.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

224.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Leap Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

225.    The Board currently consists of five (5) directors: defendants Hutcheson, Harkey, LaPenta, Targoff, and Rachesky.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.    Defendants Hutcheson, Harkey, LaPenta, Targoff, and Rachesky knowingly caused or permitted the wrongs alleged herein and participated in efforts to conceal or disguise those wrongs from Leap and its stockholders. Accordingly, defendants Hutcheson, Harkey, LaPenta, Targoff, and Rachesky face a substantial likelihood of liability for their misconduct and are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

b.    Defendants Hutcheson and Targoff face a substantial likelihood of being held liable for engaging in illegal insider trading of Leap securities, as alleged herein, and therefore they are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

c.    The principal professional occupation of defendant Hutcheson is his position as President and CEO of Leap, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Accordingly, defendant Hutcheson lacks independence from defendants Rachesky and Targoff, who are not disinterested and/or independent and who exert influence over defendant Hutcheson's compensation by virtue of their position as members of the Board's Compensation Committee.  This lack of independence renders defendant Hutcheson incapable of impartially considering a demand to commence and vigorously prosecute this action;

d.   Defendants Harkey, LaPenta, and Targoff, as Audit Committee members, knowingly prepared, approved and/or signed false and misleading financial statements, proxy statements and other SEC filings in violation of GAAP, as described above.  Accordingly, defendants Harkey, LaPenta, and Targoff face a substantial likelihood of liability for their misconduct and are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action; and

e.   Defendants Hutcheson, Harkey, LaPenta, Targoff, and Rachesky, as directors, knowingly prepared, approved and/or signed false and misleading financial statements, proxy statements and other SEC filings in violation of GAAP, as described above.  Accordingly, defendants Hutcheson, Harkey, LaPenta, Targoff, and Rachesky face a substantial likelihood of liability for their misconduct and are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

226.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

227.   As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

228.   As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things: (i) establishing or allowing the improper accounting and financial reporting practices at Leap; (ii) willfully ignoring the obvious and pervasive problems with Leap's internal control practices and procedures and failing to make a good faith effort to correct the problems or prevent their recurrence; (iii) knowingly disseminating to Leap shareholders false and misleading financial statements and proxy statements; (iv) failing to maintain adequate internal controls; (v) violating GAAP; and (vi) rejecting the buyout offer from MetroPCS while knowing the Company's true business and financial condition and/or by putting the Company in a precarious position so that it could not accept or negotiate a higher deal.

229.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and

1  expenses incurred in connection with the Company's internal review and restatement of historical

2  financial statements.

3

4                                    **COUNT II**

5  **AGAINST THE INDIVIDUAL DEFENDANTS**
   **FOR GROSS AND RECKLESS MISMANAGEMENT**

6          207.    Plaintiff incorporates by reference and realleges each and every allegation contained

7  above, as though fully set forth herein.

8          208.    By their actions alleged herein, the Individual Defendants, either directly or through

9  aiding and abetting, abandoned their responsibilities and fiduciary duties with regard to prudently

10 managing the assets and business of Leap in a manner consistent with the operations of a publicly

11 held corporation.

12         209.    As a direct and proximate result of the Individual Defendants' gross mismanagement

13 and breaches of duty alleged herein, Leap has sustained significant damages in excess of tens, if not

14 hundreds, of millions of dollars.

15         210.    As a result of the serious misconduct and breaches of duty alleged herein, the

16 Individual Defendants are liable to the Company.

17

18                                   **COUNT III**

19 **AGAINST THE INDIVIDUAL DEFENDANTS**
   **FOR WASTE OF CORPORATE ASSETS**

20         211.    Plaintiff incorporates by reference and realleges each and every allegation contained

21 above, as though fully set forth herein.

22         212.    By failing to properly consider the interests of the Company and its public

23 shareholders in their failure to conduct proper supervision, the Individual Defendants have caused

24 Leap to waste valuable corporate assets by, *inter alia*, forcing the Company to potentially incur

25 millions of dollars in legal liabilities and/or legal costs to defend the Individual Defendants'

26 unlawful actions and causing the Company to incur millions of dollars in additional interest expense

27 due to Leap's violation of the $1.1 billion secured loan and credit facility.

28

1    213.    As a result of this egregious waste of corporate assets, the Individual Defendants are

2    liable to the Company.

3

4                                    **COUNT IV**

5    **AGAINST DEFENDANTS HUTCHESON, KHALIFA, TARGOFF, DONDERO, AND
     LUVISA FOR UNJUST ENRICHMENT**

6    230.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set

7    forth fully herein.

8    231.    Defendants Hutcheson, Khalifa and Luvisa were unjustly enriched by their receipt of

9    salaries, cash bonuses, restricted stock awards and stock option grants to purchase Leap common

10   stock based on false and misleading financial statements, as alleged herein, and it would be

11   unconscionable to allow them to retain the benefits thereof.

12   232.    Defendants Hutcheson, Targoff and Dondero were unjustly enriched by their sales of

13   their personally held and/or beneficially held shares of Leap common stock based on material non-

14   public information concerning the Company's improper accounting and financial practices and

15   pervasive violations of GAAP that ultimately necessitated the restatement of more than three years

16   of the Company's financial results, as alleged herein, and it would be unconscionable to allow them

17   to retain the benefits thereof.

18

19                                   **COUNT V**

20   **AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF
     SECTION 14(a) OF THE SECURITIES AND EXCHANGE ACT**

21   233.    Plaintiff incorporates by reference and realleges each and every allegation set forth

22   above, as though fully set forth herein.

23   234.    Rule 14-A-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides

24   that no proxy statement shall contain "any statement which, at the time and in the light of the

25   circumstances under which it is made, is false or misleading with respect to any material fact, or

26   which omits to state any material fact necessary in order to make the statements therein not false or

27   misleading." 17 C.F.R. §240.14-A-9.

28

---

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                61
Case No. 08-CV-0246

1    235.    The proxy statements described herein violated Section14(a) and Rule 14-A-9

2    because the Individual Defendants made false and misleading statements and omitted material facts,

3    including the fact that they were improperly recognizing revenue, a practice which the Individual

4    Defendants were aware of and participated in from 2004 to 2007.

5    236.    The Individual Defendants knew that the proxy statements were materially false and

6    misleading.  The revelation of the improper accounting practices would have been important to

7    shareholders in deciding how to vote on the election of directors and compensation plans for

8    executives.

9    237.    The misrepresentations and omissions in the proxy statements were material.  The

10    proxy statements were an essential link in the accomplishment of the continuation of the Individual

11    Defendants' improper accounting practices, as revelations of the truth would have immediately

12    thwarted a continuation of such practices.

13    238.    The Company was damaged as a result of the material misrepresentations and

14    omissions in the proxy statements in 2006 and 2007, as alleged herein.

15

16
## COUNT VI

17
### AGAINST HUTCHESON, TARGOFF AND DONDERO FOR
### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

18    239.    Plaintiff incorporates by reference and realleges each and every allegation set forth

19    above, as though fully set forth herein.

20    240.    At the time of the stock sales set forth herein, defendants Hutcheson, Targoff and

21    Dondero knew of the undisclosed adverse information by which they intended to take advantage.  As

22    a result, when the insider sales were made, they failed to disclose that they were engaged in a plan

23    and scheme to injure Leap and its shareholders and waste corporate assets.  Defendants Hutcheson,

24    Targoff and Dondero knew the information described above and sold Leap common stock on the

25    basis of such information.

26    241.    At the time of the stock sales set forth herein, the information described above was

27    proprietary non-public information, relating to the Company's financial condition and future

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    62
Case No. 08-CV-0246

1  business prospects. It was a proprietary asset belonging to the Company, which defendants

2  Hutcheson, Targoff and Dondero used for their own benefit when they sold Leap common stock.

3      242.   Since the use of the Company's proprietary information for one's own gain

4  constitutes a breach of fiduciary duties, the Company is entitled to the imposition of a constructive

5  trust on any profits that defendants Hutcheson, Targoff and Dondero obtained thereby.

6      WHEREFORE, Plaintiff demands judgment as follows:

7      a.   Against all of the Individual Defendants and in favor of the Company for the
8  amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of law;

9      b.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and violations of law;

10

11      c.   Imposing a constructive trust in favor of the Company for the amount of proceeds defendants Hutcheson, Targoff and Dondero received from their
12  sales of Leap common stock alleged herein and the amount of proceeds defendants Hutcheson, Khalifa and Luvisa derived from their service as directors and/or executives of the Company alleged herein;

13

14      d.   Ordering defendants Hutcheson, Targoff and Dondero to disgorge to the Company all proceeds derived from their sales of Leap common stock
15  alleged herein and defendants Hutcheson, Khalifa and Luvisa to disgorge to the Company all proceeds derived from their service as directors and/or executives of the Company alleged herein;

16

17      e.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and
18  expenses; and

19      f.   Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

20

21      Plaintiff demands a trial by jury.

22  DATED: September 12, 2008     Respectfully submitted,

23      GERGOSIAN & GRALEWSKI LLP

24

25      /s/ Edward. M. Gergosian
    Edward M. Gergosian (105679)
26      655 West Broadway, Suite 1410
    San Diego, CA 92101
27      Telephone: (619) 237-9500
    Facsimile: (619) 237-9555

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Nichole Browning (251937)
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
Telephone: (925) 945-0200
Facsimile:  (925) 945-8792
-and-
Eric L. Zagar (250519)
Tara P. Kao
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

MILBERG LLP
Jeff S. Westerman (94559)
Michelle Furukawa (234121)
Andrew J. Sokolowski (226685)
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975

*Co-Lead Counsel for Plaintiff*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. 08-CV-0246

64

1

## CERTIFICATE OF SERVICE

2    I, Johanna Cervantes, declare as follows:

3    I am at least 18 years of age, and not a party to this action. My business address is 655 West

4    Broadway, Suite 1410, San Diego, California 92101.

5    On September 12, 2008, the following document was filed electronically with the Clerk of

6    Court via ECF and the ECF will send an electronic notice to all parties registered for electronic filing

7    in this case:

8    **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

9    I declare under penalty of perjury under the laws of the State of California that the foregoing

10    is true and correct.

11    DATED: September 12, 2008

12                                            Johanna Cervantes

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE                                                          1
Case No. 08-CV-0246

1                                     **<u>VERIFICATION</u>**

2         I, NICHOLE BROWNING, hereby declare as follows:

3         1.      I am an attorney of the law firm of Schiffrin, Barroway, Topaz & Kessler, LLP,

4 counsel for plaintiff Charles Graham in the above-entitled action. I have read the foregoing Verified

5 Consolidated Shareholder Derivative Complaint and know the contents thereof. I am informed and

6 believe the matters therein are true and on that ground allege that the matters stated therein are true.

7         2.      I make this Verification because plaintiff Charles Graham is absent from the County

8 of Contra Costa, California where I maintain my office.

9         Executed this 12th day of September, 2008.

10

11

12                                           */s/ Nichole Browning*

                                          NICHOLE BROWNING

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28